JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - x

STARR INTERNATIONAL COMPANY,
INC., INDIVIDUALLY AND
DERIVATIVELY ON BEHALF OF          :
AMERICAN INTERNATIONAL GROUP,
INC.,                              :

                                       Plaintiff,          **VERIFIED COMPLAINT**

       - against -

FEDERAL RESERVE BANK OF NEW          **JURY TRIAL DEMANDED**
YORK,                              :

                                     Defendant,          :

and AMERICAN INTERNATIONAL
GROUP, INC., a Delaware corporation,          :

                              Nominal          :
                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Starr International Company, Inc. ("Starr International") individually, and

derivatively on behalf of nominal defendant American International Group, Inc. ("AIG" or the

"Company"), alleges for this Verified Complaint with knowledge as to its own acts and status

and acts taking place in its presence, and upon information and belief as to all other matters, as

follows:

## NATURE OF THIS ACTION

    1.     This is a direct and shareholder derivative action brought by Starr International on

behalf of itself and on behalf of nominal party AIG against the Federal Reserve Bank of New

York ("FRBNY") as controlling shareholder and controlling lender for violating duties owed to

Starr International and AIG and for coercing, inducing, and requiring AIG directors and officers to violate their duties to Starr International and AIG.

2.      As described in more detail in *Starr International Co. v. United States*, filed earlier today in the Court of Federal Claims, beginning in September 2008 and continuing until at least January 2011, the Government imposed a series of transactions on AIG that resulted in depriving AIG and its shareholders of tens of billions of dollars.  In the initial transaction on September 17, 2008, FRBNY provided AIG with a fully secured $85 billion line of credit at a 14.5% interest rate and AIG agreed to give up approximately 80% of its equity to the United States Treasury.

3.      Both the punitive interest rate imposed on AIG and the appropriation of 80% of the Company's equity was discriminatory, unprecedented, and inconsistent with liquidity assistance offered by the Government to other comparable firms at the time.  As described in *Starr International Co. v. United States*, those transactions represented discriminatory takings of the property and property rights of AIG and its shareholders without due process or just compensation in violation of the Equal Protection, Due Process, and Takings Clauses of the United States Constitution.

4.      Those transactions also resulted, beginning on September 17, 2008, with the FRBNY controlling AIG.

5.      As a result of the FRBNY's position and power as a controlling shareholder and controlling lender, the FRBNY assumed fiduciary duties, and other duties and obligations, to AIG and its shareholders.  The FRBNY's control and position also enabled it to control AIG's officers and directors and to cause them to breach their duties to AIG and its shareholders.  This

action seeks to recover damages for the harm done to AIG and its shareholders after the FRBNY began to control AIG.

6.    For more than two years, beginning in September 2008, the FRBNY repeatedly breached its duties to AIG and its shareholders. For example, beginning in November 2008, the FRBNY orchestrated a complex series of transactions by which AIG was required to transfer "collateralized debt obligations" ("CDOs"), $35 billion of collateral previously posted by AIG to secure those obligations, and an additional $5 billion in equity to an entity (Maiden Lane III, or "ML III") controlled by FRBNY. FRBNY then used its control over ML III effectively to pay AIG's credit default swap counterparties 100 cents on the dollar for "CDO" obligations which at the time could have been compromised for substantially less than 100 cents on the dollar. Moreover, FRBNY required AIG, in addition to paying 100 cents on the dollar, to provide its counterparties with releases of claims related to those CDOs.

7.    FRBNY was ostensibly motivated in these transactions by a desire to help the counterparties weather the financial crisis without confronting the public and political opposition that the FRBNY feared would arise if it aided the counterparties openly and directly. Regardless of whether the FRBNY's support of the counterparties was good or bad public policy, in using AIG and AIG's assets to accomplish a secret "backdoor bailout" of AIG's counterparties, FRBNY breached the duties it, and those acting in concert with FRBNY, owed to AIG. As a result of this breach, AIG and its shareholders lost billions of dollars.

8.    FRBNY then concealed both the identity of the counterparties receiving payments as well as the fact that those counterparties were paid in full. FRBNY's efforts to conceal the identity of the counterparties and the fact that they were paid 100 cents on the dollar evidences FRBNY's awareness of the impropriety of its conduct. Eventually, the identities of the

counterparties and the fact that they received payment in full were disclosed, prompting extensive criticism of FRBNY. Although FRBNY then attempted to justify its failure to obtain concessions from the counterparties by offering various excuses, subsequent investigations have demonstrated that those justifications were at best pretextual.

9.      FRBNY also breached its duties to AIG and its shareholders by engaging in self-dealing for its benefit and AIG's detriment. For example, during the time FRBNY controlled AIG, an approximately two-thirds interest in collateral previously posted by AIG to secure the ML III CDO obligations was transferred to FRBNY without fair consideration and without shareholder approval.

10.     FRBNY further breached its duties to AIG and its shareholders by later conveying the CDO securities ML III received when it paid off AIG's CDO obligations at 100 cents on the dollar to favored third parties at prices less than the securities were worth at the time.

11.     FRBNY also breached its duties to Common Stock shareholders of AIG by participating in, and causing AIG's officers and directors to participate in, the evasion of AIG's existing Common Stock shareholders' right to approve the massive issuance of the new Common Stock shares required to complete the Government's taking of a nearly 80% interest in the Common Stock of AIG.

12.     Under Delaware law, the existing Common Stock shareholders were entitled to a separate class vote to decide whether the authorized Common Stock of the Company would be increased to allow the demanded appropriation of a nearly 80% interest in that Common Stock. In connection with the FRBNY's "bailout" transaction, AIG shareholders commenced an action in the Delaware Court of Chancery expressly to ensure that this requirement be met. AIG's commitments in that action, subsequent securities filings by AIG, and the controlling Stock

Purchase Agreement itself, all explicitly contemplated that the approximately 80% interest in the Common Stock of AIG could be appropriated only if the holders of the Common Stock of AIG approved, by a separate class vote, an amendment to the AIG Certificate of Incorporation to increase the authorized shares of the Company.

13.     The actual vote of the Common Stock shareholders rejected the increase in authorized shares.  Nevertheless, during the period FRBNY controlled AIG, FRBNY deliberately circumvented that vote.  In so doing, FRBNY again breached, and caused AIG's officers and directors to breach, the duties they owed to AIG and its shareholders.

14.     In addition, as described in more detail below, in a series of self-dealing transactions, FRBNY used its control over AIG to divert the rights and assets of AIG and its shareholders to itself and favored third parties, including taking two-thirds of the residual value of ML III even though it contributed no equity and even though the entire residual value was based on collateral AIG had posted before FRBNY took control of AIG.

15.     After FRBNY assumed control of AIG, FRBNY internally recognized that there were alternatives available to the actions that FRBNY was taking and causing AIG to take that were much more favorable to AIG and its shareholders than the actions actually taken.  One of those alternatives was providing loan guarantees, which FRBNY had the authority to do. Another alternative was filing for bankruptcy protection.  However, FRBNY did not pursue such alternative actions or present such alternatives to AIG's Board.

16.     FRBNY's actions during the period it controlled AIG breached its duties to AIG and its shareholders and caused AIG and its shareholders substantial damages.

**THE PARTIES**

17.     Plaintiff Starr International Company, Inc., is a Panama Corporation with its principal place of business in Switzerland.  The sole common stockholder of Starr International

5

is a charity that provides millions of dollars of support to humanitarian, educational, and medical causes. It is currently and was at all relevant times, a shareholder of AIG. At the time of the conduct at issue in this action Starr International was the largest shareholder of AIG Common Stock.

18.     Nominal Party AIG is a Delaware corporation with its principal executive offices located at 180 Maiden Lane, New York, New York. AIG is a holding company that provides a broad range of insurance and financial services through its subsidiaries in the United States and internationally.

19.     Defendant Federal Reserve Bank of New York is one of 12 regional Reserve Banks. FRBNY's principal place of business is located at 33 Liberty Street in New York, New York.

## JURISDICTION

20.     This Court has federal question jurisdiction under 12 U.S.C. § 632, which expressly provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits". Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(1) because defendant Federal Reserve Bank of New York's principal place of business is located in this District.

## FACTUAL ALLEGATIONS

**I.     Background of AIG**

21.     AIG was founded in 1967. Under the leadership of Maurice R. "Hank" Greenberg, who took over as CEO in 1968, AIG became a publicly held company in 1969 and grew into the world's largest group of insurance and financial services companies. When Mr. Greenberg retired as CEO in March 2005 AIG's market capitalization was more than $130

billion.  In early 2008, AIG's market capitalization was also more than $130 billion.

## II.     AIGFP and Credit Default Swaps

22.     One of AIG's businesses, beginning in the 1980s, was entering into contracts called "derivatives," in which one party in effect paid the other party a fee to take on the risk of business transaction.  This business was conducted by AIG Financial Products ("AIGFP").

23.     In 1998, at the request of J.P. Morgan Chase & Co. ("JPM"), AIGFP expanded the business of taking on risk in financial transactions entered into by AIG's clients (called "counterparties") in exchange for periodic payments to include writing a type of financial insurance on a structured debt offering JPM was assembling.  The insurance provided that if the underlying debt securities JPM was offering failed to perform as expected and did not generate sufficient cash to allow the securities to meet their interest payment obligations, AIGFP would, in effect, buy the securities from the holders at the initial offering price, thereby taking on the risk that the securities would not perform.  This was an early form of what came to be known as a "credit default swap" (or "CDS").

24.     CDSs are contracts that function much like insurance policies for debt securities instruments.  In exchange for payments made over a period of time by a counterparty, the party writing the CDS is obligated to pay the counterparty the par value of the referenced debt instrument in the event that instrument defaults.  The party writing the CDS then succeeds to the counterparty's interest in the referenced debt instrument.

25.     Between the time AIGFP began writing CDSs in 1998 and the time Mr. Greenberg retired as AIG's CEO in March 2005, AIGFP had written a total of about 200 CDSs totaling approximately $200 billion in notional amount.  Most of these CDSs were based on underlying corporate debt.

26.     Until Mr. Greenberg retired as CEO in March 2005, AIG carefully scrutinized

each CDS transaction entered into by AIGFP to limit and manage the risks assumed. From 1987

through 2004, AIGFP earned approximately $5 billion in profits.

27.     After Mr. Greenberg retired, AIGFP increasingly began to enter into credit default

swaps on securities that included subprime residential mortgages.

28.     Between March 2005 and December 2005, for example, AIGFP wrote

approximately another 220 CDSs – more than in the entire period before Mr. Greenberg left AIG.

Moreover, most of these new CDSs referenced, not corporate debt, but subprime mortgage debt.

29.     The securities that were referenced by the CDSs written by AIGFP included

"collateralized debt obligations" ("CDOs"). A CDO is a complex type of structured investment

product that is typically backed by a pool of fixed-income assets. The collateral backing of a

CDO can consist of various types of assets, including asset-backed securities ("ABSs"). The

CDO then essentially repackages the income stream of those assets into separate securities that

are tiered by "tranche," that is, arranged in a hierarchy of subordinated payment priority from

senior to junior. Each tranche has its own risk profile, with each more senior tranche being less

risky than those subordinated to it. Each tranche is purportedly designed to pay an interest rate

commensurate with the level of risk assigned to it, which permits each tranche to be rated

independently from the other tranches. Thus, an investor in a CDO may choose from among

differently rated securities relating to the CDO, each paying an interest rate purportedly

commensurate with the level of risk that the investor will be taking on. CDOs are derivatives,

meaning their value is derived from events related to a defined set of reference securities that

may or may not be owned by the parties involved.

30.     One common type of ABS used to form CDOs was mortgage-backed securities

("MBSs"), usually residential mortgage-backed securities ("RMBSs"), which are securities

backed by pools of residential mortgages, often from diverse geographic areas. CDOs can be backed by other types of securities also, and when the flow of new subprime mortgages was insufficient to generate new RMBSs to package together into new CDOs, CDO collateral managers sometimes used securities issued by other CDOs as the asset pool for new CDOs. This type of CDO is sometimes called a "CDO squared" or "synthetic" CDO.

31.     In technical terms, a synthetic CDO is a form of collateralized debt obligation in which the underlying credit exposures are taken on using a credit default swap rather than by having a vehicle buy assets such as bonds. A synthetic CDO is a complex financial security used to speculate or manage the risk that an obligation will not be paid (i.e., credit risk). A synthetic CDO is typically negotiated between two or more counterparties that have different viewpoints about what will ultimately happen with respect to the underlying reference securities. Various financial intermediaries, such as investment banks and hedge funds, may be involved in selecting the reference securities and finding the counterparties. Synthetic CDO securities are not typically traded on stock exchanges.

32.     In late 2005, senior executives at AIGFP concluded that writing CDSs on CDOs dependent on subprime mortgage debt was unacceptably risky, and in December 2005, AIGFP decided to stop writing new CDSs for CDOs backed by subprime mortgage debt. However, the CDS contracts AIGFP had already written remained on its books. As written by AIG in the period after Mr. Greenberg left AIG, these CDSs presented at least two types of risk: credit risk and collateral risk.

33.     The par value, or "notional" amount, of the CDOs underlying the CDSs written by AIGFP was important because if any of those CDOs defaulted – meaning the CDO could no longer meet its obligations to pay interest to holders of the securities – under the CDS's terms

AIG was responsible for paying whatever portion of the obligations to the holders of the securities was not met by the defaulted CDO. In the worst case, AIG would be required in effect to purchase the CDO at full value. If the CDO had no value, this could result in a 100% loss to AIG. This was the "credit risk."

34.     "Collateral risk" is the risk that AIG would have to post collateral in connection with a CDS. Because a CDS contract is a form of guarantee, which under certain conditions can require the swap issuer to pay the counterparty up to the notional amount of the CDO, the swap contracts sometimes contain provisions requiring the swap issuer to post collateral as an assurance that the issuer of the swap will be able to perform its obligation in the event of a default. Many of AIGFP's CDS contracts written after Mr. Greenberg left AIG contained a provision requiring AIGFP to post collateral if AIGFP's credit rating fell or if the valuation or rating of the CDOs underlying the CDSs fell below a certain threshold.

## III.    The Liquidity Issues Facing AIG in the Summer of 2008

35.     As has been widely documented, in or about 2007, the previously high-flying housing market began to falter, leading to a cascade of economic problems that precipitated a global financial crisis that reached a flash point in September 2008. These severe problems included rising mortgage default rates, falling home values, failures of hedge funds that had long positions in the mortgage market, and bankruptcies of many subprime mortgage lenders and servicers. These events, which continued throughout 2007 and 2008, increasingly exposed AIG to heightened risk, particularly collateral risk, on its CDS portfolio, and ultimately contributed to AIG's liquidity crisis in 2008.

36.     Beginning in 2007, growing global financial problems – and in particular subprime mortgage issues – caused AIGFP's CDS counterparties to claim that the value of the underlying CDOs was falling precipitously and to make increasingly large collateral calls on

AIGFP.  Those claims by AIGFP's counterparties increased in the spring and summer of 2008. It was the collateral risk, not the credit risk, that primarily fueled AIG's liquidity problems. Significantly, as discussed in more detail below, even the troubled CDOs transferred to ML III have proved ultimately to have substantial value.

37.     Despite AIG's diverse holdings, with assets more than sufficient to meet AIG's obligations to its counterparties, many of AIG's assets were relatively illiquid and would have been difficult to sell quickly, or to sell quickly at prices reflecting their value.  AIG's liquidity was also being pressured because of the impact of the crisis on its securities lending program.

38.     In addition, beginning around the same time, the securities lending program operated by AIG insurance subsidiaries also began to exert liquidity pressure on AIG.  Under that program, those subsidiaries lent securities to counterparties in exchange for cash collateral, which, after Mr. Greenberg's retirement, the AIG subsidiaries then used to purchase RMBS and other assets.  In 2007, AIG began to experience a growing differential between its liability to return that cash collateral to the counterparties and the fair value of the RMBS and other assets the subsidiaries purchased with that cash collateral.

39.     Although AIG posted substantial amounts of collateral in or around the summer of 2008 – approximately $14.8 billion in total – AIG did not have liquid assets sufficient to cover these increasing collateral calls and liquidity shortfalls generated by the securities lending program.  As a result, AIG faced a liquidity squeeze in or around July 2008 and continuing into September 2008.

40.     In or around July 2008, AIG's then-Chief Executive Officer, Robert B. Willumstad, expressed concern to AIG's Board of Directors regarding a potential liquidity crisis, telling them the only source from which the Company could secure enough liquidity if such a

crisis occurred was the government.

**IV.    Defendant Refused to Allow AIG Access to the Federal Reserve's Discount Window or to Take Other Remedial Measures, Forcing AIG to Accept a Bailout Through Which FRBNY Effectively Took Control of AIG and Became A Controlling Shareholder and Lender of AIG.**

41.    On July 29, 2008, Mr. Willumstad approached the President of FRBNY to explain AIG's liquidity situation and request access to the Federal Reserve System's discount window, which would have solved AIG's liquidity issues.  At the time, AIG's assets substantially exceeded its actual and potential liabilities.  AIG's problem was a liquidity problem, not a solvency problem.  Nevertheless, AIG was denied access to the Federal Reserve's discount window.

42.    In response, Mr. Willumstad noted that a number of institutions, including nondepository institutions like AIG, had been permitted access to the discount window after the failure of Bear Stearns Companies, Inc. in March 2008.  However the Federal Reserve continued to decline to permit AIG access to the Federal Reserve's discount window.

43.    On September 9, 2008, Mr. Willumstad again met with the President of the FRBNY in another unsuccessful attempt to obtain relief, this time by means of becoming a primary dealer – which would have entitled AIG to access the discount window.

44.    On September 12, 2008, Standard & Poor's ("S&P") placed AIG on negative credit watch, signaling a potential upcoming downgrade in the company's credit rating as early as the following week.

45.    Over the weekend of September 13-14, 2008, AIG made renewed attempts (all unsuccessful) to obtain discount window access while also initiating efforts to try to identify possible private-sector solutions.

46.    AIG had also begun considering bankruptcy and engaged legal counsel to begin

preparations for a possible bankruptcy proceeding.

47.     On the morning of Monday, September 15, 2008, Lehman Brothers Holdings Inc. filed for bankruptcy protection, materially worsening the global financial crisis.

48.     In the afternoon of September 15, 2008, the three largest rating agencies, Moody's, S&P, and Fitch Ratings Services, downgraded the long-term credit rating of AIG. The ratings downgrades, combined with a steep drop in AIG's common stock price, prevented AIG from accessing the short-term lending markets. At this point, although the Company was solvent, it faced possible bankruptcy as it no longer had liquidity sufficient to meet the collateral demands of AIGFP's counterparties.

49.     Earlier on September 15, 2008, to help AIG address its liquidity crisis, the State of New York, through Governor David Paterson and State Insurance Superintendent Eric Dinallo, offered temporarily to relieve AIG's property and casualty subsidiaries from certain state law capital requirements, thereby freeing $20 billion in capital that AIG could use to improve its liquidity. However in light of the deteriorating conditions and the absence of movement from FRBNY, that offer was withdrawn.

**A.     The Credit Agreement Between AIG and the FRBNY**

50.     Notwithstanding the deepening crisis at AIG, the Government still denied AIG access to the Federal Reserve's discount window loans and other forms of low cost capital made available to other comparable institutions that would have relieved the Company's liquidity stress.

51.     Instead, seven weeks after AIG first approached the FRBNY to request discount window access, the Government finally took action in the form of an unprecedented and rushed demand in connection with such access in the form of a $85 billion FRBNY revolving credit facility (bearing an unprecedented cost of 14.5% in interest and fees) that AIG grant the

Government control of the Company and agree to later convey an approximately 80% interest in AIG's Common Stock.

52.     On the afternoon of September 16, 2008, FRBNY delivered a three-page term sheet. The term sheet set forth the $85 billion credit facility, the exceptionally high interest rate, the requirement that any AIG loan pursuant to the credit facility be secured by substantially all of the assets of AIG (which assets at the time substantially exceeded the maximum amount of the credit facility), and the requirement that AIG agree to convey an approximately 80% stake in AIG to the Government for no consideration (other than the making of the fully secured, high interest rate loan). The President of the FRBNY personally and expressly told Mr. Willumstad that this was "the only proposal you're going to get."

53.     AIG's acceptance of the Government's terms was announced publicly before the opening of the next trading day, September 17, 2008. As a result of the provisions of the credit facility, AIG's shareholders and directors selected independently of FRBNY had lost the ability to control AIG, protect its interests, or remedy acts that damaged it.

54.     On September 18, 2008, the day after the FRBNY assumed control over AIG, AIG's CEO was unilaterally fired and replaced with a new CEO, Edward M. Liddy, who would be under the control of FRBNY. Neither AIG nor its shareholders had any say in the selection of Mr. Liddy, who lacked experience running a large, multi-faceted financial institution like AIG, as CEO. Mr. Liddy was, at all relevant times, under the control and the agent of FRBNY and the Government.

55.     On September 22, 2008, while FRBNY was in control of AIG, AIG and the FRBNY entered into a Credit Agreement ("Credit Agreement") in which FRBNY agreed to extend up to $85 billion in credit to AIG on a revolving basis to be used by AIG for "general

corporate purposes", including "as a source of liquidity to pay principal, interest and other amounts under Indebtedness and other obligations as and when they become due and payable." The interest on any loans made pursuant to the Credit Agreement was the three-month LIBOR rate plus 8.5%, which, with fees, resulted in an annual cost to AIG of approximately 14.5%.

56.    Loans made pursuant to the Credit Agreement were secured by assets of AIG that, according to a September 2011 Government Accountability Office Report, in the words of FRBNY officials, "fully secured the Federal Reserve System."

57.    In addition to requiring AIG to "fully secure" the loan with AIG's assets, and in addition to the excessive interest rate imposed, AIG was required to agree to ultimately issue nearly 80% of AIG's common equity to a trust, the only beneficiary of which is the United States Treasury.  The trust is governed by the AIG Credit Facility Trust Agreement dated as of January 16, 2009 ("Trust Agreement").

58.    Despite government allegations to the contrary, the Credit Agreement was imposed upon the AIG board.  The Government's coercion is evidenced by, among other facts, the Government's unilateral removal of Mr. Willumstad and its installation of Edward M. Liddy to do FRBNY's bidding.

**B.    The FRBNY Control of AIG**

59.    In addition to the control the FRBNY exercised through Mr. Liddy and other AIG Board members who were later also installed by FRBNY, FRBNY had an on-site team whose sole task was to monitor AIG's financial condition and exercise FRBNY's consent rights under the Credit Agreement, which were utilized to control the day-to-day management of AIG.

60.    FRBNY exercised virtually complete control over AIG, including by directing and influencing AIG's day-to-day management, selecting and otherwise influencing AIG's board of directors, and compelling AIG to enter into unusual transactions, including, for example, the

Maiden Lane III transaction discussed below.

61.     FRBNY also exercised control over AIG's SEC filings relating to the bailout, including causing AIG to omit significant counterparty information concerning the ML III transaction from SEC filings; undertook to negotiate on AIG's behalf with AIGFP counterparties; exercised control over proxy materials and AIG's annual meeting; appointed and removed directors; and influenced all material business decisions made by AIG.

62.     FRBNY also directed AIG management that officers of AIG could not address members of Congress concerning the "backdoor bailout," asserting that any such disclosures would violate a moratorium on what were defined as "federal lobbying activities" contained in a "Policy on Lobbying, Government Ethics, and Political Activity" at AIG.  This requirement was without basis and intended to conceal from the public information regarding the "backdoor bailout"; this effort at concealment again evidences recognition of the impropriety of the treatment of AIG and its shareholders.

63.     FRBNY also undertook to negotiate on AIG's behalf with AIGFP counterparties, ostensibly to secure concessions from such counterparties.

64.     In sum, during the period of time immediately following FRBNY's $85 billion loan, FRBNY influenced virtually every material business decision made by AIG.

65.     As an entity that exercised control over AIG and over material decisions affecting the Company, FRBNY stood in a fiduciary relationship to AIG's minority shareholders as well as to AIG itself.

**C.     Additional $37 Billion Loan to AIG**

66.     On October 8, 2008, the Federal Reserve Board announced that AIG had exhausted the $85 billion line of credit established by the Credit Agreement and that FRBNY had agreed to provide up to an additional $37.8 billion in cash to AIG collateralized by

investment-grade, fixed-income securities from AIG.

### D.   The November 2008 Restructuring

67.   In November 2008, the Federal Reserve Board implemented financial transactions related to AIG, including:

(a)   On or about November 10, 2008, the terms of the Credit Agreement were modified to lower the interest rate to the three-month LIBOR + 3.0% and extend the length of the facility to five years.

(b)   On or about November 25, 2008, the Treasury purchased $40 billion in newly issued AIG preferred "Series D" shares under the Troubled Asset Relief Program ("TARP"), some of the proceeds of which were used by FRBNY to reduce the commitment amount available under the Credit Agreement from $85 billion to $60 billion.

### E.   FRBNY Used the Maiden Lane III Transaction to Funnel AIG's Assets to AIG's Struggling CDS Counterparties to the Detriment of AIG and Its Shareholders.

#### 1.   FRBNY Created Maiden Lane III Ostensibly to Assist AIG in the Termination of Certain CDSs With Certain AIGFP Counterparties.

68.   Acting (as always) at the direction and under the supervision of FRBNY, in or around October 2008, AIG was attempting to resolve its liquidity crisis through bilateral discussions with counterparties attempting to negotiate the modification or termination of the CDSs in exchange for cash payments.

69.   In early November 2008, however, FRBNY decided to create a special purpose vehicle ("SPV") designated Maiden Lane III to resolve AIG's obligations to CDS counterparties.

#### 2.   Creation of Maiden Lane III

70.   On November 25, 2008, Maiden Lane III LLC ("ML III") was created and

purchased approximately $46.1 billion in notional CDO assets. On December 18 and 22, 2008, ML III engaged in a second round of CDO asset purchases totaling approximately $16 billion in notional value.

71.    Prior to the formation of ML III, AIG had recently posted a total of approximately $35 billion in collateral to secure the CDO obligations later purchased by ML III. At the time ML III was formed, AIG was required to make an additional $5 billion equity investment. Based on AIG's equity contribution of $40 billion, FRBNY agreed to lend up to $30 billion to ML III.

72.    Although AIG was the only party contributing material equity to ML III, FRBNY is the controlling party and managing member of ML III. Through its control over AIG, FRBNY required AIG to use this vehicle to fund the purchase of CDOs from the counterparties.

73.    With respect to the FRBNY loan to ML III, the interest rate is the one-month LIBOR plus 1% and repayment of the loan is to come from the first proceeds from the CDO portfolio, *i.e.*, by maturity or liquidation of the assets.

74.    In addition, as part of ML III, AIGFP and FRBNY (acting through ML III) entered into a "Shortfall Agreement" under which AIG was required to make payments to ML III to the extent that the collateral posted by AIG with counterparties was less than the negative mark-to-market value of the CDS as of October 31, 2008 (and ML III was required to make a payment to AIG to the extent that the posted collateral exceeded the October 31, 2008 market value).

75.    ML III ultimately borrowed approximately $24.3 billion from FRBNY, which together with an equity funding of $5.0 billion provided by AIG and approximately $32.5 billion in collateral previously contributed by AIG, were used by ML III to purchase from certain third-party counterparties of AIGFP certain U.S. dollar denominated CDOs.

18

3. **FRBNY Permitted the AIGFP Counterparties to Retain the Entire $32.5 Billion in Collateral AIG Posted Prior to ML III, Which Together with What Was Paid by ML III Resulted in the AIGFP Counterparties Receiving Par Value, Which Was Far Higher than Market Value for Those Investments.**

76.    Under ML III, the AIGFP counterparties received essentially par value – that is, the notional, or face, value – for their CDOs (or close to par value after certain expenses) through a combination of receiving payments from ML III plus retaining collateral AIG had previously posted to collateralize its CDS contracts.  In return, the counterparties agreed to cancel their CDS contracts with AIG.

77.    Of the $35 billion in collateral provided to counterparties by AIGFP prior to ML III, approximately $20.2 billion was funded from the initial $85 billion loan under the Credit Agreement and $14.8 billion was funded by AIG prior to the Credit Agreement.  (AIG apparently received $2.5 billion of this amount back pursuant to the Shortfall Agreement.)

78.    The purchase payments the counterparties received from ML III, together with the prior collateral provided by AIG, paid the AIGFP counterparties approximately $62 billion, even though AIG's obligations could have been compromised for substantially less.

79.    While it is understandable why the counterparties would desire to receive par value, and while in light of the global credit crisis it might be understandable why FRBNY would want to assist the counterparties in dealing with their liquidity needs, no party who genuinely was focused on protecting the interests of AIG or its shareholders would have implemented this arrangement.

4. **FRBNY's Self-Dealing Appropriated Two-Thirds of the Value of the Collateral Posted by AIG to the FRBNY.**

80.    Under the priority of payments (also known as the payment "waterfall") in the ML III transaction, the proceeds ML III received – either in the form of cash from the liquidation

of CDOs or the principal and interest payments from retained CDOs – after payment of ML III's fees and expenses were paid first and exclusively to satisfy the FRBNY's $24.3 billion loan to ML III.  Any proceeds remaining after the FRBNY's loan was satisfied would then be used to redeem AIG's equity contribution in ML III.

81.     Any ML III proceeds remaining after the FRBNY's loan and AIG's equity contribution were satisfied are known as "residual interests" and, under the terms of ML III, split between FRBNY (which receives approximately two-thirds of the residual interests) and AIG (which receives approximately one-third of the interests).  This was so even though by definition FRBNY had already received back its entire loan with interest and even though the "residual interests" were funded entirely by the collateral that AIG alone had furnished.

82.     Not only did FRBNY's self-dealing appropriate two-thirds of those residual interests despite having virtually no risk in the ML III transaction after its loan is paid off, FRBNY also refused to use any residual interest proceeds to pay down AIG's outstanding balance under the Credit Agreement.

83.     First, FRBNY forced AIG to fund approximately 60% of the par value purchase price ($5 billon in new equity, plus $32.5 billion in previously posted collateral compared to FRBNY's last-in-first-out loan of $24.3 billion), which price far exceeded the market value.  Second, and without justification, FRBNY appropriated the majority of the returns resulting from the collateral AIG had posted, and without a reduction in AIG's debt to Defendant.

### 5.   FRBNY Paid the ML III Counterparties Par Value Despite the Expectation – Even by Some Counterparties – that FRBNY Would Obtain Discounts from Those Counterparties.

84.     At the time ML III was formed, it was expected that concessions, or discounts, would be obtained on the par value of AIGFP counterparties' CDOs purchased for the ML III portfolio.

85.     Securing such concessions or discounts would have provided more loan security to FRBNY in connection with the Credit Agreement and lowered the size of Defendant's overall lending commitment to AIG.  Both AIG and FRBNY would have benefitted.

86.     Nevertheless, FRBNY made no effort to demand or negotiate concessions and only limited, inconsistent efforts even to give counterparties the opportunity to volunteer concessions.

87.     Of the 16 AIGFP counterparties involved in ML III, FRBNY apparently contacted only 8 of them regarding concessions or discounts.  Moreover, those contacts were made on or around November 5 and 6, 2008, and FRBNY only gave those counterparties until the close of business Friday, November 7, 2008, to make an offer with respect to concessions or discounts.

88.     If FRBNY had diligently sought concessions, FRBNY would have been able to compromise AIG's obligations for billions of dollars less than what ML III paid.

89.     Despite FRBNY's failure to diligently seek concessions, at least one counterparty expressed a willingness to accept concessions or discounts saying that it was only right and what the counterparties were expecting.  Another counterparty indicated to FRBNY it was considering a range of discounts.  However, FRBNY indicated to those counterparties, and to the other counterparties, that it had decided against concessions and that FRBNY would instead pay all counterparties essentially 100 cents on the dollar, literally turning away counterparties' offers of concessions.

90.     In not pursuing (and even refusing to accept) concessions from AIG's CDS counterparties, FRBNY acted contrary to the interests of AIG and its shareholders.  Had FRBNY appropriately pursued and accepted concessions, those concessions would have increased the value of AIG's interest in ML III, both in the form of reduced downside risk with respect to

AIG's $5 billion equity investment and increased upside potential for AIG's one-third share of the ML III residual income.

> **6. Not Only did FRBNY Require that the Counterparties Receive Par Value, It Also Required that they Receive a Release of All Claims that AIG Could have Asserted Against Them Relating to the CDOs Purchased by ML III.**

91.     Even though the counterparties were already receiving 100 cents on the dollar, FRBNY also required AIG to execute releases waiving all claims (known or unknown) against the counterparties arising out of the credit default swaps that were canceled through ML III.

92.     FRBNY used ML III to secure the cancellation of the CDS contracts by immediately paying to the counterparties, through cash payments and by granting the counterparties ownership rights over collateral, everything they could conceivably have received in the event that all of the securities covered by the swaps ever defaulted.  Those terms were already generous enough to the counterparties and damaging enough to AIG; FRBNY had no legitimate basis, in addition, to provide releases on any possible claims AIG might have, including possible claims arising from AIG's effectively selling insurance on the CDOs.

93.     AIG obviously had no need for a release of potential claims that might have been asserted by the counterparties, who by virtue of what they had already received could not possibly have claimed injury either then or in the future.  And, there was no need or justification to prematurely release AIG's claims against certain counterparties who had packaged and issued the CDOs before AIG or FRBNY had an opportunity at that time to evaluate the possible merits of any such claims.  The strength or weakness of any such possible claims based on the particular facts relevant to particular individual counterparties would determine how much, if any, leverage such claims might give AIG in negotiations with one or more counterparties.  There was, however, no basis for giving up all claims against all counterparties for no consideration before

any analysis of such strengths and weaknesses had ever taken place.  In using its control over

AIG and ML III to do so, FRBNY violated its duties to AIG and its shareholders.

> **7. Paying the ML III Counterparties Par Value on Assets Worth Far Less Effectuated a "Backdoor Bailout" of AIG's Counterparties at AIG's Expense.**

94.     Even though it is filled with, and to a large extent based on, the self-serving

assertions of the FRBNY and other participants in the process, a November 17, 2009 report by

the Office of the Special Inspector General for TARP ("SIG-TARP") entitled *Factors Affecting*

*Efforts to Limit Payments to AIG Counterparties* (the "SIG-TARP Report") concluded that "the

structure and effect of FRBNY's assistance to AIG, both initially through loans to AIG, and

through asset purchases in connection with ML III effectively transferred tens of billions of

dollars of cash from Defendant to AIG's counterparties, even though senior policy makers

contend that assistance to AIG's counterparties was not a relevant consideration in fashioning the

assistance to AIG".

95.     A January 25, 2010 Report issued by the U.S. House of Representatives

Committee on Oversight and Government Reform likewise suggested that FRBNY had engaged

in a "backdoor bailout of AIG's counterparties" through AIG and then attempted to cover it up.

> **8. FRBNY Attempted to Cover Up the "Backdoor Bailout" of ML III Counterparties.**

96.     In December 2008, and following consultation with FRBNY, AIG filed two Form

8-K statements with the SEC related to ML III after ML III was created.  At FRBNY's request,

AIG omitted the sentence (which AIG had included in its draft) disclosing that: "As a result of

this transaction, the AIGFP counterparties received 100 percent of the par value of the Multi-

Sector CDOs sold and the related CDS have been terminated."  Also, at FRBNY's insistence, the

actual filings did not include the Shortfall Agreement's Schedule A, which contained ML III

counterparty and CDO deal information.

97.     Shortly after the filing, the SEC noted the Schedule A omission and told AIG that under agency rules, it must include the schedule for public disclosure or request confidential treatment.  In response, AIG, at FRBNY's instance, filed Schedule A with the SEC on January 29, 2009 and a confidential treatment request with the SEC for the information in Schedule A.

98.     Although AIG and FRBNY still refused to make Schedule A public, continued pressure from government agencies and Congress prompted AIG to publicly disclose certain CDS counterparty information in a March 15, 2009 press release.  According to that AIG press release, which FRBNY controlled, the following amounts were said to be the amounts paid to the following AIGFP counterparties, including the ML III counterparties, in connection with CDO purchases and collateral postings relating to the CDSs (in $ bn):

| Counterparty | Collateral Posted | ML III Payments | Total |
|---|---|---|---|
| Societe Generale | 4.1 | 6.9 | 11.0 |
| Deutsche Bank | 2.6 | 2.8 | 5.4 |
| Goldman Sachs | 2.5 | 5.6 | 8.1 |
| Merrill Lynch | 1.8 | 3.1 | 4.9 |
| Calyon | 1.1 | 1.2 | 2.3 |
| Barclays | 0.9 | 0.6 | 1.5 |
| UBS | 0.8 | 2.5 | 3.3 |
| DZ Bank | 0.7 | 1.0 | 1.7 |
| Wachovia | 0.7 | 0.8 | 1.5 |
| Rabobank | 0.5 | 0.3 | 0.8 |
| KFW | 0.5 | 0.0 | 0.5 |
| J.P.Morgan | 0.4 | 0.0 | 0.4 |
| Banco Santander | 0.3 | 0.0 | 0.3 |
| Danske | 0.2 | 0.0 | 0.2 |
| Reconstruction Finance Corp | 0.2 | 0.0 | 0.2 |
| HSBC Bank | 0.2 | 0.0 | 0.2 |
| Morgan Stanley | 0.2 | 0.0 | 0.2 |
| Bank of America | 0.2 | 0.5 | 0.7 |

| | | | |
|---|---|---|---|
| Bank of Montreal | 0.2 | 0.9 | 1.1 |
| Royal Bank of Scotland | 0.2 | 0.5 | 0.7 |
| Landesbank Baden-Wuerttemberg | 0.0 | 0.1 | 0.1 |
| Dresdner Bank AG | 0.0 | 0.4 | 0.4 |
| Other | 4.1 | 0.0 | 4.1 |
| **Totals** | **$22.4** | **$27.1** | **$49.5** |

99.     Based on Schedule A (which ultimately became public) and the SIG TARP

Report, the total amounts paid to AIGFP's counterparties were actually as follows (in ($ bn)):

| **AIG Counterparty** | **Collateral Posted (as of 11/7)** | **ML III Payment** | **Total** |
|---|---|---|---|
| Societe Generale | 9.6 | 6.9 | 16.5 |
| Goldman Sachs | 8.4 | 5.6 | 14.0 |
| Merrill Lynch | 3.1 | 3.1 | 6.2 |
| Deutsche Bank | 5.7 | 2.8 | 8.5 |
| UBS | 1.3 | 2.5 | 3.8 |
| Calyon | 3.1 | 1.2 | 4.3 |
| Deutsche Zentral-Genossenschaftsbank | 0.8 | 1.0 | 1.8 |
| Bank of Montreal | 0.5 | 0.9 | 1.4 |
| Wachovia | 0.2 | 0.8 | 1.0 |
| Barclays | 0.9 | 0.6 | 1.5 |
| Bank of America | 0.3 | 0.5 | 0.8 |
| The Royal Bank of Scotland | 0.6 | 0.5 | 1.1 |
| Dresdner Bank AG | 0.0 | 0.4 | 0.4 |
| Rabobank | 0.3 | 0.3 | 0.6 |
| Landesbank Baden-Wuerttemberg | 0.0 | 0.1 | 0.1 |
| HSBC Bank, USA | 0.2 | 0.0[*] | 0.2 |
| **Totals** | **$35.0** | **$27.1** | **$62.1** |

---

[*] Amount rounded down to $0.

**V.    The Trust Agreement Established to Control the Nearly 80% Interest in AIG**

100.    The Trust established to hold the Series C Preferred Shares and intended to hold and dispose of the nearly 80% interest in AIG's Common Stock is governed by the Trust Agreement.  The corpus of the Trust consisted entirely of the Series C Preferred Shares.

101.    The Trust Agreement purports to provide the Trustees with "absolute discretion and control" over the Series C Preferred Shares, including exercising the voting rights of those shares.  Despite these representations, the FRBNY controls the Trust and the Trustees.

102.    At the time of its creation, the Trustees of the Trust were Jill M. Considine, Chester B. Feldberg, and Douglas L. Foshee.  On February 26, 2010, Mr. Foshee was replaced as a Trustee by Defendant Peter A. Langerman.

103.    The Trustees have longstanding ties to FRBNY.  In particular, Jill Considine recently completed a six-year term as a member of the Board of FRBNY where she served as chairman of the Audit and Operational Risk Committee.  Further, from 1991 to 2000, Chester B. Feldberg served as executive vice president in charge of the Bank Supervision Group at the FRBNY and was an employee of the FRBNY for 36 years, starting as a lawyer in the Bank's Legal Department before moving to the Credit and Capital Markets Group and then the Bank Supervision Group.

104.    The Trust Agreement itself directs that "in exercising their discretion" the Trustees "are advised that it is the FRBNY's view that (x) maximizing the Company's ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department and (y) the Company being managed in a manner that will not disrupt financial conditions, are both consistent with maximizing the value of the Trust Stock."

105.    Section 2.04(c) of the Trust Agreement also requires the Trustees to "take any and all reasonable actions available to them and necessary to cause" the Certificate of Incorporation

to be amended to increase the number of authorized shares of Common Stock to 19 billion, and requires the Trustees to "Vote or cause to be Voted all of the Trust Stock in favor of" the amendment.

106.    In addition, under the "standard of care" articulated in the Trust Agreement, the Trustees are indemnified from liability only if each Trustee "(i) acted in good faith in a manner the Trustee reasonably believed to be in accordance with the provisions of this Trust Agreement and in or not opposed to the best interests of the Treasury and (ii) had no reasonable cause to believe his or her conduct was unlawful."

107.    FRBNY exercised control over AIG's SEC filings; undertook to negotiate on AIG's behalf with AIGFP counterparties; exercised control over proxy materials and AIG's annual meeting; appointed and removed directors; and influenced all material business decisions made by AIG.

**VI.    Defendant Fully Understood That a Shareholder Vote By Those Holding the Common Stock of AIG Was Required To Legally Implement the Appropriation of an Approximately 80% Interest in AIG Common Stock.**

108.    Defendant fully understood and was aware that the approval of AIG's common shareholders would be required in order to increase the number of Common Stock shares available so that the Series C Preferred Shares provided pursuant to Defendant's proposed takeover could be converted into approximately 80% of AIG's Common Stock.

109.    Moreover, Delaware law, which governs the Charter, is unequivocal that the amendment of a certificate of incorporation to increase the number of authorized shares in a class of stock can be accomplished only through a majority vote of the then-existing outstanding shares in that class.  The express purpose of this requirement of corporate law is to protect the property rights and interests of the corporation's shareholders.

110.    Under AIG's then-governing Restated Certificate of Incorporation (the "Charter"),

27

AIG's Charter did not authorize a sufficient number of shares of Common Stock to permit AIG to transfer an approximate 80% interest in the Common Stock of the Company without the approval of existing shareholders. Specifically, the Charter provided that the number of authorized shares of Common Stock was 5 billion shares, of which more than 3 billion shares had previously been issued or reserved.

## VII.   The Delaware Consent Order Protects the Rights of AIG Shareholders

111.   On November 4, 2008, a lawsuit was filed in the Delaware Court of Chancery on this very issue to ensure that the rights of the Common Stock shareholders of AIG were respected with regard to Defendant's takeover of the Company. *Walker, et al. v. AIG, et al.*, CA No. 4142-CC. That lawsuit, which included breach of fiduciary duty claims against Mr. Liddy and the Company's then Directors and Officers (the "AIG defendants"), sought, among other things, compliance with Delaware law and an order declaring that the Super Voting Preferred "is not convertible into common stock absent a class vote by the common stock to increase the number of authorized shares, as well as all relief appropriate in light of the Board of Directors' failure to call a class vote and failure to act in the interests of the common stockholders who are entitled to reject the dilution of their shares."

112.   On February 5, 2009, the Delaware Court of Chancery entered a Stipulation and Order of Dismissal finding the request for this relief to be moot in light of the representation and agreements of Mr. Liddy and the AIG defendants that there would be a shareholder vote in which "holders of the common stock will be entitled to vote as a class separate from the holders of the Series C Preferred Stock on any amendment to AIG's Restated Certificate of Incorporation that increases the number of authorized common shares and decreases the par value of the common shares."

**VIII.   The Representations of AIG and Defendant in Securities Filings**

113.   All representations and disclosures made by AIG and the Government in required securities filings were consistent with the Delaware Consent Order and with AIG's representation upon which the Consent Order was based.  These representations and disclosures made clear that the proposed takeover of AIG with its conversion of its Preferred Shares to a nearly 80% interest in the Common Stock of AIG required a vote of the existing Common Stock shareholders be held to permit an increase in the authorized number of shares of AIG Common Stock.

114.   For instance, in its Form 10-Q for the third quarter of 2008 (filed with the SEC on November 10, 2008), AIG stated:  "Under the terms of Fed Credit Agreement . . . After the Series C Preferred Stock is issued, AIG will be *required* to hold a special shareholders' meeting to amend its restated certificate of incorporation to increase the number of authorized shares of common stock to 19 billion and to reduce the par value per share.  The holders of common stock will be entitled to vote as a class separate from the holders of the Series C Preferred Stock on these changes to AIG's Restated Certificate of Incorporation.  *If* the increase in the number of authorized shares and change in par value is approved, the Series C Preferred Stock will become convertible into common stock." (emphasis supplied).

115.   In its 2009 Form 10-K (filed with SEC on February 26, 2010), AIG again confirmed that the Series C Preferred Shares "will become convertible into common stock upon the subsequent amendment of AIG's Amended and Restated Certificate of Incorporation, which amendment will *need* to be approved by a separate class vote of the holders of AIG Common Stock.  *Upon such amendment*, the AIG Series C Preferred Stock will be convertible into a number of shares of AIG Common Stock representing its voting power at that time." (emphasis supplied).

116.    All filings and disclosures by AIG to the Common Stock shareholders of AIG were consistent with the representation that the Government would not complete its proposed appropriation of nearly 80% of the Common Stock of AIG unless the existing Common Stock shareholders, voting as a separate class, approve an increase in the authorized shares of AIG Common Stock to "19 billion."

## IX.    The Express Terms of the Stock Purchase Agreement

117.    Consistent with Delaware law, the Delaware Consent Order and AIG's representation upon which the Consent Order was based, and the representations made in various securities filings, the Stock Purchase Agreement entered between the Trust and AIG on March 1, 2009 ("Series C SPA"), provides that Defendant and its agents would be permitted to convert the Preferred Shares to a nearly 80% interest in the Common Stock of AIG only upon a valid vote by the existing Common Stock shareholders to "approve the Charter Amendment" that would "reduce the par value of the Common Stock to $0.000001 per share and increase the number of authorized shares of Common Stock to 19 billion."

118.    AIG also covenanted in the Series C SPA to adopt several Board resolutions pursuant to Delaware law, including an amendment to the Charter increasing the number of authorized shares, as to which the Series C SPA specifically stated would require "the holders of the Common Stock voting as a separate class in the case of the Common Stock Amendment Proposal" *and that if not obtained, "the Company shall include a proposal to approve such proposals at each subsequent annual meeting of its shareholders."*  (emphasis supplied).

119.    In connection with the shareholder meeting at which such vote was to take place, AIG further covenanted in the Series C SPA to file with the SEC "a preliminary proxy statement *reasonably acceptable to the Trust*".  Moreover, under that Agreement, none "of the information . . . in any proxy statement . . . will . . . contain any untrue statement of material fact

or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading."

**X.    Defendant's Efforts to Appropriate a Nearly 80% Interest in the Common Stock of AIG Through a "Backdoor" Conversion.**

120.    On or around June 5, 2009, AIG submitted its 2009 proxy statement and materials, which were the subject of review and approval by Defendant, in advance of the June 30, 2009 annual shareholder meeting.  That statement and materials included a proposal ("Proposal 3") to amend the Charter to increase the number of authorized shares of Common Stock.

121.    According to the proxy statement, Proposal 3 required a "for" vote of a majority of the voting power of the outstanding shares of Common Stock and Series C Preferred Stock "plus a 'for' vote of a majority of the outstanding shares of AIG Common Stock, voting as a separate class."

122.    At AIG's annual shareholder meeting on June 30, 2009, this Proposal 3 to increase the authorized shares of AIG Common Stock, which was the *only* proposal for approval in which the Common Stock shareholders of AIG were entitled to a vote separate from the controlling vote exercised by the Trust, "*failed*."  That is, the vote contemplated by (i) Delaware law, (ii) the Delaware Consent Order and AIG's representation upon which the Consent Order was based, (iii) all securities filings by AIG and Defendant, and (iv) the Series C SPA itself, and the only vote in which AIG Common Stock shareholders were entitled to a separate vote to protect their property and interests with respect to Defendant's takeover, *failed*.

123.    However, Defendant, and at Defendant's insistence AIG, had inserted into the proxy materials a mechanism to evade the requirement of a vote by AIG's Common Stock shareholders by creating a sufficient number of authorized but unissued shares, to hand over nearly 80% of the Common Stock of the Company despite the failure of the required vote of

<u>existing Common Shareholders</u>. This mechanism was a proposal ("Proposal 4") to amend the Charter to effectuate a reverse 20:1 stock split. This reverse stock split, with respect to which the trust's controlling vote was permitted to participate (and, hence, effectively nullify the vote of AIG's existing common shareholders), was deliberately engineered to *guarantee* that sufficient authorized shares of AIG Common Stock were made available to allow the conversion of the Series C Preferred Shares to approximately 80% of the Common Stock, *regardless* of the independent vote of the Common Stock shareholders regarding the number of authorized shares. The reverse stock split vote was engineered to proportionately decrease both the authorized and issued Common Stock shares of AIG *only if* the increase in the number of authorized shares was approved by the Common Stock shareholders; in the event the Common Stock shareholders rejected an increase in the authorized shares of AIG common stock, then the 20:1 reverse stock split would *only* apply to *issued* shares, but not to *authorized* shares. As a result, if Proposal 3 failed, Proposal 4 would reduce the approximately 3 billion of outstanding Common Stock shares to slightly more than 150 million shares, but the number of authorized shares would remain at 5 billion. Through these machinations, the number of authorized, but unissued, shares of AIG Common Stock available for conversion would move from less than 40% of the outstanding Common Stock to more than 90% of the outstanding Common Stock.

124. The proxy materials accompanying Proposal 4 did not relate the stock split in any manner to Defendant's takeover and desire to appropriate nearly 80% of the Common Stock of the Company. Indeed, the proxy statement misleadingly stated that "AIG currently has no plans for these authorized but unissued shares of Common Stock" other than purposes unrelated to the scheme for which they were actually used. As part of the scheme, *no* proposal was presented that would have allowed the Common Stock shareholders of AIG to vote for a reverse stock split

32

that would apply to **both** issued and authorized Common Stock.  The vice of Proposal 4 was not that it involved a reverse stock split but that if Proposal 3 failed, Proposal 4 only reverse split the outstanding shares and not the authorized shares so as to permit FRBNY to evade the required common stockholder vote.

125.    At AIG's annual shareholder meeting on June 30, 2009, Proposal 3 (voted upon by the separate class of AIG Common Stock shareholders) failed, and Proposal 4, in which Defendant's controlling voting interest was permitted to participate, passed.

126.    Pursuant to this "backdoor" scheme to effectively increase the number of shares of authorized Common Stock without a class vote, FRBNY enabled the conversion of the Preferred Shares to Common Stock of AIG even though the vote on that issue had failed.

127.    Neither Defendant nor AIG has offered any justification as to why they engineered this scheme to circumvent the requirement of a Charter Amendment vote by the class of existing Common Stock shareholders to increase the authorized shares of AIG Common Stock to 19 billion as specifically contemplated by (i) Delaware law; (ii) the Delaware Consent Order and AIG's representation upon which the Consent Order was based, (iii) all securities filings by AIG and Defendant, and (iv) the Series C SPA itself.  Defendant's deliberate and knowing scheme to circumvent the vote of existing Common Stock shareholders on whether to increase the authorized shares of AIG Common Stock was a breach of FRBNY's duties and obligations to AIG and its Common Stock shareholders.

128.    In September 2010, AIG announced an "exit plan" that was designed to repay all AIG's obligations to Defendant and required AIG, among other things, to sell two of its valuable operating units – namely, American Life Insurance Company (ALICO) and American International Assurance Company, Ltd. (AIA).  On January 14, 2011, upon completion of the

exit plan, the Series C Preferred Shares were converted into nearly 80% of AIG Common Stock.

## XI.      Defendant's "Exit Plan".

129.    On December 8, 2010, AIG and the U.S. Government executed a "Master Agreement on Recapitalization Plan" (the "Recapitalization Plan") superseding and incorporating most of the terms of a September 30, 2010 agreement-in-principle.

130.    The Recapitalization Plan involved a series of integrated transactions in which AIG would, among other things:

(a)      Repay and terminate the Credit Agreement with FRBNY;

(b)      Convert Treasury's preferred shares obtained in connection with the Credit Agreement (i.e., the Series C Stock) and its preferred shares obtained pursuant to TARP (i.e., the Series E and F Stock) into a total of 92.1% of AIG's common stock or approximately 1.7 billion shares;

(c)      Issue to existing shareholders ten-year warrants for up to 75 million shares of AIG common stock at a strike price of $45 per share; and

(d)      Permit Treasury to gradually sell off its 92.1% stake.

131.    With respect to Treasury's staggered sell-off of its AIG stake, under the Recapitalization Plan, Treasury has complete control over the terms, conditions, and pricing of any share sales until its ownership stake in AIG falls below 33%.

132.    Also with respect to Treasury's staggered sell-off, an October 1, 2010 *Wall Street Journal* article noted that "Treasury stands to profit on its AIG shares if it can sell them at about $29 apiece," although the article further noted that Treasury's "goal is to sell at around $45 per share, the same price at which private shareholders can exercise warrants".

133.    On January 14, 2011, upon closing of the Recapitalization Plan, AIG repaid FRBNY, including the outstanding balance on the original $85 billion Credit Agreement.

134.    Upon the closing of the Recapitalization Plan, Treasury still owned a 92.1% equity interest in AIG.

135.    The terms of the Recapitalization Plan were not put to a vote of AIG's private common stock shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff brings Claims I, II and V as a shareholder's derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

137.    Plaintiff brings this action derivatively in the right and for the benefit of AIG to redress injuries suffered, and to be suffered, by AIG as a direct result of the violations described herein.  AIG is named as a nominal defendant solely in a derivative capacity.

138.    Plaintiff will adequately and fairly represent the interests of AIG and its shareholders in enforcing and prosecuting its rights.

139.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.    Plaintiff was a shareholder of AIG at the time of the actions complained of herein and remains a shareholder.

141.    Since the facts concerning FRBNY's actions began to be revealed, Plaintiff repeatedly requested that AIG institute proceedings against the Defendant and its affiliates to recover for the wrongs alleged in this complaint.  Any further request or demand would be futile, and AIG has so acknowledged.

142.    Moreover, under the applicable "Standard of Care" set forth in section 3.03(a) of the January 16, 2009 Trust holding the voting rights which AIG was required to give up, the trustees may only take actions that are "in or not opposed to the best interests of the Treasury".

Section 2.04(d) in turn provides that the Trustees "shall exercise all such Voting and other similar rights with respect to the Trust Stock in accordance with the Applicable Standard of Care (as defined in Section 3.03(a) hereof)." The Trustees are therefore duty bound to elect only Board members who similarly will act only "in or not opposed to the best interests of the Treasury." The Department of the Treasury continues to control approximately 77% of the equity of AIG.

143.    The Trustees, under the control and direction of FRBNY, have exercised their voting rights to install all 14 members of the current Board – all consistent with the applicable "standard of care" discussed above. Further, 11 of the 14 members of the current Board became AIG Board members for the first time after the formation of the Trust.

144.    Plaintiff has not made a demand on other shareholders to bring this lawsuit. Such an act would be futile and useless because the vast majority of outstanding voting shares are held by the Trust. Further, AIG is a publicly traded company with millions of shares outstanding that are not controlled by the Trust and thousands of shareholders. Making demand on such a number of shareholders would be impossible for Plaintiff, which has no way of finding out the names, addresses or phone numbers of shareholders. Moreover, making a demand on all shareholders would force Plaintiff to incur huge expenses, even assuming all shareholders could be individually identified.

## CLAIM I – BREACH OF FIDUCIARY DUTY (DERIVATIVE)

145.    Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-144, as though fully set forth herein.

146.    At all relevant times, by reason of its control of AIG and its power to act on behalf of AIG, as described above, Defendant owed the Company duties, including the obligation of good faith, fair dealing, loyalty, and due care.

36

147.   As demonstrated above, Defendant violated its duties to AIG by taking actions, including actions that involved self-dealing, that were deliberately contrary to the interests of the Company.

148.   AIG has suffered injury as a direct and proximate result of Defendant's unlawful actions, including but not limited to monetary injury.  As a result of the conduct alleged herein, Defendant is liable to AIG.

## CLAIM II – REQUIRING AND/OR INDUCING AIG OFFICERS AND DIRECTORS TO BREACH THEIR FIDUCIARY DUTIES (DERIVATIVE)

149.   Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-144 and 145-148, as though fully set forth herein.

150.   At all relevant times, the officers and directors of AIG owed fiduciary duties to AIG's shareholders.

151.   Defendant, with knowledge or reckless disregard of the fact that AIG's officers and directors would be in breach of their fiduciary duties to AIG shareholders as a result of their participation in the actions alleged above, used its power and authority to require and induce the aforementioned breaches of fiduciary duties, and knowingly participated in, aided and abetted, directed, and solicited those breaches.

152.   AIG has suffered injury as a direct and proximate result of Defendant's unlawful actions, including but not limited to monetary injury.  As a result of the conduct alleged herein, Defendant is liable to AIG.

## CLAIM III – BREACH OF FIDUCIARY DUTY (DIRECT)

153.   Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-144, 146-148, and 150-152, as though fully set forth herein.

154.   At all relevant times, by reason of its control of AIG, including as a result of its

position as a controlling lender and shareholder, Defendant owed AIG's common shareholders including Plaintiff duties, including the obligation of good faith, fair dealing, loyalty, and due care.

155. Defendant repeatedly violated the duties it owed to Plaintiff, including as described above.

156. Plaintiff has suffered injury as a direct and proximate result of Defendant's unlawful actions, including but not limited to monetary injury. As a result of the conduct alleged herein, Defendant is liable to Plaintiff and all similarly situated shareholders.

## CLAIM IV – REQUIRING AND/OR INDUCING AIG OFFICERS AND DIRECTORS TO BREACH THEIR FIDUCIARY DUTIES (DIRECT)

157. Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-144, 146-148, 150-152, and 154-156, as though fully set forth herein.

158. At all relevant times, the officers and directors of AIG owed fiduciary duties to Plaintiff.

159. Defendant, with knowledge or reckless disregard of the fact that AIG's officers and directors would be in breach of their fiduciary duties to AIG shareholders as a result of their participation in the actions alleged above, used its power and authority to require and induce the aforementioned breaches of fiduciary duties, and knowingly participated in, aided and abetted, directed, and solicited those breaches.

160. Plaintiff has suffered injury as a direct and proximate result of Defendant's unlawful actions, but not limited to monetary damage. As a result of the conduct alleged herein, Defendant is liable to Plaintiff.

## CLAIM V – CONSTITUTIONAL CLAIMS (DERIVATIVE)

161. Plaintiff incorporates by reference and realleges each and every allegation

contained in ¶¶ 1-144, 146-148, 150-152, 154-156, and 158-160, as though fully set forth herein.

162.    The Equal Protection, Due Process, and Takings Clause of the United States Constitution protect companies and shareholders from having their property and property rights taken by the Government, in a discriminatory manner, without due process or without just compensation.

163.    The FRBNY has asserted that in exercising its control over, and acting on behalf of, AIG it did not act in an official, governmental capacity or at the direction of the Department of Treasury.

164.    To the extent the proof at or prior to trial shows that the FRBNY did in fact act in a governmental capacity, or at the direction of the Department of Treasury, the improper conduct described above constitutes the discriminatory takings of the property and property rights of AIG without due process or just compensation.

165.    AIG has suffered injury as a direct and proximate result of such takings, including but not limited to monetary damage. As a result of the conduct alleged herein, Defendant is liable to AIG, and AIG is entitled to relief.

## CLAIM VI – CONSTITUTIONAL CLAIMS (DIRECT)

166.    Plaintiff incorporates by reference and realleges each and every allegation contained in ¶¶ 1-144, 146-148, 150-152, 154-156, 158-160, and 162-165, as though fully set forth herein.

167.    The Equal Protection, Due Process, and Takings Clause of the United States Constitution protect companies and shareholders from having their property and property rights taken by the Government, in a discriminatory manner, without due process or without just compensation.

168.    The FRBNY has asserted that in exercising its control over, and acting on behalf

of, AIG it did not act in an official, governmental capacity.

169.    To the extent the proof at or prior to trial shows that the FRBNY in fact acted in a governmental capacity, the improper conduct described above constitutes the discriminatory takings of the property and property rights of Plaintiff without due process or just compensation. Plaintiff has suffered injury as a direct and proximate result of such takings, including but not limited to monetary damage. As a result of the conduct alleged herein, Defendant is liable to Plaintiff and Plaintiff is entitled to relief.


WHEREFORE, Plaintiff Starr International demands judgment against Defendant as follows:

A. Finding that Plaintiff may maintain this action on behalf of AIG and that Plaintiff is an adequate representative of AIG;

B. Finding that the Defendant has breached and/or conspired to breach its duties to AIG and to Plaintiff;

C.  Finding that Defendant has coerced, induced, and required AIG officers and directors to breach their fiduciary duties to AIG and to Plaintiff;

D. Determining and awarding to AIG the damages sustained by it as a result of the violations set forth above from Defendant;

E. Awarding AIG the costs and disbursements of this action attributable to the claims brought on behalf of AIG, including reasonable attorneys' and experts' fees, costs and expenses;

F. Determining and awarding to Plaintiff the damages sustained by it as a result of the violations set forth above from Defendant;

G. Awarding Plaintiff the costs and disbursements of this action attributable to the claims

brought on behalf of Plaintiff, including reasonable attorneys' and experts' fees, costs and

expenses; and

H. Granting such other relief, including equitable and injunctive relief, as this Court may

deem just and proper.

Dated:  New York, New York
        November 21, 2011

                              BOIES, SCHILLER & FLEXNER LLP

                              By   _David Boies_____
                                   David Boies
                                   333 Main Street
                                   Armonk, NY 10504
                                   Tel. (914) 749-8200
                                   Fax (914) 749-8300
                                   Email: dboies@bsfllp.com

                                   Robert J. Dwyer
                                   Nicholas A. Gravante Jr.
                                   Duane L. Loft
                                   Julia C. Hamilton
                                   575 Lexington Avenue
                                   New York, NY 10022
                                   Telephone:  (212) 446-2300

                                   Samuel C. Kaplan
                                   5301 Wisconsin Avenue, NW
                                   Washington, DC 20015
                                   Telephone:  (202) 237-2727

                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                   John L. Gardiner
                                   Four Times Square
                                   New York, NY 10036
                                   Telephone:  (212) 735-3000

                                   *Attorneys for Plaintiff Starr International Company,*
                                   *Inc.*

41

## VERIFICATION

I, Edward E. Matthews, hereby verify as follows:

1.      I am a Director of Starr International Company, Inc. ("Starr").  I make this Verification in connection with the filing of the foregoing shareholder-derivative complaint.

2.      I am authorized to make this Verification on Starr's behalf.

3.      Starr currently holds shares of American International Group, Inc. and has held such shares continuously at all times relevant to the complaint.

4.      I have reviewed the complaint and know the contents thereof.  I verify that the allegations as to Starr and allegations as to which I have personal knowledge are true.  With respect to the remaining allegations, I am familiar with the factual basis for those allegations and verify them to be true to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of November 2011 at Princeton, New Jersey.

Edward E. Matthews