UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STARR INTERNATIONAL COMPANY,
INC., INDIVIDUALLY AND                          :
DERIVATIVELY ON BEHALF OF
AMERICAN INTERNATIONAL GROUP,                   :
INC.,                                                                No. 11-cv-8422 (PAE)
                                                :
                      Plaintiff,                         ECF Case
                                                :
          - against -
                                                :
FEDERAL RESERVE BANK OF NEW
YORK,                                           :

                                                :
                      Defendant,
                                                :
and AMERICAN INTERNATIONAL
GROUP, INC., a Delaware corporation,            :

                      Nominal                   :
                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................6

    A.   FRBNY Took Control of AIG ............................................................7

    B.   FRBNY Engineered the Maiden Lane III "Backdoor Bailout" ..............9

    C.   FRBNY Circumvented the Required Separate Class Vote to Increase the
Number of Authorized Shares Through a Deceptive Reverse Stock Split ...........12

ARGUMENT ..............................................................................................15

I.       STANDARD OF REVIEW .............................................................15

II.      STARR PROPERLY STATES BOTH DIRECT AND DERIVATIVE
CLAIMS ........................................................................................16

    A.   Starr Alleges Direct Claims Under Settled Delaware Law...................16

    B.   Starr Adequately Alleges Demand Futility With Respect to Its Derivative
Claims ...........................................................................................20

III.    WHEN IT TOOK CONTROL OF AIG, FRBNY ASSUMED CLEAR
FIDUCIARY OBLIGATIONS UNDER DELAWARE LAW............................26

    A.   FRBNY Cannot Overcome the Strong Presumption that It is Subject to
State Fiduciary Duty Law ...............................................................26

    B.   To Be Preempted, State Law Must Significantly Interfere With the
Legitimate Exercise of a Federal Function ........................................28

    C.   Requiring FRBNY to Adhere to Corporate Governance Law Does Not
Frustrate any Legitimate FRBNY Function........................................32

         1.   Section 13(3) is Not Frustrated by Application of Fiduciary Duty Law
to FRBNY's Use of Its Control Over AIG to Bail Out Other
Companies With AIG's Assets and to Nullify the Voting Rights of
AIG's Shareholders...............................................................33

         2.   Under Section 13(3), FRBNY Did Not Have the Authority to Exercise
Unfettered Control Over a Corporation ........................................35

IV.    FRBNY BREACHED FIDUCIARY DUTIES TO AIG AND ITS
COMMON STOCK SHAREHOLDERS THROUGH MAIDEN LANE III
AND THE WRONGFUL CONVERSION OF SERIES C PREFERRED
STOCK ..........................................................................................39

A.  Starr Has Adequately Alleged FRBNY's Control Over AIG.................................39

    1.  Starr Need Only Allege Facts Supporting the Inference of Control................40

    2.  Starr Has Alleged Facts Supporting FRBNY's Control Over AIG.................41

B.  Starr Has Adequately Alleged That FRBNY Breached Its Fiduciary Duties to AIG and AIG Shareholders...................................................................46

    1.  FRBNY Breached Its Fiduciary Duty by Effecting the Backdoor Bailout and Appropriating Two-Thirds of the Residual Interests of ML III............................................................................................46

    2.  FRBNY Breached Its Fiduciary Duty by Engineering a Scheme to Circumvent an Independent Shareholder Vote Through a Reverse Stock Split That Applied Only to Issued Shares.................................49

V.  PLAINTIFF HAS STATED VALID AIDING AND ABETTING CLAIMS AGAINST FRBNY..............................................................54

CONCLUSION...............................................................................56

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)................................................................................... 30

*Anderson Nat'l Bank  v. Luckett*,
   321 U.S. 233 (1944)................................................................................. 28

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   No. 10-4591-CV, 2012 WL 1085948 (2d Cir. Apr. 3, 2012) ................................ 28, 51

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ............................................................... 22, 25, 47

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................ 16, 53

*Atherton v. FDIC*,
   519 U.S. 213 (1997)............................................................................ 29, 30

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
   426 F.3d 635 (2d Cir. 2005) ..................................................................... 16

*Baldanzi v. WFC Holdings Corp.*,
   No. 07-9551, 2008 WL 4924987 (S.D.N.Y. Nov. 14, 2008)................................... 31

*Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*,
   820 F. Supp. 2d 490 (S.D.N.Y. 2011) .......................................................... 16

*Banco de Espana v. Fed. Reserve Bank of N.Y.*,
   114 F.2d 438 (2d Cir. 1940) ..................................................................... 27

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) ....................................................................... 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................ 16, 53

*Billings Util. Co. v. Advisory Comm., Bd. of Governors*,
   135 F.2d 108 (8th Cir. 1943) .................................................................... 37

*Boyle v. United Technologies Corp.*,
   487 U.S. 500 (1988)............................................................................. 29

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ........................................................................ 22

*Burks v. Lasker,*
    441 U.S. 471 (1979)..................................................................................... 30

*Cal. Nat'l Bank v. Kennedy,*
    167 U.S. 362 (1897)..................................................................................... 38

*Corporacion Venzolana de Fomento v. Vintero Sales Corp.,*
    629 F.2d 786 (2d Cir. 1980) ...................................................................... 27

*Dubroff v. Wren Holdings, LLC,*
    C.A. Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011)........ 18

*Duncan v. Walker,*
    533 U.S. 167 (2001)..................................................................................... 27

*Empire City Capital Corp. v. Citibank, N.A.,*
    No. 10-CV-2601, 2011 WL 4484453 (S.D.N.Y. Sept. 28, 2011) ........................ 15, 23

*FDIC v. Meyer,*
    510 U.S. 471 (1994)..................................................................................... 27

*Fed. Hous. Admin. v. Burr,*
    309 U.S. 242 (1940)..................................................................................... 28

*Fed. Land Bank of St. Louis v. Priddy,*
    295 U.S. 229 (1935)..................................................................................... 28

*Fed. Reserve Bank of Atlanta v. Thomas,*
    220 F.3d 1235 (11th Cir. 2000) .................................................................. 27

*Feldman v. Cutaia,*
    956 A.2d 644 (Del. Ch. 2008) .................................................................... 17

*Frydman & Co. v. Credit Suisse First Boston Corp.,*
    708 N.Y.S.2d 77 (App. Div. 2000)............................................................... 40

*Gatz v. Ponsoldt,*
    925 A.2d 1265 (Del. 2007) ....................................................17-19, 47, 51

*Gentile v. Rossette,*
    906 A.2d 91 (Del. 2006) ........................................................... 17, 18, 20

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.,*
    866 F.2d 38 (2d Cir. 1989) ........................................................................ 27

*Harris v. Carter,*
    582 A.2d 222 (Del. Ch. 1990) .................................................................... 24

*Hartsel v. Vanguard Grp., Inc.*,
  C.A. No. 5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011) ............................ 20

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ......................................................................... 53

*Hudson Farms, Inc. v. McGrellis*,
  620 A.2d 215 (Del. 1993) ............................................................................. 50

*Huntington Towers, Ltd. v. Franklin Nat'l Bank*,
  559 F.2d 863 (2d Cir. 1977) ......................................................................... 37

*In re Alloy, Inc.*,
  No. 5626, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011) .............................................. 55

*In re Cysive, Inc. S'holders Litig.*,
  836 A.2d 531 (Del. Ch. 2003) ................................................................... 40, 41

*In re Delphi Fin. Grp. S'holder Litig.*,
  No. 7144-VCG, 2012 WL 729232 (Del. Ch. Mar. 6, 2012) .......................................... 52

*In re Dow Chem Co. Deriv. Litig.*,
  No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) ............................................ 22

*In re Franklin Nat'l Bank Secs. Litig.*,
  478 F. Supp. 210 (E.D.N.Y. 1979) .................................................................. 38

*In re Johnson & Johnson Deriv. Litig.*,
  No. 10-2033, 2011 WL 4526040 (D.N.J. Sept. 29, 2011) ........................................... 25

*In re Loral Space & Commc'ns Inc.*,
  Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) .......... 40, 41

*In re Ltd., Inc. S'holders Litig.*,
  No. 17148, 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ............................................. 22

*In re Oakwood Homes Corp.*,
  340 B.R. 510 (Bankr. D. Del. 2006) ................................................................ 40

*In re Paxson Commc'ns Corp. S'holders Litig.*,
  No. 17568, 2001 WL 812028 (Del. Ch. July 12, 2001) ............................................. 25

*In re Primedia Inc. Deriv. Litig.*,
  910 A.2d 248 (Del. Ch. 2006) ...................................................................... 41

*In re Tri-Star Pictures, Inc. Litig.*,
  634 A.2d 319 (Del. 1993) ................................................................... 17, 18, 19

*James v. Fed. Reserve Bank of N.Y.*,
    471 F. Supp. 2d 226 (E.D.N.Y. 2007) ........................................................ 29

*Jefferson v. Chase Home Fin.*,
    No. 06-6510, 2008 WL 1883484 (N.D. Cal. Apr. 29, 2008) ......................... 31

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ......................................................................... 47

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991) ..................................................................................... 31

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
    540 A.2d 726 (Del. 1988) ........................................................................... 21

*Loeffler v. Frank*,
    486 U.S. 549 (1988) ................................................................................... 28

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ....................................................................... 16

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994) ..................................................................................... 30

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002) ................................................................... 22, 23

*Paramount Commc'ns Inc. v. QVC Network Inc.*,
    637 A.2d 34 (Del. 1994) ............................................................................. 50

*Platinum Estates, Inc. v. TD Bank, N.A.*,
    No. 11-60670, 2012 WL 760791 (S.D. Fla. Mar. 8, 2012) .......................... 55

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) ........................................................................... 22

*Quantum Color Graphics, LLC v. The Fan Assoc. Event Photo GMBH*,
    185 F. Supp. 2d 897 (N.D. Ill. 2002) .......................................................... 55

*Raichle v. Fed. Reserve Bank of N.Y.*,
    34 F.2d 910 (2d Cir. 1929) ......................................................................... 37

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ........................................................................... 22

*Reis v. Hazelett Strip-Casting Corp.*,
    28 A.3d 442 (Del. Ch. 2011) ...................................................................... 50

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ................................................................................................ 22, 30

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ..................................................................................... 12

*Tooley v. Donaldson, Luftkin & Jenrette, Inc.*,
  845 A.2d 1301 (Del. 2004) ....................................................................................... 20

*Uni-Marts, Inc. v. Stein*,
  No. 14713, 1996 WL 466961 (Del. Ch. Aug. 12, 1996) ............................................. 54

*United States v. Kimbell Foods, Inc.*,
  440 U.S. 715 (1979) ............................................................................................ 31, 35

*Wiener v. Lazard Freres & Co.*,
  672 N.Y.S.2d 8 (App. Div. 1998) ............................................................................. 41

*Williamson v. Cox Commc'ns, Inc.*,
  No. 1663-N, 2006 WL 1586375 (Del. Ch. June 5, 2006) ................................. 40, 41, 45

## **Statutes**

12 U.S.C. § 24 (Seventh) ........................................................................................... 38

12 U.S.C. § 341 ............................................................................................... 27, 36, 38

12 U.S.C. § 343 .......................................................................... 3, 4, 7, 32, 33, 35, 36-39

12 U.S.C. § 357 ...................................................................................................... 3, 36, 39

12 U.S.C. § 632 ................................................................................................... 26, 27

28 U.S.C. § 1331 ...................................................................................................... 26

12 U.S.C. § 5223 ................................................................................................... 35, 39

Del. Code tit. 8 § 242 ......................................................................................... 49, 50, 51

Model Business Corporations Act § 10.04 (2010) ........................................................ 50

## **Other Authorities**

Alexander Mehra,
  *Legal Authority in Unusual and Exigent Circumstances: The Federal Reserve
  and the Financial Crisis*,
  13 U. Pa. J. Bus. L. 221 (2010) ................................................................................ 34

Chad Emerson,
   *The Illegal Actions of the Federal Reserve*:  *An Analysis of How the Nation's*
   *Central Bank Has Acted Outside the Law in Responding to the Current*
   *Financial Crisis*,
   1 Wm. & Mary Bus. L. Rev. 109 (2010) .................................................................... 34

David Small & James Clouse,
   *The Limits the Fed. Reserve Act Places on the Monetary Policy Actions of the*
   *Fed. Reserve*,
   19 Ann. Rev. Banking L. 553, 571, 579 (2000) .......................................................... 38

Plaintiff Starr International Company, Inc. ("Starr") respectfully opposes the Motion to Dismiss the Amended Complaint (the "Motion") filed by Defendant Federal Reserve Bank of New York ("FRBNY") on April 2, 2012.

## PRELIMINARY STATEMENT

This lawsuit primarily seeks compensation for FRBNY's breaches of the fiduciary duties it owed both to American International Group ("AIG") and directly to AIG's shareholders, including Starr.  FRBNY assumed such duties when it assumed control of AIG, and breached those duties when it caused AIG to take actions which helped third parties and furthered FRBNY's goals unrelated to FRBNY's core statutory purpose: lending.

According to FRBNY, because it lent and exercised control as part of a rescue operation, it was freed of *any* duty whatsoever to the loan-receiving entity or its Common Stock shareholders.  FRBNY contends that all fiduciary duties are preempted, and appears to contend that it is also subject to no constitutional constraints.  FRBNY is not correct, and indeed its argument fundamentally misapprehends the nature of the claims against it.  The Amended Verified Complaint ("Amended Complaint") does *not* tell the Court that its only choices are: (a) to preempt *all* duties (and thus immunize the FRBNY no matter what it does); or (b) to require that FRBNY *always* and mechanically subordinate all of its own interests and prefer those of the loan-receiving entity.  To the contrary, as the federal preemption law on which FRBNY relies makes clear, the issue must be addressed through a case-by-case determination of (a) whether there is a core federal function asserted; and (b) whether application of state law would significantly interfere with the legitimate exercise of that function.

Thus, for example, Plaintiff alleges that FRBNY used the assets of AIG to subsidize other private entities.  That is something that has no conceivably rational connection to lending, "emergency lending," or any other legitimate FRBNY function.  FRBNY nevertheless argues that unless the Court allows it to engage in such extraordinary, self-serving conduct with impunity, then in any future case where (unlike here) a legitimate federal function is or at least may plausibly be at stake, the Court will have no choice but to sacrifice the federal interests in favor of the interests of the private loan-receiving entity.  That is simply not correct.  Even though there may be situations in which an asserted fiduciary duty might actually interfere with a legitimate federal function, the fact pattern here—exercising control over the borrower to use its assets to subsidize others—is not one of those situations.  Yet that purported "policy" argument is what FRBNY offers here to avoid justifying its use of AIG assets to subsidize other firms.

FRBNY makes a similar argument with respect to the additional challenged action—its use of a reverse stock split to nullify state law protections that require a vote of Common Stock shareholders to increase the number of authorized shares.  Again, FRBNY has no legitimate interest in circumventing this requirement, nor does it attempt to identify one.  Instead, it argues that its "discretionary decisions concerning its emergency lending powers" should not generally be subject to a fiduciary duty.  Through this formulation, FRBNY fails to explain how limiting its ability to engage in the *specific actions that are challenged in this case* would interfere with a significant federal function.  The exercise of control over a company to nullify the voting rights of Common Stock shareholders is not analogous to basic lending functions such as the setting of an

interest rate, ensuring of adequate security, or even vetoing of business decisions that could interfere with a company's ability to repay a loan.  In asking the Court to treat them the same, and under the guise of protecting its basic lending functions from interference, FRBNY effectively seeks the ability to exercise unfettered control over corporations without any regard for the interests of the corporation or its shareholders.  Federal preemption law, however, does not require such a gross disregard for context.  To the contrary, it presumes that there should be no displacement of state law in the absence of the clear conflict with core federal functions that FRBNY has not even attempted to demonstrate here.

FRBNY's assertion of immunity from any action it could take related to its control over AIG is additionally untenable given that both actions that are challenged—the backdoor bailout of other companies and the circumvention of shareholder protections—arose not out of lending, but rather out of the takeover of and control over a company, AIG.  FRBNY identifies no statute that authorized it to use its emergency lending power to acquire a controlling share of a corporation.  To the contrary, FRBNY's claim of immunity is premised on section 13(3) of the Federal Reserve Act, codified at 12 U.S.C. § 343 ("Section 13(3)").  Section 13(3), however, is a "narrow and specified" statute (Mot. 2) granting the authority to "discount notes, drafts, and bills of exchange arising out of actual commercial transactions."  The only consideration that it authorized FRBNY to obtain was an interest rate "fixed with a view of *accommodating commerce and business*."  12 U.S.C. § 357 (emphasis added).  Moreover, even if this "narrow and specified" statute did authorize FRBNY to engage in corporate management activities, it

would not shield FRBNY from liability for acts which were unrelated to any lending

function and were, instead, undertaken to avoid public scrutiny and Delaware law.

Specifically, Section 13(3) cannot grant immunity for FRBNY's actions in:

- establishing a trust for the benefit of the Treasury[1] (the "Trust") that would receive a controlling stake in AIG and vote according to a "best interest of the Treasury standard," and then using the Trust's controlling voting and equity interest in contravention of Delaware law to effect a reverse stock split, which accomplished an increase in the relative number of authorized but not issued Common Stock shares of AIG without a separate vote of Common Stock shareholders, destroying existing Common Stock shareholder equity.

- causing the "Series C Preferred Stock," which had almost 80 percent of voting interests, and was acquired by the Trust for only $500,000, to be exchanged for more than 562 million shares of Common Stock worth $25 billion.  FRBNY did not obtain a fairness opinion for this transaction even though it did obtain such opinions for its simultaneous exchanges of its Series E and F AIG Preferred Stock.

- creating a special purpose vehicle designated Maiden Lane III LLC ("ML III" or "Maiden Lane III") to which FRBNY transferred $37.5 billion of AIG's assets to effect a "backdoor bailout" of certain of AIG's counterparties by purchasing—at par (or face) value—securities that were worth far less at that time.   Maiden Lane III was designed to shield FRBNY from public scrutiny by hiding what would have been an unpopular bailout.

- Although FRBNY purposefully overpaid for those securities (using AIG's money), FRBNY has now begun to sell those securities for an amount that, in the words of its current president, "significantly exceeds" the original price paid. Despite AIG's $37.5 billion contribution towards the purchase of those securities, FRBNY claimed a two-thirds interest in any profits, such that AIG suffered the loss from the overpayment without receiving the benefit of the subsequent growth in value.

With no legal basis for its claim of immunity, FRBNY resorts simply to disputing

the complaint's well-pleaded factual allegations by asserting (i) that FRBNY did not have

control over AIG, and (ii) that the purpose of the reverse stock split was to avoid

delisting, not to dilute the interests of shareholders without their consent in violation of

---

[1] As used herein, "Treasury" refers to the United States Treasury.

Delaware law.  Both assertions are unfounded and inappropriate at the motion to dismiss

stage where Starr is entitled to the presumption that its factual allegations are true and to

all reasonable inferences.

FRBNY's assertion that it lacked control over AIG, moreover, ignores the

allegations in the Amended Complaint that demonstrate otherwise.  FRBNY had the

unilateral control necessary to establish and implement its goals by, *inter alia*, (i)

requiring AIG shareholder votes on any proposal it deemed necessary to the Credit

Agreement entered into between AIG and FRBNY on September 22, 2008 (the "Credit

Agreement"); (ii) requiring AIG shareholder votes on the conversion of the Trust's

shares; (iii) establishing that the controlling stake would be voted according to a "best

interest of the Treasury" standard; (iv) installing former high-ranking FRBNY officials as

trustees of the Trust (the "Trustees") who would vote the shares; (v) entering into an

enforceable agreement with the Trustees that required them to exercise their duties in the

best interests of the Treasury; (vi) appointing and controlling AIG's chief executive

officer; and (vii) providing for consent rights under the Credit Agreement that enabled

FRBNY to control the day-to-day management of AIG.  *See infra* Statement of Facts § A.

FRBNY's assertions concerning the purpose of the reverse stock split are equally

unfounded and equally inappropriate at the motion to dismiss stage.   FRBNY summarily

asserts that the Court should conclude as a matter of law that the reverse stock split's

purpose was to avoid delisting, rather than to circumvent the need to secure Common

Stock shareholders' consent to increase the number of authorized shares.  This argument

ignores the true vice of the reverse stock split—its application only to issued shares and

not to authorized but unissued shares, which demonstrates that the reverse stock split was used to evade Delaware law.

FRBNY's additional technical objections likewise fail.  *First*, it insists that the Amended Complaint is defective for failure to make a pre-suit demand on AIG's Board of Directors (the "Board"), but that argument ignores the fact that the Treasury is the controlling shareholder and that the Board was appointed based on FRBNY's judgment that AIG's directors would only take actions "in or not opposed to the best interests of the Treasury" (Am. Compl. ¶ 106)—facts that easily excuse any demand requirement. *Second*, FRBNY asserts that none of Starr's claims may be brought as direct claims, but that argument ignores well-established Delaware law providing that claims can be asserted both directly and derivatively where they involve a controlling party's expropriation of the equity and voting power of a non-controlling shareholder.

In sum, there is no basis for dismissing this case at this preliminary stage, and FRBNY's motion should be denied.[2]

## STATEMENT OF FACTS

In 2008, AIG was the world's leading international insurance organization, with "high-quality" assets that were more than sufficient to meet any claimed contractual obligations.  (*Id.* ¶¶ 21, 41, 56.)  However, because these assets were by nature, and for reasons unrelated to the financial crisis, relatively illiquid, AIG was imperiled by a severe lack of required liquidity as the financial crisis escalated at the end of the summer of 2008.  (*Id.* ¶¶ 35-41.)  Notwithstanding the number and quality of AIG's assets, FRBNY

---

[2] FRBNY takes the position that Starr's takings claims against FRBNY are properly brought in the United States Court of Federal Claims in light of the fact that FRBNY "was acting as a federal instrumentality."  (Mot. 44 n.17.)  Starr agrees that, given this admission, the affirmative takings claims are properly brought in that Court.

refused repeated requests from AIG for discount window access or other forms of low-cost capital, even while affording such aid to institutions with assets of inferior quality. (*Id*. ¶¶ 41-45, 50, 51(d).)  AIG's liquidity problems rapidly worsened as a result of FRBNY's refusals.  (*Id.* ¶¶ 42-51.)

Seven weeks after FRBNY first refused to grant AIG discount window access, AIG was offered a fully secured $85 billion FRBNY revolving credit facility bearing interest and fees at an unprecedented initial annual cost of 14.5 percent.  (*Id*. ¶¶ 51(a), 56.)[3]  The terms of the loan further required AIG to make FRBNY a controlling shareholder and lender by transferring a nearly 80 percent interest in the company.  (*Id*.) Although FRBNY's own representative had aptly described the terms which became the Credit Agreement as an attempt to "steal the business" (*id.* ¶ 51(c), (d)), even the Credit Agreement provided, in accordance with Delaware law, that the "preferred shares" created pursuant to the agreement (the Series C Preferred Stock) would be convertible to Common Stock only upon a vote of the existing Common Stock shareholders (*id*. ¶¶ 114-19).

## A.    FRBNY Took Control of AIG

FRBNY quickly took control of the Company.  Two days after the term sheet was executed, AIG's CEO was fired and replaced with a new CEO, Edward M. Liddy, who

---

[3] FRBNY appears to contest the fact that the loan was fully secured when it notes that many of AIG's assets were illiquid.  (Mot. 7 n.1.)  First, such an argument is inappropriate on a motion to dismiss, where the facts alleged (*see, e.g.*, Am. Compl. ¶¶ 52, 56-57) must be assumed to be true.  In any case, the fact that AIG's assets were illiquid does not mean that the loan was not fully secured.  FRBNY fails to mention that Section 13(3) *requires* a loan to be fully secured as a prerequisite to its issuance, and that FRBNY officials acknowledged in Congressional testimony that AIG "fully secured the Federal Reserve System," and that "AIG had enough high-quality collateral" such that FRBNY was "not making an investment in AIG," it was "making a fully secured loan." (*Id.* ¶ 56.)

was under FRBNY's control.  (*Id*. ¶¶ 54, 58.)  FRBNY also installed an on-site team led

by a senior FRBNY official whose sole task was to monitor AIG's decision making and

financial condition and to exercise FRBNY's consent rights under the Credit Agreement,

which FRBNY used to control the day-to-day management of the company.  (*Id*. ¶¶ 59-

60.)

On September 22, 2008, FRBNY's handpicked CEO executed a "Credit

Agreement" between AIG and FRBNY.  (*Id.* ¶ 55.)  In addition to the interest rates and

assets securing the loan from FRBNY, the Credit Agreement required AIG to issue to the

Trust shares of Series C Preferred Stock that carried a nearly 80 percent voting interest

and were convertible into just under 80 percent of AIG's Common Stock (subject to a

requirement of shareholder consent that FRBNY would ultimately disregard).  (*Id.* ¶ 57;

Mot. Ex. 1 (Credit Agreement dated September 22, 2008), at Ex. D.)[4]  The Trust paid

only $500,000 for the Series C Preferred Stock, and ultimately exchanged the stock for

Common Stock worth in excess of $25 billion.  (Am. Compl. ¶ 134(b).)

Various provisions of the credit facility, as well as consent rights used by FRBNY

to control the day-to-day management of AIG, effectively made FRBNY AIG's

controlling shareholder and lender.  (*Id*. ¶¶ 59-60.)  For example:  (i) FRBNY had the

unilateral power to put to a vote any proposal it deemed necessary to exchange the Series

C Preferred Stock into Common Stock or any proposal it deemed necessary to the

operation of the loan (Mot. Ex. 1 (Credit Agreement dated September 22, 2008), at Ex.

D); (ii) FRBNY was able to prevent AIG from incurring additional debt or paying off any

debt ahead of schedule, including the termination of Credit Default Swaps ("CDSs")

---

[4] As used herein, "Motion Exhibits" refers to the exhibits attached to the Declaration of
John S. Kiernan in Support of Defendant's Motion to Dismiss the Amended Complaint.

(Credit Agreement dated September 22, 2008 §§ 6.01, 6.09);[5] (iii) FRBNY required that

the 79.9 percent voting share would be exercised "in or not opposed to the best interests

of the Treasury" (Am. Compl. ¶ 106); and (iv) FRBNY retained the legal ability to

enforce that standard as the party to the agreement that established the Trust (*id.* ¶¶ 57,

100-101; *see* Mot. Ex. 2, AIG Credit Facility Trust Agreement dated January 16, 2009

(the "Trust Agreement"), at 22).  Further to point (iii), Defendant acknowledges that the

Trust Agreement conditions the exercise of the "full discretionary power" granted to the

Trustees who formally controlled the Trust on compliance with "the Applicable Standard

of Care" (Mot. 9; Mot. Ex. 2 § 2.04(d)), which is the defined term in the Trust Agreement

that includes the requirement that the Trustees act "in or not opposed to the best interests

of the Treasury" (Mot. Ex. 2 § 3.03(a)(i)).

Further cementing its control, FRBNY appointed as two of the three Trustees

individuals with longstanding ties to FRBNY, including a former member of FRBNY's

Board who had recently completed a six-year term, and a former employee who had been

with FRBNY for 36 years.  (Am. Compl. ¶ 103.)  As a result of the foregoing, and at all

times relevant to Starr's and AIG's claims, FRBNY exercised virtually complete control

over AIG.  (*Id*. ¶ 59.)

**B.      FRBNY Engineered the Maiden Lane III "Backdoor Bailout"**

In the fall of 2008, FRBNY established Maiden Lane III.  (*Id.* ¶ 69.)  FRBNY

used ML III to funnel AIG funds and assets to AIG's Credit Default Swap ("CDS")

counterparties to avoid the public scrutiny that would accompany directly bailing those

companies out.  (*Id.* ¶¶ 63, 69, 79.)  FRBNY accomplished this by negotiating settlements

---

[5] *Available at* http://www.newyorkfed.org/aboutthefed/aig/pdf/original_credit_
agreement.pdf.

9

in which ML III paid par (*i.e.*, the full face) value for these counterparties' collateralized debt obligations ("CDOs"), literally *turning down* concessions.[6]  (*Id.* ¶¶ 75-78, 89, 94-95.)  As a result of the settlements negotiated by FRBNY, the counterparties benefited by over $60 billion; they kept approximately $32.5 billion in cash collateral previously posted by AIG and received the proceeds of $5 billion in new equity contributed to ML III by AIG as well as a $24.3 billion loan from FRBNY to ML III.  (*Id.* ¶¶ 74-75.)  In exchange, the counterparties agreed to cancel their CDS contracts with AIG, and ML III assumed the right to the proceeds either from the liquidation of the CDOs or the principal and interest payments from retained CDOs.  (*Id.* ¶¶ 76, 80.)

This structure was—from AIG's perspective—an inefficient and costly alternative to options at FRBNY's disposal, including a guarantee of the CDS contracts.  (*Id.* ¶ 69.) The guarantee option would have relieved AIG of the need to post collateral, thus substantially resolving AIG's liquidity crisis at potentially no cost to taxpayers.  (*Id.*) Instead, FRBNY opted to spend more than $60 billion of taxpayer and AIG funds for the benefit of favored financial institutions on terms that breached FRBNY's fiduciary duties to AIG and its shareholders.  (*Id.*)  The only beneficiaries of this arrangement were the counterparties, who received full credit protection as if all of the instruments insured by

[6] FRBNY argues that it was not required "to use its position and muscle to coerce AIG's counterparties to forfeit a part of their contractual entitlement."  (Mot. 12-13.)  In no sense can taking advantage of the fact that "at least one counterparty *expressed a willingness* to accept concessions or discounts" and that "Another counterparty indicated to FRBNY it was considering a range of discounts" be characterized as "coercion."  (Am. Compl. ¶ 89.)  To the contrary, using bargaining power for the benefit of AIG was part of FRBNY's fiduciary duties to AIG, especially as FRBNY was not acting within its statutory function.  Moreover, FRBNY did not even contact 50 percent of the counterparties who ultimately benefitted from the "backdoor bailout" and, when offered concessions, turned them down based on a unilateral decision not even to attempt to negotiate prices favorable to AIG.  (*Id.* ¶¶ 86-90.)

the CDSs had defaulted.  (*Id.* ¶¶ 76, 92.)  Thus, Maiden Lane III's purpose was to effect a

"backdoor bailout" of these counterparties, thereby avoiding public scrutiny, and reduced

AIG's ability to repay its loans.  (*Id.* ¶¶ 63, 69, 79.)

　　　FRBNY also appropriated a disproportionately high share of the "residual

interests"—*i.e.*, returns from the underlying CDOs.  (*Id.* ¶¶ 80-83.)  Pursuant to the

payment "waterfall," any proceeds would be paid in the following order:  (i) to FRBNY

until it had received full reimbursement for its $24.3 billion loan (FRBNY's only

contribution); (ii) to AIG until it was reimbursed for its $5 billion equity contribution;

and (iii) to FRBNY (2/3) and AIG (1/3) without any recognition or reimbursement of the

$32.5 billion in collateral AIG had contributed (this third level of payments was referred

to as "residual interests").  (*Id.* ¶¶ 80-81.)  FRBNY did not permit sale of the residual

interests to reduce AIG's debt, further evidencing that this arrangement had nothing to do

with FRBNY's lending functions.[7]  (*Id.* ¶ 82.)

　　　In fact, FRBNY has already begun to auction off Maiden Lane III's assets.  (Press

Release, the Federal Reserve Bank of New York, New York Fed Sells MAX CDO

Holdings in Competitive Process (Apr. 26, 2012)).[8]  According to FRBNY's president,

---

[7] FRBNY's argument that the "complaint does not allege that this typical capital
structure, in which debt was repaid before equity, was improper" (Mot. 11) ignores the
allegations that *profits* were disproportionately distributed without reimbursing AIG's
$32.5 billion contribution.  FRBNY's argument that it was owed "2/3 of the upside
return" because it agreed to bear "more than 80% of possible future downside risk by
investing $24.3 billion in ML III compared to AIG's $5 billion" (*id.* at 12) similarly
overlooks AIG's unreimbursed $32.5 billion contribution.  FRBNY cannot advance the
argument that AIG's $32.5 billion contribution can be ignored on a motion to dismiss
when the allegations in the Amended Complaint must be accepted as true.  *See infra*
Section I.

[8] *Available at* http://www.newyorkfed.org/newsevents/news/markets/2012
/an120426.html.  Despite "the rule that a district court must confine itself to the four
corners of the complaint when deciding a motion to dismiss," the Court may take judicial

the sale price "significantly exceeds" the price FRBNY paid for them.  (Al Yoon, *N.Y. Fed Unloads Bonds Tied to AIG*, Wall St. J. (Apr. 27, 2012);[9] *see* Caroline Salas Gage & Sarah Mulholland, *Fed Sells CDOs from AIG Rescue to Barclays, Deutsche*, Bloomberg.com (Apr. 26, 2012)[10] (stating that FRBNY earned $2.8 billion from completed Maiden Lane II auctions and security sales.)  The value of the ML III residual interests is therefore far from an academic question.

### C.   FRBNY Circumvented the Required Separate Class Vote to Increase the Number of Authorized Shares Through a Deceptive Reverse Stock Split

On March 4, 2009, AIG issued the Series C Preferred Stock to the Trust.  (Am. Compl. ¶ 67(b).)  Delaware law required approval by AIG's existing Common Stock shareholders before FRBNY would be permitted to convert the Trust's Series C Preferred Stock into nearly 80 percent of AIG Common Stock because AIG's then-governing Restated Certificate of Incorporation (the "Charter") did not authorize a sufficient number of shares to permit such a transaction to occur.  (*Id.* ¶¶ 67(b), 109, 110.)

Accordingly, the Credit Agreement required AIG to call a shareholder meeting to hold a vote to amend the Charter to increase the number of authorized shares of Common Stock to 19 billion and to reduce the par value per share.  (*Id.* ¶ 114.)  AIG represented in separate filings with the SEC, and in a Delaware consent order that settled a lawsuit

---

notice of "media reports" not "for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (internal quotation marks and brackets omitted).

[9] *Available at* http://online.wsj.com/article/SB10001424052702303990604577368301323656754.html.

[10] *Available at* http://www.bloomberg.com/news/2012-04-26/fed-sells-cdo-debt-from-aig-rescue-to-barclays-deutsche-bank.html.

brought to ensure that such a vote would be held, that conversion would require a class vote of the Common Stock shareholders (*i.e.*, a vote in which the almost 80 percent voting interests controlled by FRBNY were not permitted to vote).  (*Id*. ¶¶ 111-116.) Moreover, the Stock Purchase Agreement entered between the Trust and AIG on March 1, 2009 ("Stock Purchase Agreement"), expressly and unequivocally provides that FRBNY and its agents would be permitted to convert the Series C Preferred Stock to a nearly 80 percent interest in the Common Stock of AIG *only* upon a valid vote by the existing Common Stock shareholders to "approve the Charter Amendment" that would "reduce the par value of the Common Stock to $0.000001 per share and increase the number of authorized shares of Common Stock to 19 billion."  (*Id*. ¶ 117.)  AIG also agreed in the Stock Purchase Agreement to adopt an amendment to the Charter increasing the number of authorized shares that would require "the holders of the Common Stock voting as a separate class in the case of the Common Stock Amendment Proposal" *and that if not obtained*, "*the Company shall include a proposal to approve such proposals at each subsequent annual meeting of its shareholders*."  (*Id*. ¶ 118 (emphasis in Am. Compl.).)

FRBNY never secured independent shareholder approval for the necessary increase.  (*Id.* ¶ 122.)  Instead, FRBNY circumvented this requirement through a misleading 20:1 reverse stock split of issued, but not authorized, shares.  (*Id.* ¶ 123.)  The reverse stock split reduced the approximately three billion shares of issued Common Stock by 95 percent to approximately 150 million, while leaving the number of overall authorized shares at approximately five billion.  (*Id.*)  Through this scheme, FRBNY created a sufficient number of shares to exchange its Series C Preferred Stock for AIG

Common Stock without having to obtain the consent of the Common Stock public shareholders through an independent vote.  (*Id*.)

FRBNY argues that the "Court need not accept plaintiff's unsubstantiated assertion as to the reverse stock split's purpose," *i.e.*, to circumvent the requirement of independent shareholder approval, and offers an alternative explanation drawn from evidence not contained in the Amended Complaint.  (Mot. 42-43.)  Plaintiff, however, alleges that (i) FRBNY was responsible for submitting the reverse 20:1 stock split proposal ("Proposal 4") to shareholders (Am. Compl. ¶ 123); (ii) the proxy statement leading to the vote on Proposal 4 misleadingly informed shareholders that "AIG currently has no plans for these authorized but unissued shares" (*id.* ¶ 124); and (iii) the "authorized but unissued shares" were then used to circumvent the independent shareholder approval requirement (*see id.* ¶ 128).  Whatever alternative explanation FRBNY seeks to advance based on improper extraneous evidence, these allegations are more than sufficient to create a reasonable inference (*see infra* Section I) that the purpose of the reverse stock split was to circumvent Delaware law and AIG's representations to the SEC and the Delaware courts.

Thus, on January 14, 2011, FRBNY caused AIG to allow the Trust to exchange its Series C Preferred Stock, together with preferred shares obtained pursuant to the Troubled Asset Relief Program (Series E and F Preferred Stock), for a 92.1 percent stake in AIG Common Stock (or 1,655,037,962 shares).  (Am. Compl. ¶¶ 130, 133-34.) 562,868,096 of these shares (nearly four times the number held by Common Stock shareholders after the FRBNY-engineered reverse stock split), were exchanged for the Series C Preferred Stock.  (*Id*. ¶ 134.)  Approximately 11 million of those shares (worth

about $500 million) were acquired without any explanation, as the Trust's approximately 551 million shares of Series C Preferred Stock should have been exchanged into an approximately equal amount of Common Stock.  (*Id.*)

While AIG received $500,000 for the Series C Preferred Stock, the 562,868,096 shares of Common Stock FRBNY caused the Treasury to acquire in exchange for the Series C Preferred Stock were worth $25 billion.  (*Id.*)  In contrast, the Government acquired the 1,092,169,866 shares of AIG Common Stock it received for the Series E and F Preferred Stock (for which it had paid approximately $49 billion) through an exchange at the market price ($45.25 per share).  (*Id.* ¶ 134(a), (b).)  Unsurprisingly, in light of the unfairness of the Series C exchange, while the Series E and F exchanges received fairness opinions, none was received for the Series C exchange.[11]  (*Id.* ¶ 134(b).)

## ARGUMENT

### I.   STANDARD OF REVIEW

The Motion seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) (takings claims only), 12(b)(6) (all claims), and 23.1(b)(3) (derivative claims only). (Notice of Mot. 1.)  The standard applicable under Rule 23.1 is discussed *infra* Section II.B.

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  *Empire City Capital Corp. v. Citibank, N.A.*, No. 10-CV-2601, 2011 WL 4484453, at *1 (S.D.N.Y. Sept. 28, 2011) (internal quotation marks and brackets omitted).  A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

---

[11]  Either no opinion was sought, or the investment banks that gave the Series E and F opinions refused to opine that the Series C exchange was "fair."

detailed factual allegations," but the allegations "must be enough to raise a right to relief

above the speculative level" such that it states a claim "that is plausible on its face." *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).

      "After construing all ambiguities and drawing all inferences in a plaintiff's favor,

a district court may properly dismiss a case for lack of subject matter jurisdiction under

Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it."

*Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (internal

quotation marks, brackets and citations omitted) (applying "policy of liberal construction

of complaints"); *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)

("Construing all ambiguities and drawing all inferences in" the plaintiff's "favor").

"When considering a motion to dismiss, courts are generally limited to examining the

sufficiency of the pleadings but, where a party challenges the court's subject matter

jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to

evidence outside the pleadings." *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820

F. Supp. 2d 490, 499 (S.D.N.Y. 2011) (internal quotation marks omitted).

## II.   STARR PROPERLY STATES BOTH DIRECT AND DERIVATIVE CLAIMS

### A.   Starr Alleges Direct Claims Under Settled Delaware Law

      FRBNY's argument that "Starr's purported direct claims are not cognizable as

such" and "can only be asserted as derivative claims on behalf of AIG" misapplies

controlling Delaware law.  (Mot. 19.)  Any other entity in FRBNY's place would be

directly liable to Starr for breaching its fiduciary duties.

Starr can seek "redress in a direct action" because FRBNY's exercise of "control

over the corporate machinery to cause an expropriation of economic value and voting

power from the public shareholders," *Gatz v. Ponsoldt*, 925 A.2d 1265, 1281 (Del. 2007),

has resulted in "a separate and distinct harm . . . apart from any harm caused to the

corporation."  *Id.* at 1274.  The Delaware Supreme Court has expressly endorsed the

application of this doctrine in *Gatz*, a case that interestingly also involved the use of

"Series C Preferred Shares" and "a reverse stock split" to engineer expropriation of

public shareholder rights.  *Id.*; *see Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006)

("improper transfer – or expropriation – of economic value and voting power from the

public shareholders to the majority or controlling shareholder" states direct claim); *In re*

*Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 331-32 (Del. 1993) ("cash value dilution"

and "loss of voting power resulting from . . . issuance of 75 million shares" constituted

direct claim).

Indeed, the authority relied on by FRBNY makes clear that both direct and

derivative claims may be advanced where the complaint alleges facts showing that:

> (1) a stockholder having majority or effective control caused the
> corporation to issue 'excessive' shares of its stock in exchange for assets
> of the controlling stockholder that have a lesser value; and
>
> (2) the exchange caused an increase in the percentage of the outstanding
> shares owned by the controlling shareholder, and a corresponding decrease
> in the share percentage owned by the public (minority) shareholders.

*Feldman v. Cutaia*, 956 A.2d 644, 656 (Del. Ch. 2008) (internal brackets omitted)

(quoting *Gentile*, 906 A.2d at 100).

This action is controlled by these cases. *First*, Starr alleges that FRBNY had control of AIG based on its voting powers exercised through the Trust, as well as through direct, day-to-day control. (*See, e.g.*, Am. Compl. ¶¶ 4, 53-65; Statement of Facts § A, *supra*.) *Second*, as discussed in greater detail above (Statement of Facts § C), Starr alleges that FRBNY evaded "AIG's existing Common Stock shareholders' right to approve the massive issuance of the new Common Stock shares required to complete the Government's taking of a nearly 80% interest in the Common Stock of AIG." (Am. Compl. ¶ 11; *see, e.g.*, *id.* ¶¶ 50-65, 100-07.) *Finally*, Starr alleges that the transactions resulted in the expropriation of Common Stock shares by FRBNY, and a corresponding decrease in the Common Stock share percentage—and therefore the proportion of equity and voting rights—owned by the public shareholders. (*See, e.g., id.* ¶¶ 50-65, 120-35.) The allegations in the Amended Complaint are more than sufficient to state a direct cause of action under established Delaware law. *See Dubroff v. Wren Holdings, LLC*, C.A. Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175, at *6-9 (Del. Ch. Oct. 28, 2011) (alleging (1) control and (2) responsibility for transaction that (3) decreased minority shareholder interest and increased controlling group's interest states direct claim).

In sum, as in *Gatz* and *Gentile*, the wrongful actions of FRBNY in the exercise of its controlling interest in AIG resulted in a massive change in the equity structure of the company in a manner that directly and uniquely harmed the existing public Common Stock shareholders. *See Gatz*, 925 A.2d at 1281; *Gentile*, 906 A.2d at 100; *Tri-Star*, 634 A.2d at 330-31; *Dubroff*, 2011 WL 5137175, at *8.

FRBNY's attempt to distinguish the established *Gatz/Gentile* line of authority is limited to a footnote, in which it argues that "FRBNY owned no AIG stock, and neither

FRBNY nor anyone else was a controlling shareholder of AIG when AIG agreed on September 16, 2008 to provide a nearly 80% equity interest to the Trust as part of the consideration for FRBNY's rescue loan."  (Mot. 20 n.9.)  This argument is wrong for two independent reasons.

First, FRBNY's use of the Trust as a vehicle to hold the Series C Preferred Stock does not diminish FRBNY's control of AIG.  In *Gatz*, the Delaware Supreme Court rejected similar attempts to evade direct liability, holding that the person in *de facto* control of a corporation could be held directly liable for breaches of fiduciary duty owed to that corporation when the control of the corporation was exercised indirectly (and unofficially) through a trust.  *Gatz*, 925 A.2d at 1275-77, 1281; *see also Tri-Star*, 634 A.2d at 328-29 (finding control based on shareholder agreements and influence in proxy preparation process).  Like here, the fact that entities stood between the ultimate controller and the corporate entity and shareholders to whom duties were owed did not prevent shareholders from asserting direct claims.  As the *Gatz* court recognized, "equity will not permit a fiduciary to deprive his beneficiaries of their entitlement to seek direct redress . . . by structuring a transaction so as to obscure that entitlement."  *Gatz*, 925 A.2d at 1280.  The structure of the transaction, therefore, is irrelevant to whether FRBNY breached its fiduciary duties.  The only issue is whether Starr has alleged that FRBNY was in control, and the Amended Complaint has done precisely that.  (*See infra* Section IV.A.)

Second, FRBNY's argument that it could not breach its fiduciary duties in 2008 when it controlled no shares (Mot. 20 n.9), ignores the Amended Complaint's clear allegations of "the harm done to AIG and its shareholders *after* FRBNY began to control

AIG." (Am. Compl. ¶ 5 (emphasis added).) Such harm includes the loss of voting rights and equity dilution suffered by the public shareholders. In March 2009, FRBNY was firmly in control of AIG as a result of having obtained Series C Preferred Stock (held by the Trust) constituting 79.9 percent of the equity voting power of AIG. (*Id.* ¶ 57.) FRBNY then caused the Trust to vote its preferred shares in June 2009 to increase the ratio of authorized shares to issued shares of Common Stock (*id.* ¶¶ 123-25), and completed the expropriation of the public shareholders' equity interest in January 2011 by exchanging the Trust's Series C Preferred Stock for Common Stock (*id.* ¶¶ 133-35). FRBNY structured the transactions to obtain controlling shareholder status, and it succeeded in using that control to cause an increase in outstanding Common Stock shares for the benefit of FRBNY and at the expense of the Common Stock shareholders. (*Id.* ¶¶ 51(a), 52-57.)[12]

### B.    Starr Adequately Alleges Demand Futility With Respect to Its Derivative Claims

FRBNY argues that Starr's derivative claims should be dismissed for failure to adequately plead either a demand on AIG's board of directors, or facts demonstrating that demand is excused under Federal Rule of Civil Procedure 23.1 ("Rule 23.1"). (Mot.

---

[12] FRBNY's cases (Mot. 20 n.9) either support Starr's position or are inapposite. The court in *Gentile* noted that the fact that minority shareholders have direct claims in circumstances like this "fits comfortably within the analytical framework mandated by" *Tooley v. Donaldson, Luftkin & Jenrette, Inc.*, 845 A.2d 1301 (Del. 2004), because the minority shareholders suffered injury that was independent of the corporation's injury. *See Gentile*, 906 A.2d at 102-03. *Hartsel v. Vanguard Group, Inc.*, C.A. No. 5394-VCP, 2011 WL 2421003, at *17-18 (Del. Ch. June 15, 2011), is distinguishable because there plaintiffs did not sufficiently allege an injury separate from that suffered by the funds in which they held shares.

16.)[13]   As an initial matter, Starr agrees with AIG that the Court should defer its ruling on whether demand was excused.  (Nominal Def. Am. Int'l Grp., Inc. ("AIG")'s Response to Fed. Reserve Bank of N.Y.'s Mot. to Dismiss, at 4 (The "pre-suit demand issue is best left to be addressed, if necessary, after the Court decides whether to grant FRBNY's motion to dismiss under Rules 12(b)(1) and 12(b)(6)").)  In light of AIG's request, Delaware precedent relied on by FRBNY (Mot. 16 n.6) establishes that, if the corporation permits the lawsuit, there are no demand issues and, if it opposes the suit, it can do so in its own brief.  *See Kaplan v. Peat*, *Marwick*, *Mitchell & Co.*, 540 A.2d 726, 731-32 (Del. 1988).[14]   Because the demand doctrine is intended to protect AIG, not FRBNY, there is no reason, as a prudential matter, for the Court to address an issue of state law at this time when the party that the defense is meant to protect has requested the Court not do so.

But, even if the Court chooses to address the matter, Starr has adequately alleged that demand is excused in this case.  Under Rule 23.1, a plaintiff must "state with particularity" "any effort by the plaintiff to obtain the desired action from the directors or comparable authority" and "the reasons for not obtaining the action or not making the effort."  Under Delaware law,[15] demand is excused where there is "a reasonable doubt

---

[13] Nowhere does FRBNY argue that Starr's claims are not cognizable as derivative claims.  Instead, FRBNY's arguments concerning Starr's derivative claims are limited to Starr's alleged failure to satisfy the demand requirement.

[14] Indeed, a "position of neutrality is viewed as inconsistent with objection to the continued prosecution of the derivative action and thus serves to excuse demand."  *Kaplan*, 540 A.D.2d at 727.  Starr has agreed "that it will not contend that the postponement of AIG's time to respond to the complaint constitutes tacit approval by AIG of Starr's failure to make a demand."  (February 29, 2012, Letter from D. Boies to the Court, at 1 (internal quotation marks omitted).)

[15] To determine whether a plaintiff has complied with Rule 23.1, a court "must apply the demand futility exception as it is defined by the law of the State of incorporation."  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991).

that, as of the time the complaint is filed, the board of directors could have properly

exercised its independent and disinterested business judgment in responding to a

demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993); *see generally Aronson v.*

*Lewis*, 473 A.2d 805, 808 (Del. 1984), *overruled on other grounds*, *Brehm v. Eisner*, 746

A.2d 244, 254 (Del. 2000).[16]   "Directorial interest exists whenever divided loyalties are

present." *In re Ltd., Inc. S'holders Litig.*, No. 17148, 2002 WL 537692, at *4 (Del. Ch.

Mar. 27, 2002) (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)); *see also*

*Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812, 815; *Pogostin*, 480 A.2d at

624).  Further, to raise a question concerning the independence of a board member, a

plaintiff asserting the "control of one or more directors" need only allege "particularized

facts manifesting a direction of corporate conduct in such a way as to comport with the

wishes or interests of the corporation (or persons) doing the controlling." *Orman v.*

*Cullman*, 794 A.2d 5, 23-24 (Del. Ch. 2002) (internal citation and quotations omitted).

Starr has alleged ample particularized facts demonstrating that AIG's Board is neither

independent nor disinterested.

    *First*, each current Board member was elected based on the understanding that

they would act only "in or not opposed to the best interests of the Treasury."  (Am.

Compl. ¶¶ 105-06, 142-43.)  Indeed, the Trust that elected the Board was duty-bound

never to act contrary to the interests of the Treasury, and to elect Board members who

would act according to that same standard.  (*Id.* ¶ 106.)  The assumption that the Trust

performed at the standard it was required to perform—an inference the Court is required

---

[16] *In re Dow Chem Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769, at *7 (Del. Ch. Jan.
11, 2010) and *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004)—cases cited by
FRBNY (Mot. 17)—both agree that the standard is one of "reasonable doubt."

to draw in Plaintiff's favor on a motion to dismiss, *see Empire City Capital Corp.*, 2011 WL 4484453, at *1—by itself creates more than a "reasonable doubt" that any Board elected by the Trust could impartially consider a demand to sue FRBNY, a federal instrumentality that itself acts to further the interests of the Treasury.  AIG, moreover, was under a duty under the Credit Agreement to ensure that the Board was satisfactory to the Trustees, who, again, were bound to perform their duties based on a standard that required complete fidelity to the interests of the Treasury.  (Am. Compl. ¶ 106.)  A reasonable doubt as to whether the Board could act independently in AIG's interest when acting at FRBNY's behest creates a "reasonable doubt" as to whether the Board would independently consider a demand to sue FRBNY when it is effectively the controlling shareholder.

*Second*, the Amended Complaint alleges numerous specific facts demonstrating the manner by which FRBNY dominated and controlled the Board to cause AIG to take actions in the best interest of FRBNY and its designated beneficiary—the United States—rather than in the best interests of AIG and its shareholders.  *See Orman*, 794 A.2d at 24 (independence of board member called into question by "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling" (internal citation and quotation marks omitted)).  For example, FRBNY unilaterally fired AIG's CEO and installed its own handpicked successor without the approval of AIG's Board or its shareholders (Am. Compl. ¶ 54) and then installed a handpicked Board that would do its bidding (*id.* ¶¶ 142-43).  In addition, FRBNY placed an on-site team within AIG, led by a

senior FRBNY official, which used its monitoring and consent rights under the governing

agreements to influence and direct the day-to-day management of AIG.  (*Id.* ¶ 59.)

The Amended Complaint also sets forth at length the manner by which FRBNY

required or induced the Board to act contrary to the interests of AIG's public shareholders

in order to execute the expropriation of economic value and voting power of their shares

in favor of FRBNY.  (*See, e.g.*, *id.* ¶¶ 61, 108-128.)  After repeated assurances that the

conversion of the Series C Preferred Stock would occur only upon approval by a separate

vote of the existing Common Stock shareholders, FRBNY required or induced the Board

to abandon that promise and circumvented this basic legal requirement in violation of its

obligations.  (*Id.* ¶¶ 108-28.)  Permitting and participating in such actions in derogation of

the rights of public shareholders, and permitting expropriation of the interests of existing

stockholders, readily demonstrate FRBNY's control over the Board.  *See Harris v.*

*Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) ("circumstances alleged in which" controlling

shareholder "acquired its controlling interest" and "immediately achieved board approval

for a series of very complex transactions that are alleged to have been wasteful, and

indeed fraudulent, itself is sufficient" to excuse demand).

The Amended Complaint also contains numerous examples of specific decisions

and corporate conduct directed by FRBNY for its own benefit, including: compelling

AIG to enter into unprecedented transactions, such as the ML III transaction, that were

unfavorable to AIG (Am. Compl. ¶¶ 60, 68-95); dictating the contents of SEC filings and

disclosures relating to those transactions (*id.* ¶¶ 61, 96-99); instituting a moratorium on

"lobbying activities" that was designed to conceal information about FRBNY's activities

from shareholders and the public (*id.* ¶ 62); and negotiating the terms of agreements on

behalf of AIG (*id.* ¶¶ 63, 68-95).  These allegations are more than sufficient to establish

self-interested control of a corporation by a controlling stockholder through a dominated

and controlled board of directors.  *See Aronson*, 473 A.2d at 812; *see also In re Johnson*

*& Johnson Deriv. Litig.*, No. 10-2033, 2011 WL 4526040, at *12-13 (D.N.J. Sept. 29,

2011) (citing cases decided under Delaware's demand futility standard and determining

"that it is proper to consider . . . allegations in the aggregate").[17]

FRBNY argues that these various transactions do not demonstrate that the current

Board is dominated (Mot. 17-18) and ignores the Amended Complaint's particularized

allegations of suspicious transactions continuing into 2011 (Am. Compl. ¶ 134).  It defies

logic to assert that such a pattern of government domination would permit even-handed

consideration of a lawsuit against FRBNY for billions of dollars *after* the election of

Boards by Trustees who were duty-bound not to exercise their voting power contrary to

the interests of the Treasury, and *after* the direct appointment by the Treasury of two

additional Board members.  (*Id.* ¶ 143.)  FRBNY even admits that it "owed no duty . . . to

elevate the interests of AIG and its shareholders above the public interest."  (Mot. 27.)  If

FRBNY does not believe that it must consider its fiduciary duties to AIG and its

shareholders when making its corporate governance decisions, then that raises a

reasonable doubt as to whether the Board it appointed could independently consider a

litigation demand.

---

[17] *In re Paxson Communication Corp. Shareholders Litigation*, No. 17568, 2001 WL
812028, at *9 (Del. Ch. July 12, 2001) (Mot. 18 n.7), is therefore inapposite because
there the plaintiffs made only "generalized" and "vague" allegations that were not
sufficient to allege control, unlike the specific and numerous allegations advanced by
Starr.

Taking the pleaded allegations as true, there is no basis to dismiss the control

allegations as a matter of law.

## III. WHEN IT TOOK CONTROL OF AIG, FRBNY ASSUMED CLEAR FIDUCIARY OBLIGATIONS UNDER DELAWARE LAW

FRBNY argues that it is not subject to state fiduciary duty laws because

application of those laws would interfere with its status as "a federal instrumentality

engaged in core discretionary federal functions prescribed by federal law and authorized

by the Board of Governors in the public interest."  (Mot. 21-32.)  This argument fails for

the basic reason that Plaintiff's fiduciary duty claims do not challenge FRBNY's exercise

of its "core discretionary federal functions," *i.e.*, lending decisions.  Rather, Plaintiff

challenges specific actions that FRBNY took *after* lending to, and taking control of, AIG,

and that have nothing to do with lending—namely, forcing AIG to use its assets to

subsidize other corporations and using a reverse stock split to circumvent the right of

shareholders to approve an increase in the number of authorized shares.  FRBNY has not

attempted to show how limiting its ability to engage in such activities would interfere

with a core federal function and thus has offered no possible basis for the immunity that it

asks this Court to confer.

### A. FRBNY Cannot Overcome the Strong Presumption that It is Subject to State Fiduciary Duty Law

FRBNY is subject to state law under 12 U.S.C. § 632 ("Section 632"), which

provides that "all suits of a civil nature at common law or in equity to which any Federal

Reserve bank shall be a party shall be deemed to arise under the laws of the United

States."  If this statute did not subject FRBNY to state law, then it would be pointless.  28

U.S.C. § 1331 already provides a broad grant of subject matter jurisdiction for cases

arising under federal law; Congress had no need to enact an additional statute providing

26

redundantly that actions against FRBNY arising under federal law are "deemed to arise under the laws of the United States." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)).  Rather, as federal courts have confirmed by entertaining such claims, Section 632 allows suits against FRBNY under state law.  *See, e.g.*, *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 43-44 (2d Cir. 1989) (looking to state law to supply standard of "ordinary care" required by federal regulation concerning FRBNY function); *Banco de Espana v. Fed. Reserve Bank of N.Y.*, 114 F.2d 438, 447-48 (2d Cir. 1940) (affirming denial of FRBNY motion to dismiss several state law tort claims brought by the plaintiff Spanish bank, though FRBNY was acting at all relevant times as the fiscal agent of the United States).[18]

In addition, Section 341 of the Federal Reserve Act (Fourth), 12 U.S.C. § 341, specifically provides that federal reserve banks may "sue and be sued" without limitation. The Supreme Court has repeatedly "recognized that such sue-and-be-sued waivers are to be liberally construed notwithstanding the general rule that waivers of sovereign immunity are to be read narrowly in favor of the sovereign."  *FDIC v. Meyer*, 510 U.S. 471, 480 (1994) (internal citations and quotation marks omitted).  Absent a "clear showing of congressional purpose" to the contrary, "agencies authorized to sue and be

---

[18]  Indeed, "the history of section 632 strongly suggests that Congress intended to provide Federal Reserve Banks with a federal forum for all actions by or against them, and did not intend to carve out an exception for state statutory claims." *Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1242 (11th Cir. 2000).  The only case cited by FRBNY which arose in the context of Section 632 applied federal choice-of-law rules in order to determine whether New York or Venezuelan law should apply as the substantive law governing the allegations of fraud. *Corporacion Venzolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980).  Therefore, the case does not support the application of substantive federal, rather than state, common law under Section 632.

sued are presumed to have fully waived immunity." *Id.* at 481 (internal quotation marks omitted). FRBNY has not attempted to make such a showing—nor could it—because by "launching" the federal reserve banks "into the commercial world, and including a sue-and-be-sued clause" in their charter, Congress has "cast off" the banks' "cloak of sovereignty" and given them the "status of a private commercial enterprise." *Loeffler v. Frank*, 486 U.S. 549, 556 (1988) (internal quotation marks omitted) (considering suit against the United States Post Office); *see Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 245 (1940) ("it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be").

### B.    To Be Preempted, State Law Must Significantly Interfere With the Legitimate Exercise of a Federal Function

FRBNY ignores the applicable legal standard in claiming total immunity for all acts regardless of circumstance or purpose, and in seeking a remarkable deference principle, under which "discretionary decisions concerning its emergency lending powers . . . cannot be second-guessed." (Mot. 30.) Even putting aside that Starr's fiduciary duty claims do not relate *at all* to FRBNY's emergency lending powers, *see infra* Section III.C, the Supreme Court has held that state laws must actually and significantly interfere with statutory functions before they can be preempted. *See Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248 (1944) ("This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions."); *Fed. Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 236-37 (1935) (finding federal land banks subject to state

attachment proceeding despite being federal instrumentalities); *see also James v. Fed. Reserve Bank of N.Y.*, 471 F. Supp. 2d 226, 243 (E.D.N.Y. 2007) ("This Court fails to see how the enforcement of state employment laws that are consistent with federal law to which the New York Fed is subject already will interfere with the New York Fed's performance of its federal function.").

FRBNY concedes that state law is not subject to federal preemption unless it frustrates, or significantly interferes with, the purpose of the federal scheme, and acknowledges that a court would, in any event, look to state law to "fill gaps for which a developed body of federal common law does not exist." (Mot. 28, 31-32.) As FRBNY further acknowledges (Mot. 28), the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), found the displacement of state law appropriate only where a "significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (internal citations, quotation marks, and brackets omitted); *see also Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (holding that a "significant conflict between some federal policy or interest and the use of state law" is a "precondition" to fashioning rules of federal common law (internal quotation marks omitted)).

Similarly, FRBNY asserts that Starr's claims are precluded because "judgments within the range of discretion committed to officials and instrumentalities by federal law are not subject to challenge under state tort law." (Mot. 27, 29-30.) FRBNY asserts that its "discretionary decisions concerning its emergency lending powers fall squarely within this principle and cannot be second-guessed through this action. (*Id.* at 30.) Starr's

fiduciary duty claims, however, are not challenging judgments "within the range of discretion committed to FRBNY" and its officials.  As explained *infra* Section III.C, the discretion committed to FRBNY concerned lending decisions, not corporate management decisions unrelated to any loan and taken for the purpose of effecting a bailout of third parties outside the public eye, and to avoid Delaware law.

Moreover, whether "latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts."  *Atherton*, 519 U.S. at 218 (internal quotation marks omitted).  Indeed, Congress acts "against the background of the total corpus juris of the states," which cautions against creating federal common law to supplant state law.  *Id.* at 218; *see O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (observing that "cases in which judicial creation of a special federal rule would be justified" are "few and restricted").

There is also a presumption against preempting state law in areas traditionally allocated to the states, such as corporate governance.  *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ("When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (internal brackets omitted) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))); *cf. Burks v. Lasker*, 441 U.S. 471, 477-85 (1979) (holding that federal courts should look to state law to allocate governing powers within a corporation because corporations are creatures of state law).  Preemption is also disfavored for actions based upon state laws of general application, as opposed to specific state regulations that conflict with or impede federal law.  *See Baldanzi v. WFC Holdings*

*Corp.*, No. 07-9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."); *Jefferson v. Chase Home Fin.*, No. 06-6510, 2008 WL 1883484, at *10 (N.D. Cal. Apr. 29, 2008) (holding that state common law misrepresentation claim was not preempted by National Bank Act because "such laws of general application . . . do not impair a bank's ability to exercise its lending powers").

The cases cited by FRBNY (Mot. 28) merely reaffirm that state law should not be preempted unless it conflicts with the bank's core lending functions or is contrary to a statutory provision. *See, e.g.*, *Kamen*, 500 U.S. at 95, 97, 104 (addressing whether state or federal law should "fill the interstices of private causes of action brought under federal securities laws" and otherwise emphasizing the impropriety of federal common-lawmaking beyond this "interstitial mandate"). For example, the Court in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979), adopted state law "as the appropriate federal rule for establishing the relative priority" of competing federal and private liens in a Small Business Administration loan program. The Court explained that in "structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved." 440 U.S. at 739. Thus, "had Congress intended the private commercial sector, rather than taxpayers in general, to bear the risks of default entailed by" the program at issue, "it would have established a priority scheme displacing state law." *Id*. at 735. Similarly, and as discussed in greater detail below, had Congress intended for FRBNY to nationalize private companies

unfettered by any duty to shareholders and for the pursuit of purposes outside statutory

mandates, it would have expressly provided for such authority.

C.     **Requiring FRBNY to Adhere to Corporate Governance Law Does Not
       Frustrate any Legitimate FRBNY Function**

Application of state fiduciary law to the conduct at issue here does not interfere

with FRBNY's exercise of its statutory emergency lending authority—conferred by

Section 13(3) of the Federal Reserve Act, 12 U.S.C. § 343.  Nothing in the language or

background of Section 13(3) suggests that Congress intended to permit federal reserve

banks to take control of a private corporation, especially where the control is not

exercised to further either a federal lending function or the well-being of the company.

Even if application of state fiduciary law to FRBNY's exercise of control over a private

corporation could ever interfere with its statutorily authorized functions, it would not do

so where, as here, FRBNY used such control to (i) circumvent limitations on its own

authority and basic shareholder protections, and (ii) enter into self-dealing transactions

that hurt AIG and its shareholders to the benefit of FRBNY and favored financial

institutions.  Regardless of the general applicability of fiduciary duty law to FRBNY's

actions, therefore, application of such principles in this case—where none of the

challenged actions were necessary for FRBNY's lending activities—is appropriate.

FRBNY does not dispute any of these points.  Thus, it never argues that Congress

intended unbounded control over private corporations to be a core function of the federal

reserve banks.  Instead, FRBNY merely denies that it exercised control over AIG (*see*

Mot. 33-39), an argument that is not subject to ruling as a matter of law at the motion to

dismiss stage (and rebutted in Section IV.A, *infra*).  FRBNY also advances generalized

arguments about interference with its lending authority that are not relevant to Starr's

claims.  (*See, e.g.*, Mot. 1-2, 28, 30.)

> **1.  Section 13(3) is Not Frustrated by Application of Fiduciary Duty
> Law to FRBNY's Use of Its Control Over AIG to Bail Out Other
> Companies With AIG's Assets and to Nullify the Voting Rights of
> AIG's Shareholders**

As explained above, the specific claims advanced against FRBNY here assert

breach of fiduciary duties in connection with (1) causing AIG to enter into the ML III

transaction with an entity also controlled by FRBNY for the benefit of FRBNY and third

parties, and to the detriment of AIG; and (2) obtaining 562,686,096 shares of AIG

Common Stock by circumventing a required shareholder vote through a deceptive and

improper reverse stock split.  Both claims arise well after FRBNY's loan to AIG (*i.e.*,

after FRBNY executed its statutory lending power), and both claims are based on actions

unnecessary to protect that loan.

Neither fiduciary duty claim challenges any of the terms of the loan or any

lending function by FRBNY.  *First*, FRBNY directed the ML III transaction because it

wished to bail out third parties while avoiding the public scrutiny that would accompany

doing so openly.  (Am. Compl. ¶¶ 63, 69, 79.)  This had nothing to do with lending,

"emergency lending," or any other legitimate FRBNY function.  If anything, the ML III

transaction made it *harder* for AIG to repay FRBNY because it committed $40 billion of

AIG's assets.  (*Id.* ¶¶ 69, 71.)  Applying state law to the forced and clandestine subsidy of

unpopular corporations to avoid political accountability does not interfere with a core

federal function.

Far from reflecting an exercise of a congressionally authorized function, ML III

represented an attempt to circumvent limitations on FRBNY's authority and avoid public

scrutiny.  FRBNY lacked the authority to purchase and hold CDOs from counterparties or

AIG, so it accomplished the functionally identical result by creating a limited liability

company (notwithstanding the absence of any apparent authority to do so), placing itself

in control of that LLC, and then using it to purchase the CDOs, control their disposition,

and appropriate for itself the bulk of the proceeds from their sale.[19]  Moreover, as

discussed above, the purpose of the backdoor bailout was to subsidize other financial

institutions in a manner directly contrary to the interests of taxpayers, AIG, and AIG's

shareholders. FRBNY cannot claim to be exercising a core function when it was required

to go to such lengths to avoid limitations on its statutory authority.

     *Second*, the reverse stock split was not only independently wrongful because it

violated Delaware law and AIG's representations, it also was unrelated to any lending

function.  At the time of the reverse stock split, FRBNY's loan to AIG already was "fully

secured" by all of AIG's assets.  (*Id.* ¶ 56.)  To carry out its lending function, FRBNY

had no conceivable legitimate need for *any* additional equity in AIG, much less $25

billion in shares of AIG Common Stock.  (*Id.* ¶¶ 56, 111-16.)  Moreover, the express

terms of the Credit Agreement *required* the shareholder vote that the reverse stock split

circumvented.  (*Id.* ¶ 114.)  Thus, if anything, holding FRBNY responsible for

---

[19] *See* Alexander Mehra, *Legal Authority in Unusual and Exigent Circumstances*: *The Federal Reserve and the Financial Crisis*, 13 U. Pa. J. Bus. L. 221, 249 (2010) (concluding that "the set of transactions effected by Maiden Lane II and III went beyond the scope of the Fed's authority" both because FRBNY lacked the authority to purchase the CDOs and because its loan went to ML III rather than the party that needed assistance); Chad Emerson, *The Illegal Actions of the Federal Reserve*:  *An Analysis of How the Nation's Central Bank Has Acted Outside the Law in Responding to the Current Financial Crisis*, 1 Wm. & Mary Bus. L. Rev. 109, 129 (2010) (finding that "the Fed's attempt to conceal an illegal purchase of AIG assets through the use of a wholly-controlled LLC is, at best, a surreptitious attempt to circumvent the meaning of the Federal Reserve Act and, at worst, an intentional and purposeful violation of the law").

improperly nullifying that vote is entirely consistent with FRBNY's lending activities.  In any event, the purpose of Section 13(3) is to provide emergency loans through arms-length bargaining and, thus, applying state law to a stratagem designed to deprive public shareholders of voting rights protected by state law would not interfere with a core federal function.  *See, e.g.*, *Kimbell Foods*, 440 U.S. at 739-40 (adopting state law lien requirements and rejecting a rule giving priority to a lien arising out of federal loan).

Moreover, FRBNY's position is inconsistent with the intent manifested by Congress in the Emergency Economic Stabilization Act ("EESA"), which directs that even the Secretary of the Treasury (who, unlike FRBNY, has some statutory authority to obtain stock) must respect, not circumvent, requirements of shareholder approval for increases in the number of authorized shares.  *See* 12 U.S.C. § 5223(d)(2)(F) ("Should the financial institution not have sufficient authorized shares, including preferred shares that may carry dividend rights equal to a multiple number of common shares, the Secretary may, to the extent necessary, accept a senior debt note in an amount, and on such terms as will compensate the Secretary with equivalent value, in the event that a sufficient shareholder vote to authorize the necessary additional shares cannot be obtained.").  Congress did not provide that the Secretary should respond to a failure to secure shareholder approval through misleading contrivances, such as an engineered reverse stock split of only issued, but not of authorized but unissued, shares.

### 2.   Under Section 13(3), FRBNY Did Not Have the Authority to Exercise Unfettered Control Over a Corporation

Although FRBNY attempts to characterize Starr's claims as a challenge to the initial loan provided to AIG by FRBNY (*see, e.g.*, Mot. 29), Starr's fiduciary duty claims do not arise from any decision to provide such a loan, nor from the terms of that loan.

Instead, Starr's fiduciary duty claims arise from the manner in which FRBNY operated AIG after it took control of the company.  As Section 13(3) and related sections demonstrate, FRBNY's actions far exceeded any conceivable understanding of what its authorized lending functions comprise. Accordingly, application of corporate fiduciary duties to FRBNY's management of AIG *after* it fulfilled its statutory purpose by loaning money to AIG (and unrelated to protecting that loan) does not conflict with, interfere with, or frustrate FRBNY's statutorily authorized lending functions.

As FRBNY concedes, the emergency lending functions at issue here are contained in Section 13(3) which, in FRBNY's own words, is "narrow and specified."  (Mot. 2.) Section 13(3) authorized FRBNY in "unusual and exigent circumstances" and "at rates established in accordance with" Section 14 of the Federal Reserve Act (codified at 12 U.S.C. § 357) to discount "notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal reserve bank."  12 U.S.C. § 343.[20]  Section 341 (Seventh) of the Federal Reserve Act further provides that the board of directors for individual Federal Reserve Banks may exercise "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by the chapter."  12 U.S.C. § 341.

Nothing in these provisions mentions, let alone authorizes, a federal reserve bank to take control of a private corporation or to operate that company free of the legal

---

[20] The discount of a note is effectively a loan on the note that deducts from the amount loaned the interest that will run over the course of the note.

requirements imposed by the governing corporate laws applicable to corporate controllers.[21]

The absence of such express authority alone differentiates this case from cases involving "core lending functions" such as setting interest rates or deciding whether to issue a loan, all of which involved statutory powers that were expressly granted. Indeed, FRBNY had never before used Section 13(3) as a basis to exercise control of a private company and purposefully denied AIG the more traditional lending tools (such as guarantees and access to the discount window) that it used to aid other corporations. (Am. Compl. ¶¶ 41-43, 52.)[22]  In short, this is a corporate governance case, and does not involve lending functions at all, much less an interference with those functions.

---

[21] Stock is not a "note, draft, or bill of exchange," and it cannot be "discounted." To the contrary, as the Federal Reserve itself has explained, "bank discounts as commonly understood do not apply 'to a bank's acquisition through purchase of other assets, securities or obligations, such as, for example, corporate stocks, bonds or debentures.'" Bd. of Governors of the Fed. Reserve Sys., 12 Fed. Res. Bull. 3, at 269 (Mar. 1958), *available at* http://fraser.stlouisfed.org/docs/publications/FRB/1950s/frb_031958.pdf (quoting approvingly Hearing Examiner's Report and Recommendation (Sept. 12, 1957)).

[22] Because FRBNY has provided no explanation for why it would need discretion under Section 13(3) to ignore basic shareholder protections after making the decision to lend to AIG, the cases cited by FRBNY concerning federal officials' discretionary judgments are inapposite. The subset of those cases specifically addressing federal reserve banks' lending decisions are additionally inapposite because those decisions uniformly involved core lending functions expressly provided for by statute. (Mot. 30.) Moreover, the litigants in these cases, from the outset, generally sought to base their causes of action on federal law rather than generally applicable state law. *See Huntington Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 868-69 (2d Cir. 1977) (dismissing suit against federal reserve bank for allegedly failing to disclose bank insolvency while still providing discretionary grants of rescue funds); *Raichle v. Fed. Reserve Bank of N.Y.*, 34 F.2d 910, 913-14 (2d Cir. 1929) (dismissing challenge to federal reserve bank's discretionary restriction of credit through increases in the rediscount rate when actions taken pursuant to express statutory authority); *Billings Util. Co. v. Advisory Comm., Bd. of Governors*, 135 F.2d 108, 111-12 (8th Cir. 1943) (dismissing challenge to bank's decision not to extend loan because bank officers' conduct was within statutory limits and thus "their conduct is not subject to judicial review"); *In re Franklin Nat'l Bank Secs. Litig.*, 478 F.

Moreover, there is nothing in the relevant statutes to suggest that Congress contemplated that a federal reserve bank could take control of a corporation and then operate it in a manner that disregards settled principles of corporate governance and shareholder rights as a power "incidental" to "the business of banking."  Indeed, it has long been held in the analogous context of national banks that, although stock may be accepted as collateral for a loan or as settlement of a disputed debt,[23] the ability to purchase stocks is not "incidental" to the business of banking.  *See Cal. Nat'l Bank v. Kennedy*, 167 U.S. 362, 369 (1897) ("The power to purchase or deal in stock of another corporation, as we have said, is not expressly conferred upon national banks, nor is it an act which may be exercised as incidental to the powers expressly conferred.").[24]

There is also nothing to suggest that Congress intended unfettered control over private corporations to be an appropriate condition for a Section 13(3) loan.  Loans under the statute are required to be adequately secured, thereby obviating the need for such

Supp. 210, 214-16 (E.D.N.Y. 1979) (declining to recognize a cause of action against FRBNY based on statutory provisions authorizing bank examinations).

[23] Notably, Section 13(3) authorizes the federal reserve banks to purchase only certain categories of assets, which do not include stock in private companies or other private assets.  *See* David Small & James Clouse, *The Limits the Fed. Reserve Act Places on the Monetary Policy Actions of the Fed. Reserve*, 19 Ann. Rev. Banking L. 553, 571, 579 (2000) (listing the types of assets that may and may not be purchased by the Federal Reserve and identifying "equities" as "ineligible for purchase").  (David Small and James Clouse are current Federal Reserve Board economists.)

[24] The incidental powers provision of the National Bank Act at the time of the Supreme Court's opinion in *Kennedy* is functionally identical to that of the Federal Reserve Act, except that the latter is, if anything, even more narrowly circumscribed.  *Compare* National Bank Act of 1864, 13 Stat. 99, 101-102 (1864), codified at 12 U.S.C. § 24 (Seventh) (authorizing the exercise of "all such incidental powers as shall be necessary to carry on the business of banking," including "by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt") *with* 12 U.S.C. § 341 (Seventh) (authorizing the exercise of "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter").

38

control.  (*See* Am. Compl. ¶ 56 (describing testimony of FRBNY representatives that the loan was fully secured as the law required).)  Moreover, the only form of consideration that Section 13(3) expressly authorizes is an interest rate "established in accordance with the provisions of" 12 U.S.C § 357.  That section in turn provides that rates should "be fixed with a view of *accommodating commerce and business*."  12 U.S.C. § 357 (emphasis added).  This provision further demonstrates that FRBNY lacked the authority to demand excessive consideration in exchange for a loan.

Where acquisition of stock by a federal agency or instrumentality was intended, Congress has expressly authorized it and set appropriate parameters for the exercise of that authority.  For example, in the EESA, Congress expressly authorized the Secretary of the Treasury (but not FRBNY) to acquire stock warrants in exchange for providing asset guarantees.  12 U.S.C. § 5223(d).  At the same time, it specifically provided that the stock was to be nonvoting.  *Id*.  In sum, corporate management is not banking, and FRBNY's actions were not taken in furtherance of any lending goals.

## IV.   FRBNY BREACHED FIDUCIARY DUTIES TO AIG AND ITS COMMON STOCK SHAREHOLDERS THROUGH MAIDEN LANE III AND THE WRONGFUL CONVERSION OF SERIES C PREFERRED STOCK

### A.   Starr Has Adequately Alleged FRBNY's Control Over AIG

FRBNY does not dispute that a controlling shareholder or a lender with control over a corporation owes fiduciary duties to the corporation's shareholders.  (*See* Mot. 34-37.)  Nor does FRBNY deny that the Amended Complaint alleges that it was both.  Instead, FRBNY argues that the facts related to its control are insufficient as a matter of law to support the allegations.  FRBNY reaches this conclusion only by overlooking key allegations, as well as the very agreement that it attached to its own motion.

### 1.   Starr Need Only Allege Facts Supporting the Inference of Control

Courts recognize that the question of control is "intensely factual" and "a difficult one to resolve on the pleadings."  *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550-51 (Del. Ch. 2003); *see also Williamson v. Cox Commc'ns, Inc.*, No. 1663-N, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006) ("The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint."); *In re Oakwood Homes Corp.*, 340 B.R. 510, 518 (Bankr. D. Del. 2006) (in creditor-debtor context, "fiduciary liability is not dependent solely on the contract; rather liability rests on the nature of the relationship").  As a result, at the motion to dismiss stage, Starr must merely allege facts that support the inference of control, having received the benefit of all reasonable inferences.  *Williamson*, 2006 WL 1586375, at *3-4.  In making this determination, the Court must not examine the facts alleged in isolation; instead it should consider whether the "nexus of facts" supports the inference of control.  *Id*. at *6.  The facts alleged in the Amended Complaint far surpass this basic standard.

Though allegations of *de jure* control are sufficient, the Court must also consider FRBNY's *de facto* control with respect to managerial power and voting rights.  *See In re Loral Space & Commc'ns Inc.*, Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) (finding that the "question is whether the blockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes" (internal quotation marks omitted)); *In re Cysive*, 836 A.2d at 551-53 (concluding that "it would be naïve" to find that large minority stockholder with close ties to other shareholders and "practical control" of corporation was not the controlling shareholder); *Frydman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d 77, 79 (App. Div. 2000) (observing that "the

ongoing conduct between the parties may give rise to a fiduciary relationship that will be recognized by the courts" (citing *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (App. Div. 1998))). In this regard, it is sufficient if a complaint alleges control with respect to the transactions at issue. *See In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) (The "plaintiffs need not demonstrate that" the defendant "oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough"); *Williamson*, 2006 WL 1586375, at *4 (noting that a plaintiff can survive a motion to dismiss merely by alleging control over the challenged transaction). As set forth below, the Amended Complaint plainly alleges FRBNY's *de jure* and *de facto* control.

**2. Starr Has Alleged Facts Supporting FRBNY's Control Over AIG**

The Amended Complaint alleges that, following the Credit Agreement, FRBNY controlled an overwhelming majority of voting power in AIG (79.9 percent) and ensured that that voting power and control would be used in accordance with FRBNY's wishes and the best interests of FRBNY and the Treasury. (Am. Compl. ¶¶ 59-61, 106.) The Amended Complaint also alleges that FRBNY immediately solidified its control by unilaterally (without the approval or consent of AIG's Board or shareholders) firing AIG's CEO and replacing him with a new CEO of FRBNY's choosing. (*Id.* ¶ 54.) These facts alone are sufficient to establish control. *See In re Cysive*, 836 A.2d at 551-52 (noting that in "practical terms, Carbonell holds a large enough block of stock to be the dominant force in any contested Cysive election" and finding the control doctrine "reinforced when one takes into account the fact that Carbonell is Chairman and CEO of Cysive"); *see also In re Loral Space*, 2008 WL 4293781, at *20 (finding control in part because CEO was appointed at the defendants' "insistence" and CEO "knew that his

continuance as CEO depended in large measure on keeping in" defendants' "good graces").

FRBNY attempts to minimize the allegations regarding control by asserting that the shares controlled by FRBNY were not issued until March 2009, that FRBNY was not the actual holder of the shares because they were issued to the Trust (which FRBNY created and controlled), and that FRBNY and the Trust were separate legal entities. (*See* Mot. 34-35.) FRBNY further attempts to invoke the "stature and reputations" of the Board members (allegations that do not appear in the Amended Complaint) to suggest that they would be immune to FRBNY dominance. (*Id.* at 38 & n.14.) FRBNY's arguments, laden with disputed factual issues inconsistent with the express allegations of the Amended Complaint, are not only improper at the motion to dismiss stage, but also ignore key provisions of the Credit Agreement and various factual allegations in the Amended Complaint.

*First*, although FRBNY is correct that the Series C Preferred Stock was not issued until March 2009, the terms of the Credit Agreement made clear the controlling power of those shares and FRBNY's position from the outset. Indeed, all of the material terms of the Series C Preferred Stock—including the nearly 80 percent voting power—were set forth in the Credit Agreement itself. (Mot. Ex. 1, at Ex. D.) Moreover, the issuance of the Series C Preferred Stock was a mere formality that itself was entirely controlled by FRBNY. (Credit Agreement, *supra* n.5 § 5.11 (obligating AIG to "enter into such agreements and take such other actions as shall in the judgment of the NY Fed be necessary to effect the issuance of the Trust Equity").)

*Second*, separate and apart from FRBNY's voting rights, the Credit Agreement itself provided FRBNY with control over all material aspects of AIG's business, which allowed it to direct the transactions at issue here.  Indeed, the Credit Agreement required FRBNY approval for a wide variety of corporate activities relating to, for example, corporate indebtedness, investment and lending activities, the sale and acquisition of assets, capital expenditures, hedging transactions, and other matters.  (*See* Credit Agreement, *supra* n.5 § 6.)  Thus, even before the formal issuance of the Series C Preferred Stock, FRBNY had authority over the ML III transaction, and, as the Amended Complaint alleges in detail, FRBNY directed and was involved in all aspects of that transaction on behalf of AIG, including negotiating with AIG's counterparties and dictating the contents of SEC filings relating to that transaction.  (*See id.*; *see also* Am. Compl. ¶¶ 84-90, 96-99.)  FRBNY's expropriation of AIG Common Stock did not occur until January 2011, well after the Series C Preferred Stock issued.  (Am. Compl. ¶¶ 129-35.)  And, in any event, the Credit Agreement itself also provided FRBNY with complete control to require a stockholder vote on "any other measures deemed *by the NY Fed to be necessary for the conversion of the Preferred Stock or the operation of the Facility.*" (Mot. Ex. 1, at Ex. D, at 2 (emphasis added).)  In addition to its right to set votes, FRBNY had the power to ensure enactment of that agenda through a nearly 80 percent voting interest.  FRBNY had the right to determine, and implement, the standard ("in or not opposed to the best interests of the Treasury") under which the nearly 80 percent voting interest would be voted and could enforce that standard through the Trust Agreement.  (Mot. Ex. 2, Trust Agreement, at 22; Am. Compl. ¶¶ 57, 100-01.)

*Third*, the fact that FRBNY created a trust to hold formal title of the shares is inconsequential because, as the Amended Complaint establishes, FRBNY controlled the Trust and ensured that the Trust would exercise its majority voting power according to FRBNY's wishes (and in the best interest of FRBNY and the Treasury).  (Am. Compl. ¶ 101.)  The Trustees appointed by FRBNY had longstanding and high-ranking employment ties to FRBNY and the Trust documents expressly required Trustees to cast their votes in the interests of FRBNY and the Treasury.  (*Id.* ¶ 103.)  For example, the Trust Agreement contained a provision which expressly "advised" the Trustees that "maximizing the Company's ability to honor its commitments to, and repay all amounts owed to, the FRBNY" was their goal.  (*Id.* ¶ 104.)  Moreover, the Trust Agreement further required the Trustees to act "in or not opposed to the best interest of the Treasury."  (*Id.* ¶ 106.)

In addition to the structural realities of corporate governance under the Credit Agreement, the Amended Complaint identifies other means of functional control that FRBNY's motion does not address.  For example, FRBNY ignores the fact that FRBNY installed its own, handpicked CEO (*id.* ¶ 54), and instead claims that there are insufficient allegations concerning the Board's domination.  (Mot. 37-38.)  FRBNY further ignores the italicized language in the allegation that FRBNY "had an on-site team led by a senior FRBNY official whose sole task was to monitor AIG's decision making and financial condition *and exercise FRBNY's consent rights under the Credit Agreement, which were utilized by FRBNY to control the day-to-day management of AIG*."  (Am. Compl. ¶ 59 (emphasis added).)  These consent rights included an FRBNY veto on the incurrence of additional debt, as well as the ability to prevent AIG's resolution of its indebtedness

44

(apart from regularly scheduled principal and interest payments) without FRBNY's consent.  (Credit Agreement, *supra* n.5 §§ 6.01, 6.09.)  These provisions, among other things, would have made it impossible to resolve the outstanding credit default swaps—the subject of the ML III transaction—without FRBNY's consent.  *See Williamson*, 2006 WL 1586375, at *5 (finding that "potential veto power is significant for analysis of the control issue" because it "supports plaintiff's allegation" of "coercive leverage" by demonstrating that defendants "had the ability to shut down the effective operation of the . . . board of directors by vetoing board actions").

      The purpose of FRBNY's actions, including FRBNY's attempt to cover up the backdoor bailout—an allegation that echoes the findings of reports from the Special Inspector General of the TARP and the U.S. House Committee on Oversight and Government Reform—only highlights that the backdoor bailout reflected actual control rather than mere negotiation leverage.  (Am. Compl. ¶¶ 94-95.)  Had AIG's Board truly been independent it would have acted in AIG's interest to resist what amounted to an unconscionable $60+ billion subsidy of other financial institutions unrelated to any obligation or attempt to re-pay the loan to FRBNY.  This is particularly true when, as the Amended Complaint points out, other options existed that were far more favorable.  A guarantee of AIG's CDS obligations, for example, would have prevented AIG's counterparties from making debilitating collateral demands, would have freed up more than $35 billion in collateral to pay down AIG's debt or improve its liquidity, and would have obviated the need to advance more than $24 billion in additional government funds.  (*Id.* ¶ 69.)  At a minimum, an independent Board would have taken the concessions offered by AIG's counterparties and not, as FRBNY did, rejected them.  (*Id.* ¶ 89.)

In short, despite the presence of a trust created by FRBNY to evade restrictions on its ability to own stock in a private company, the Amended Complaint adequately alleges that FRBNY was both a controlling stockholder and a controlling lender, which allowed it to exercise control over AIG's decisions both in general and with respect to the specific transactions at issue in this case.  With such control of a private corporation comes, at a minimum, fiduciary responsibilities to the company and its other shareholders when making management decisions unrelated to lending.  Here, FRBNY's self-dealing and nullification of shareholders' rights and protections clearly violate those basic duties.

**B.**     **Starr Has Adequately Alleged That FRBNY Breached Its Fiduciary Duties to AIG and AIG Shareholders**

The allegations in the Amended Complaint also establish that FRBNY breached the fiduciary duty that it owed to AIG and its shareholders.[25]

**1.**     **FRBNY Breached Its Fiduciary Duty by Effecting the Backdoor Bailout and Appropriating Two-Thirds of the Residual Interests of ML III**

The ML III backdoor bailout constituted a breach of FRBNY's fiduciary duty to AIG.  *First*, FRBNY caused ML III to pay par value for CDOs that could have been acquired for substantially less.  *Second*, FRBNY appropriated two-thirds of the proceeds that remained *after* its contribution to ML III had been fully repaid, without either reducing AIG's debt to FRBNY or first reimbursing AIG for any of the $32.5 billion of posted collateral that it committed to acquiring the CDOs (and that it was unable to use to pay down its debt to FRBNY).  *Third*, FRBNY caused AIG to release all of its claims

---

[25]  FRBNY asserts that any claim that the execution of the Credit Agreement breached its fiduciary duties is barred by the statute of limitations and that, in any event, FRBNY owed no duty to AIG while negotiating that agreement.  (Mot. 39-40.)  This argument is inapposite to the fiduciary breaches challenged here (ML III and the reverse stock split), which occurred within the limitations period.

against its CDS counterparties despite the fact that ML III paid those counterparties

everything they could conceivably have received under their CDS contracts with AIG.

  These actions breached the fiduciary duties that FRBNY owed to AIG (and to its

shareholders) by virtue of FRBNY controlling AIG during this period.[26]  FRBNY used

its control over AIG to benefit third parties at AIG's expense and to transfer AIG's assets

to itself without any intention of reducing AIG's debt to FRBNY or performing other

lending activity.  Forcing a company to enter an agreement with its controlling entity is

the very definition of self-dealing.  FRBNY's motion does not even attempt to argue that

the foregoing would not constitute a breach of fiduciary duty under the premise that

FRBNY controlled AIG during this period.  Instead, in addition to repeating its

conclusory assertion that the Amended Complaint's allegations are insufficient to

establish such control (Mot. 41) (an argument that, as detailed above in Section IV.A, is

baseless), FRBNY simply tries to contest the Amended Complaint's well-pleaded

allegation "that FRBNY could have forced some CDS counterparties to accept a discount

from full payment for their CDOs, let alone that FRBNY had a legal duty to do so."  (*Id.*

at 41-42.)  As an initial matter, this assertion does not address the residual interest

distribution or the release; thus, FRBNY's argument as to breach must be rejected.  In

---

[26]  FRBNY's actions are not immunized by the business judgment rule because its self-dealing subjects it to the heightened scrutiny of the "entire fairness" standard.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction . . . bears the burden of proving its entire fairness."); *Aronson*, 473 A.2d at 812 (business judgment rule does not apply when fiduciary appears on "both sides of a transaction").  The fact that the transaction benefited a third party likewise does not preclude a finding of a breach of fiduciary duty.  *See Gatz*, 925 A.2d 1265 (holding that fact that benefits of transaction accrued to third party, rather than controlling shareholder, did not preclude direct recovery by minority shareholders).

any event, FRBNY's suggestion that the Amended Complaint "pleads no facts to support its contention" is simply incorrect.

*First*, the Amended Complaint specifically alleges that "at least one counterparty expressed a willingness to accept concessions or discounts," that another "counterparty indicated to FRBNY that it was considering a range of discounts," and that FRBNY nonetheless "indicated to those counterparties, and to the other counterparties, that it had decided against concessions and that FRBNY would instead pay all counterparties essentially 100 cents on the dollar, literally turning away counterparties' offer of concessions." (Am. Compl. ¶ 89.) FRBNY does not address these allegations.

*Second*, the counterparties would have had ample incentive to accept less than par value. The CDOs that were insured by the CDSs did not entitle the holder to immediate payment from AIG; instead, they involved entitlement to future payment streams in exchange for premiums. (*Id.* ¶¶ 23-24, 29-31.) By paying billions of dollars for the CDOs in November 2008 during a liquidity crisis, the counterparties received a significant liquidity infusion during a critical period without having to pay any of the premiums that were called for under the CDS agreements.

FRBNY further undermines its argument by asserting that its support to AIG "provided ample reason for the CDS counterparties to believe that AIG would be kept from bankruptcy, so that their contractual rights under the CDS contracts would remain intact." (Mot. 42.) With this assertion, FRBNY admits that in November 2008 the counterparties would have understood that an effective guarantee of the CDS contracts by the United States government was in place, thus rendering further collateral calls, and the asserted need to compromise the CDS contracts, completely unnecessary. FRBNY thus

48

concededly expended $37.5 billion of AIG funds and advanced over $24 billion of taxpayer funds to prevent the counterparties from insisting on the posting of collateral when there was no such risk.  Even assuming the counterparties had the technical contractual right to make the collateral demand, the lack of need for such an action alone would have provided a basis for an aggressive negotiating posture had FRBNY been more interested in protecting taxpayers and AIG, and less interested in providing a backdoor bailout to those same counterparties.

### 2. FRBNY Breached Its Fiduciary Duty by Engineering a Scheme to Circumvent an Independent Shareholder Vote Through a Reverse Stock Split That Applied Only to Issued Shares

FRBNY also breached its fiduciary duty to AIG's shareholders through the circumvention of state law voting protections that enable shareholders to prevent the dilution of their shares without their consent.  *See* Del. Code tit. 8 § 242(b)(2) ("Section 242(b)(2)").  Delaware law entitled AIG's shareholders "to vote as a class upon a proposed amendment" that would, among other things, "increase or decrease the aggregate number of authorized shares of such class."  *Id.*  FRBNY, which, as noted at page 8 above, had the power to demand any vote it deemed necessary for converting the shares, engineered a scheme to evade this protection of shareholder rights through a reverse stock split that applied only to issued shares to achieve the necessary dilution.

FRBNY does not dispute that (1) the purpose of this provision of Delaware law is to allow shareholders to prevent the dilution of shares without their consent; (2) the Credit Agreement and various other relevant documents, including the Stock Purchase Agreement, directed that such a vote would occur prior to the issuance of the shares; (3) FRBNY never secured the approval of shareholders to increase the number of authorized shares; and (4) by using a reverse stock split that applied only to the three billion issued

49

shares but not to two billion authorized but unissued shares, FRBNY achieved the

necessary dilution and the transfer of AIG Common Stock to the Treasury without ever

holding a separate class vote approving this dilution.  *See supra* Statement of Facts § C.

These actions breached FRBNY's fiduciary duty to AIG's public shareholders.

Delaware law prohibits the use of stratagems that are designed to deprive shareholders of

their voting rights.  As the Delaware Supreme Court observed in *Paramount*

*Communications Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994), because "many of

the most fundamental corporate changes can be implemented only if they are approved

by a majority vote of the stockholders," "this Court and the Court of Chancery have

consistently acted to protect stockholders from unwarranted interference with such

rights."  *Id.* at 42; *see id.* at 45 (recognizing "the traditional concern of Delaware courts

for actions which impair or impede stockholder voting rights").  If a fiduciary could use a

reverse stock split to bypass the shareholder vote requirement of Section 242(b)(2), its

protections would effectively be rendered useless.[27]  *See Reis v. Hazelett Strip-Casting*

*Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) (awarding damages to plaintiff and finding that

---

[27]  At least two other sources reflect the general understanding that reverse stock splits
are not appropriately used to circumvent the requirement of a separate class vote to
increase the number of authorized shares.  *First*, the Model Business Corporations Act
§ 10.04(a)(4), (b) (2010) requires that reverse stock splits be subject to a separate class
vote of the holders of the outstanding stock of a class where, as here, a corporation has
more than one class or series of stock.  *Id.*  The Supreme Court of Delaware has held that
it is appropriate to turn to such sources to construe ambiguous statutes on the same
subject.  *See Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218 (Del. 1993) (affirming
that "preexisting law and similar statutes from other jurisdictions," including the Model
Business Corporations Act, "which deal with comparable situations can be used as
extrinsic aids in construing the legislature's intent").

*Second*, as explained above, Congress in the EESA provided that the Department of the
Treasury (which, in contrast to the absence of any authorization to FRBNY, Congress
authorized to acquire stock in certain circumstances) was to respect, not circumvent, the
refusal of shareholders to approve an increase in the number of authorized shares.  *See*
discussion *supra* at 34.

a reverse stock split to "freeze out minority stockholders without any procedural

protections . . . will be reviewed for entire fairness" because the split under these

"circumstances is the 'functional equivalent' of a cash-out merger").

      Further, as discussed in Section III.A, a complementary line of Delaware cases

holds that a party may not exercise its control to increase its interest at the expense of the

minority.  *See, e.g.*, *Gatz*, 925 A.2d 1265 (upholding direct claim for breach of fiduciary

duty against a controlling shareholder who used his control to increase his share of the

corporation and then sell the shares to a third party).  Even in the absence of a

shareholder consent requirement such as Section 242(b)(2), there could be no clearer

example of self-dealing than a stockholder with majority voting rights—or controlling

influence of any kind—using that control to expand its interest in the company's

Common Stock in violation of the remaining shareholders' voting rights.

      FRBNY offers only two points in response, neither of which have merit.  *First*,

FRBNY asserts that the "Court need not accept plaintiff's unsubstantiated assertions as to

the reverse stock split's purpose" as "opposed to the purposes stated in the 2009 proxy

materials"—specifically, preventing AIG stock "from being delisted" and "addressing

some institutional investors' restrictions on holding low-priced stocks."  (Mot. 43.)  As an

initial matter, this argument is improper because it relies on evidence from outside the

Amended Complaint.

      Moreover, the mere existence of an alternative explanation does not render Starr's

claims subject to dismissal.  *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 10-

4591-CV, 2012 WL 1085948, at *19 (2d Cir. Apr. 3, 2012) ("The choice between two

plausible inferences that may be drawn from factual allegations is not a choice to be

made by the court on a Rule 12(b)(6) motion. . . . A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.").  Indeed, the asserted existence of a legitimate purpose for the reverse stock split only reinforces the egregiousness of FRBNY's actions.  The tying of the two purposes together meant that shareholders not misled by the proxy materials would have had to vote for the dilution of their shares to avoid the threat of delisting; at the same time, FRBNY misleadingly stated that AIG "has no plans for these authorized but unissued shares of common stock" despite the fact that the dilution that the reverse stock split achieved later enabled the Series C Preferred Stock to be converted into Common Stock.  (Am. Compl. ¶ 124.)  *See In re Delphi Fin. Grp. S'holder Litig.*, No. 7144-VCG, 2012 WL 729232, at *1 (Del. Ch. Mar. 6, 2012) (finding coercion where a shareholder vote on a desirable merger was tied to a vote to amend the corporate charter to permit the owner to receive a control premium); *see also* Mot. Ex. 6, American International Group, Inc., Proxy Statement (Schedule 14A) (June 5, 2009), at 67.  Furthermore, a reverse stock split that applied to all authorized shares would have accomplished the purposes of avoiding delisting and addressing restrictions on holding low-priced stocks *without* enabling the dilution of shareholder interests without their consent.  A vice of the reverse stock split was that it *applied only to issued shares* (FRBNY's purpose of gaining sufficient numbers of authorized shares to convert its Series C Preferred Stock into Common Stock could not be accomplished without this limitation).  (Am. Compl. ¶ 123.)  FRBNY's assertions

concerning delisting thus do not provide *any* explanation, let alone an obvious one, for the actions that form the basis of Starr's breach of fiduciary duty claim.[28]

FRBNY does not, and cannot, dispute that the reverse stock split was in fact used as the means to make available shares of Common Stock for conversion without the previously specified, independent vote of the Common Stock shareholders.  Other facts asserted in the Amended Complaint similarly support Starr's allegations and undermine FRBNY's arguments, which are based on disputed factual propositions. The independent vote of the Common Stock shareholders was explicitly mandated in the Credit Agreement, the Stock Purchase Agreement, SEC filings, and a Delaware Court order. (Am. Compl. ¶¶ 108-19.)  The independent vote to increase the number of authorized shares to enable the Treasury to acquire nearly 80 percent of the Common Stock should have occurred at the very shareholder meeting where the reverse stock split vote occurred.  (*Id.* ¶ 126.)  Meanwhile, the reverse stock split vote was structured to apply only to the *issued*, but not the *authorized*, Common Stock shares.  (*Id.* ¶ 124.)  The reasonable inference is that the reverse stock split was intentionally engineered to circumvent the independent vote of the Common Stock shareholders.  And, indeed, that is precisely how it *was* used, in contravention of the prior documentation and representations.

---

[28]  By contrast, in the cases cited by FRBNY addressing allegations of insidious purpose, the alternative explanations actually explained the action at issue and were truly obvious. *See Iqbal*, 556 U.S. at 662 (alleged disparate impact on Arab Muslims from a policy of detaining individuals connected to the September 11, 2001, terrorist attacks did not plausibly suggest discrimination); *Twombly*, 550 U.S. at 567-68 (historical existence of monopolies prior to deregulation was a "natural explanation" for the failure to compete after deregulation); *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010) (prisoner disenfranchisement legislation was enacted for reasons other than racial animus).

Finally, FRBNY incorrectly asserts that the Delaware doctrine of "independent legal significance" bars Starr's breach of fiduciary duty claim.  (Mot. 43.)  The authority cited in support of this argument establishes just the opposite.  In *Uni-Marts*, *Inc. v. Stein*, No. 14713, 1996 WL 466961 (Del. Ch. Aug. 12, 1996), the Court specifically distinguished the questions of (a) whether the defendants violated a *statutory prohibition* by accomplishing the same result through another means, and (b) whether defendants violated their *fiduciary duty* by doing so.  As the Court explained, while courts in Delaware employ a formal mode of analysis in assessing whether a statute has been breached, the doctrine of "independent legal significance" *does not apply* to "the equitable obligation of corporate fiduciaries (*i.e.*, plausible claims of self-dealing in its many guises)."  *Id*. at *9-10.  Rather, irrespective of statutory technicalities, a fiduciary's duty "remains as the background protection to shareholder interests against arrangements that, while not violating the language of" a statute, nevertheless violate its basic purpose. *Id*.  Far from undermining Starr's claim, FRBNY's own authority confirms that a violation of a defendant's fiduciary duty can exist based on the circumvention of a statute regardless of whether a defendant has violated the literal language of the statute.

## V.   PLAINTIFF HAS STATED VALID AIDING AND ABETTING CLAIMS AGAINST FRBNY

Counts II and IV of the Amended Complaint assert that FRBNY required and/or induced AIG officers and directors "to act contrary to the best interests of AIG shareholders other than FRBNY."  (*See* Am. Compl. ¶¶ 149-152, 157-160.)  FRBNY's motion to dismiss limits its discussion of these claims to a footnote with two meritless arguments.

*First*, FRBNY asserts that Claims II and IV "should be dismissed because they do not allege that AIG officers or directors breached fiduciary duties." (Mot. 39 n.15.) As noted, however, the Amended Complaint alleges that FRBNY induced or directed the officers and directors "to act contrary to the best interests of AIG shareholders other than FRBNY." And, of course, the actions which Starr alleges FRBNY caused AIG to take were also taken by AIG—that is, by AIG's officers and directors. As FRBNY's own authority reflects, an officer or director who acts contrary to the best interests of shareholders has breached his fiduciary duty. *See In re Alloy, Inc.*, No. 5626, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011) ("Corporate directors have an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." (internal quotation marks and footnote omitted)). The mere fact that Starr used different words that mean the same thing is not grounds for dismissal. *See, e.g.*, *Platinum Estates, Inc. v. TD Bank*, *N.A.*, No. 11-60670, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012) ("The Court will not dismiss an action simply because Plaintiffs fail to use 'magic words' when the pleading is otherwise sufficient." (citation omitted)); *Quantum Color Graphics, LLC v. The Fan Assoc. Event Photo GMBH*, 185 F. Supp. 2d 897, 904 (N.D. Ill. 2002) ("The question is not the magic words or language of the complaint, but the substance of the allegations."). Indeed, FRBNY can hardly claim that the Amended Complaint does not put it on notice of the aiding and abetting claim when the same sentence in its motion asserting a failure to allege breaches of fiduciary duty describes Claims II and IV as "purporting to allege that FRBNY aided and abetted *breaches* by AIG's officers or directors." (Mot. 39 n.15 (emphasis added).)

55

*Second*, FRBNY offers only the conclusory assertion that "claims for aiding and abetting breach of state fiduciary duties are not viable as they are inconsistent with FRBNY's federal functions."  (*Id.* (citing Section II of the Motion).)  FRBNY thus incorporates the same generalized arguments applied to Starr's breach of fiduciary duty claim, which should be rejected for the reasons given in Section III, *supra*.  Moreover, whether FRBNY has a fiduciary duty under state law is irrelevant to the issue of whether FRBNY induced breaches by those who indisputably do have such a duty.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that this Court deny FRBNY's Motion to Dismiss.

Dated: New York, New York
            June 1, 2012

                                    BOIES, SCHILLER & FLEXNER LLP

                                    By        /s/ David Boies
                                            David Boies
                                            Attorney of Record
                                            333 Main Street
                                            Armonk, NY 10504
                                            Tel. (914) 749-8200
                                            Fax (914) 749-8300
                                            Email: dboies@bsfllp.com

                                            Robert J. Dwyer
                                            Nicholas A. Gravante Jr.
                                            Duane L. Loft
                                            Julia C. Hamilton
                                            Luke Thara
                                            Laura Harris
                                            575 Lexington Avenue
                                            New York, NY 10022
                                            Telephone:  (212) 446-2300

Hamish P. M. Hume
Samuel C. Kaplan
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

John L. Gardiner
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000

*Attorneys for Plaintiff Starr International
Company, Inc.*

57