UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                          :
STARR INTERNATIONAL CO., *individually and*              :
*derivatively on behalf of American International Group,*  :
*Inc.*,                                                    :
                                                          :          11 Civ. 8422 (PAE)
                                     Plaintiff,           :
            -v-                                           :          <u>OPINION & ORDER</u>
                                                          :
FEDERAL RESERVE BANK OF NEW YORK,                        :
                                                          :
                                     Defendant,          :
                                                          :
AMERICAN INTERNATIONAL GROUP, INC.,                      :
                                                          :
                                     Nominal defendant.  :
                                                          :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        This case arises out of the unprecedented financial crisis that unfolded during fall 2008,

and, in particular, out of the federal government's rescue of American International Group, Inc.

("AIG").  Plaintiff Starr International Co. ("Starr"), a major stockholder in AIG, challenges,

directly and derivatively on AIG's behalf, various actions taken by the Federal Reserve Bank of

New York ("FRBNY") in connection with that rescue.  Starr alleges that, by virtue of its actions

during the rescue, FRBNY assumed a fiduciary role at AIG, but then breached its fiduciary

duties to AIG's shareholders.  Most significantly, Starr alleges that FRBNY exploited its control

over AIG to force AIG (1) to unwind credit default swap (CDS) contracts with its counterparties

on terms needlessly detrimental to AIG, in an effort by FRBNY to fortify the counterparties'

balance sheets; and (2) to cede to FRBNY an outsized portion of any residual profits received

from AIG's CDS contracts.  On those bases and others, Starr argues that FRBNY is liable for

breach of fiduciary duty under Delaware law.

FRBNY has moved to dismiss Starr's Amended Complaint, on various grounds.  For the reasons that follow, FRBNY's motion to dismiss is granted in full.

## I.     Background and Underlying Facts[1]

The circumstances underlying AIG's fall and its rescue by the government have been well chronicled in the media[2] and academic literature.[3]  The facts relevant here, as extracted from the presentation in Starr's Complaint, are these:

### A.     AIG's Business Before September 2008

AIG was founded in 1967, went public in 1969, and thereafter grew into the world's largest family of insurance and financial services companies.  Am. Compl. ¶ 21.  In the 1980s, AIG began a line of business in which it entered into derivative contracts.  In those contracts, third parties ("counterparties") paid AIG a fee—essentially an insurance premium—to take on

---

[1] The Court's account of the underlying facts of this case is drawn from the Amended Complaint ("Am. Compl.") (Dkt. 17), and the exhibits referenced therein, which have been supplied to the Court in two transmittal declarations by FRBNY counsel John Kiernan, Esq.: a declaration submitted along with the motion to dismiss ("Kiernan Decl.") (Dkt. 22) and a supplemental declaration submitted along with FRBNY's reply brief ("Kiernan Supp. Decl.") (Dkt. 28).  The Court also takes notice of the events constituting the financial crisis that occurred in fall 2008, for the purpose of providing historical context, *see* Fed. R. Evid. 201(b)(2), and because the Court "may take judicial notice of indisputable historical events."  *Miah v. Holder*, 431 F. App'x 34, 35 (2d Cir. 2011) (summ. order) (citing *Souleymane Niang v. Mukasey*, 511 F.3d 138, 149 (2d Cir. 2007)).  The Court is mindful, however, that, on a motion to dismiss, it must otherwise "confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

[2] *See, e.g.*, Carrick Mollenkamp et al., *Behind AIG's Fall, Risk Models Failed to Pass Real-World Test*, Wall St. J., Nov. 3, 2008, at A1; Gretchen Morgenson, *Behind Biggest Insurer's Crisis, Blind Eye to a Web of Risk*, New York Times, Sept. 28, 2008, at A1; Matthew Karnitschnig et al., *U.S. to Take Over AIG in $85 Billion Bailout:  Central Banks Inject Cash as Credit Dries Up*, Wall St. J., Sept. 17, 2008, at A1.

[3] *See, e.g.*, William K. Sjostrom, Jr., *The AIG Bailout*, 66 Wash & Lee L. Rev. (2009); Steven M. Davidoff & David Zaring, *Regulation by Deal:  The Government's Response to the Financial Crisis*, 61 Admin L. Rev. 463 (2009).

the risk of business transactions.  *Id.* ¶ 22.  This business was run by an arm of AIG known as

AIG Financial Products ("AIGFP").  *Id.*  In 1998, AIGFP expanded this business and began

writing insurance policies on structured debt offerings.  *Id.* ¶ 23.  Under these contracts, known

as credit-default swaps, AIGFP agreed to make the counterparty whole if a credit-linked note,

such as a mortgage-backed security, failed to perform because, for example, the underlying debt

was not paid.  *Id.* ¶¶ 23–24.  Between 1998 and March 2005, AIGFP entered into approximately

200 CDS contracts.  AIGFP thereby insured debt securities with a notional amount of nearly

$200 billion.  *Id.* ¶ 25.[4]

     After March 2005, AIGFP's business of writing CDS contracts accelerated sharply.

Between then and December 2005, AIGFP entered into another approximately 220 CDS

contracts.  These CDS contracts mostly insured debt securities linked to subprime mortgages.  *Id.*

¶¶ 27–28.

     Many securities which AIGFP agreed to insure consisted of, or included, collateralized

debt obligations, or CDOs.  *Id.* ¶ 29.  A CDO is a complex investment product:  It is a security

backed by a pool of bonds, loans, or other assets.  In the mid-2000s, these assets often included

mortgage-backed securities.  *Id.* ¶ 30.  Investors may purchase different securities corresponding

to different "tranches" of the CDO, which in turn correspond to distinct assets held within the

CDO.  Because the tranches are comprised of distinct assets, each tranche has its own risk profile

and credit rating, and each pays a different interest rate, keyed to the level of risk that the

investor will be taking on.  *Id.* ¶ 29.  A CDO is a derivative, because its value is derived from

---

[4] The "notional amount" of a credit-default swap is "the amount of exposure to a particular credit (the reference entity) for which [credit] protection is being either bought or sold . . . ."  Arvind Rajan, *A Primer on Credit Default Swaps*, *in* The Structured Credit Handbook 17, 23 (Arvind Rajan et al. eds., 2007).

events relating to a set of reference securities that may or may not be owned by the parties involved.[5]

In late 2005, however, AIGFP's senior executives concluded that writing CDSs—insurance—on CDOs was unacceptably risky.  They decided to stop writing new CDSs backed by subprime mortgage debt.  *Id.* ¶ 32.  However, the CDS contracts that AIGFP had already signed remained on its books.  *Id.*

AIGFP's positions relating to CDOs carried two types of risk—credit risk and collateral risk.  *Id.*  AIGFP's credit risk was a function of the assets underlying the CDOs and mortgage-backed securities it had insured:  If the homeowners who took out the underlying mortgages defaulted, the securities linked to those mortgages would be impaired, and AIGFP would be called upon to make up the difference.  In a worst-case scenario, this could require AIGFP to purchase the CDO at full value.  *Id.* ¶ 33.  AIGFP's collateral risk arose from the CDS contracts themselves:  Many contained a provision requiring AIGFP to post cash collateral if AIGFP's credit rating fell, or if the valuation of the underlying CDOs or mortgage-backed securities that it had insured declined.  *Id.* ¶ 34.  These collateral requirements had the potential to tie up AIGFP's available cash in the event of a market downturn.

In 2007, such a downturn began.  The housing market declined, and the value of homes began to fall.  *Id.* ¶ 35.  As mortgage default rates soared, mortgage-backed securities became impaired.  The securities linked to those mortgage-backed securities—CDOs, synthetic CDOs, and the CDSs insuring them—lost value as well.  *Id.*¶ 35.  AIGFP's CDS counterparties

---

[5] During this period, AIGFP also entered into contracts involving a type of CDO known colloquially as a "CDO squared" or a "synthetic" CDO.  These securities held assets, usually residential mortgage-backed securities ("RMBSs"), which were, themselves, CDOs—securities backed by pools of other assets.  AIGFP came to insure such "synthetic CDOs" too.  Am. Compl. ¶¶ 30–31.

thereupon asserted that the value of the assets AIGFP had insured was falling precipitously. These counterparties made increasingly large collateral calls on AIGFP.  This, in turn, forced AIGFP to post collateral, as required by the CDS contracts.  *Id.* ¶ 36.

By summer 2008, AIG had posted nearly $15 billion of cash collateral to its CDS counterparties.  *Id.* ¶ 39.  However, as economic conditions continued to deteriorate, AIG faced the prospect of receiving a collateral call that it lacked the liquid assets to meet.  *Id.* ¶ 39.  In or about July 2008, AIG's CEO expressed concern to the company's Board of Directors that the company faced a possible liquidity crisis; in such a situation, given the size of AIG's exposure, the only possible source of the necessary liquidity would be the government.  *Id.* ¶ 40.  In July 2008, AIG requested access to the Federal Reserve's "discount window" for liquidity assistance. FRBNY denied AIG such access.  *Id.* ¶¶ 41–43.

### B.     September 2008

On September 12, 2008, Standard & Poor's ("S&P") placed AIG on a negative credit watch.  *Id.* ¶ 44.  This signaled a potential upcoming downgrade of the company's credit rating. *Id.* ¶ 44.  Over the weekend of September 13-14, 2008, AIG's management made renewed attempts to access the Federal Reserve's discount window for liquidity assistance.  AIG began to consider the consequences of filing for protection under the Bankruptcy Code.  *Id.* ¶¶ 45–46.

On Monday, September 15, 2008, Lehman Brothers filed for bankruptcy protection.  This significantly worsened the global financial crisis.  *Id.* ¶ 47.  That same day, Moody's, S&P, and Fitch all downgraded AIG's long-term credit rating; AIG's stock price dropped sharply.  *Id.* ¶ 48. As a result of these events, AIG was effectively unable to access the short-term lending markets. *Id.*

On the morning of September 16, 2008, AIG's CEO alerted the government, including

FRBNY, that, as a result of its inability to obtain access to liquidity, including via the Federal

Reserve's discount window, AIG was seriously considering bankruptcy as an option.  *Id.* ¶ 51.

### C.     The $85 Billion Credit Facility and October 2008

In response to AIG's September 16, 2008 appeal for access to liquidity, FRBNY took

action.  FRBNY offered AIG a proposal including a revolving credit facility of $85 billion, fully

secured by AIG's assets, and bearing an initial annual interest rate of 14.5%; under the proposal,

the government was also to receive AIG common stock carrying approximately 80% voting

rights.  *Id.* ¶ 51(a).  On the afternoon of September 16, 2008, FRBNY sent AIG a 3-page term

sheet describing the proposed transaction.  *Id.* ¶ 52.  Starr alleges:  "AIG's Board of Directors

was left with no choice."  *Id.*  Mindful of the company's dire position, the risk that AIG would

otherwise be blamed for "a historic global collapse," and FRBNY's admonition that "this was

'the only proposal you're going to get,'" AIG's Board accepted the term sheet, even while

regarding FRBNY's "demand for 80% of the company as outrageous."  *Id.*  Starr alleges:  "The

members of the Board knew that if they refused FRBNY's demands, the blame for a historic

global collapse, and the attendant public opprobrium and risk of legal liability, likely would fall

on their own shoulders."  *Id.*

On September 17, 2008, before the start of the trading day, AIG's acceptance of the $85

billion credit facility was announced.  *Id.* ¶ 53.  On September 18, 2008, AIG's CEO was

removed and replaced with Edward Liddy.  Liddy, Starr alleges, "would be under the control of

FRBNY."  *Id.* ¶ 54.

On September 22, 2008, AIG and FRBNY formally executed the agreement ("the Credit

Agreement") memorializing the $85 billion credit facility.  *Id.* ¶ 55.  Consistent with the parties'

September 17 agreement, the Credit Agreement provided that FRBNY's loan to AIG was secured by substantially all of AIG's assets; FRBNY's loan was payable by AIG at an interest rate of approximately 14.5%. *Id.* ¶¶ 55–56.[6] The agreement also provided for AIG to issue a class of stock, Series C Preferred Stock (the "Series C shares"), which would later be convertible into 79.9% of AIG common stock. *Id.* ¶ 57. The Series C shares were to be issued to a trust (the "Trust"), whose sole beneficiary was the United States Treasury. *Id.*[7]

Starr further alleges that, in the days and weeks after the September 16, 2008 extension of the $85 billion rescue facility, FRBNY planted an "on-site team" at AIG. Starr alleges that this team exercised *de facto* control of AIG's business operations. *See generally id.* ¶¶ 59–65. As a result of this control, Starr alleges, "FRBNY stood in a fiduciary relationship to AIG's other shareholders and to AIG itself." *Id.* ¶ 65.

On October 8, 2008, the Federal Reserve Board announced that AIG had drawn down the initial $85 billion credit facility, and that FRBNY had agreed to loan up to an additional $37.8 billion to AIG, secured by investment-grade fixed-income securities held by AIG. *Id.* ¶ 66.

### D.   Maiden Lane III

By late October 2008, AIG had posted approximately $35 billion in cash collateral to satisfy calls from its CDS counterparties. *Id.* ¶ 71. During October, AIG had attempted to extricate itself from the hundreds of CDS contracts it had entered. Its goal was to prevent future rounds of collateral calls from worsening AIG's "liquidity squeeze" if the housing market

---

[6] In fact, the rate was three-month LIBOR + 8.5%, resulting in an effective rate of roughly 14.5%. The interest rate was subsequently lowered, on November 10, 2008, to three-month LIBOR + 3%. The duration of the facility was extended to five years. *Id.* ¶ 67(i).

[7] Although the agreement was executed on September 22, 2008, the Trust was not created until January 16, 2009, and the Series C Shares were not issued to the Trust until March 4, 2009. *Id.* ¶¶ 57, 67(b).

continued to deteriorate.  *Id.* ¶¶ 68–69.  As part of that effort, AIG undertook negotiations with a number of its CDS counterparties; AIG sought to modify or terminate its CDS exposure in exchange for a cash settlement.  *Id.* ¶ 68.  Starr alleges that this process had the potential to result in favorable terms for AIG.  *Id.*

However, Starr alleges, instead of allowing these negotiations to come to fruition, FRBNY, as *de facto* overseer of AIG, forced AIG to repay the CDS counterparties at full par value.  These repayments effectively served as what Starr terms "covert 'backdoor bailouts'" by FRBNY of AIG's counterparties—other banks and investment companies in the global financial system whom FRBNY favored relative to AIG.  *Id.* ¶ 69.  In forcing this outcome upon AIG, Starr alleges, FRBNY passed up the simpler solution of itself "guarantee[ing] the CDS contracts."  That option, Starr alleges, would have given AIG's counterparties, and its private-sector sources of credit, the same assurances that posting collateral provided, while "significantly improv[ing] AIG's liquidity crisis [and] potentially costing taxpayers nothing at all."  *Id.*

To implement FRBNY's "covert backdoor bailout" plan, Starr alleges, a special-purpose vehicle called Maiden Lane III ("ML III") was created.  *Id.* ¶ 70.  AIG—compelled by FRBNY, according to Starr—conveyed to ML III the $35 billion in already-posted collateral, as well as an additional $5 billion equity investment.  *Id.* ¶ 71.[8]  FRBNY then loaned ML III an additional $24.3 billion at an interest rate of one-month LIBOR + 1%.  *Id.* ¶¶ 73, 75.  Using these funds, ML III then purchased approximately $62 billion worth of CDO securities, at full par value, from AIG's counterparties, to satisfy AIG's obligations under the CDS contracts.  *Id.* ¶ 70.  Thus, Starr alleges, although AIG's CDS counterparties received cash equating to full par value, ML

---

[8] Due to technical issues relating to the mark-to-market value of the CDO securities referenced by the CDS, ML III subsequently returned $2.5 billion of AIG's collateral, reducing AIG's ultimate exposure to $32.5 billion in posted collateral.  *Id.* ¶ 74.  However, $20.2 billion of the initial $35 billion in posted collateral was received from the $85 billion credit facility.  *Id.* ¶ 77.

III received, in return, CDO securities and mortgage-backed securities of uncertain value. The purchase from AIG's counterparties occurred on November 25, 2008. *Id.* ¶¶ 67(ii), 70.

The agreement establishing ML III also governed how any proceeds derived from these assets would be distributed. *Id.* ¶ 80. The first of ML III's obligations to be satisfied was to be the $24.3 billion loan made by FRBNY. *Id.* Remaining proceeds were to be used to redeem AIG's $5 billion equity investment in ML III. *Id.* After these two obligations had been satisfied, the "residual" proceeds generated by the mortgage-backed securities or CDOs held by ML III were to be divided between FRBNY and AIG. FRBNY was to receive two-thirds, and AIG, one-third. *Id.* ¶ 81.

Starr alleges that, had AIG been left to negotiate with its CDS counterparties, rather than being forced to pay par value, AIG would have been able to negotiate more favorable settlements to the CDS contracts than those achieved by ML III. *Id.* ¶¶ 84–90. Starr alleges that, on one occasion, AIG was forced by FRBNY to turn down a concession that a CDS counterparty had offered. *Id.* ¶ 89. Starr also alleges that FRBNY forced AIG to agree, in the ML III transaction, to waive any claims that AIG may have had against the counterparties under the CDS contracts. *Id.* ¶¶ 91–93.

### E. The Trust Agreement and Issuance of the Series C Shares

In January 2009, the Trust was created to receive the Series C shares contemplated by the September 2008 $85 billion credit facility. *Id.* ¶¶ 57, 67(b). Upon its creation, the Trust had three trustees. Two had previous ties to FRBNY, although neither was associated with FRBNY at the time. *Id.* ¶¶ 102–103.

The Trust Agreement gave the trustees absolute discretion and control over the Series C shares, including as to how to exercise their 79.9% voting rights. *Id.* ¶ 101. The Trust

Agreement also limited the Trustees' ability to place FRBNY affiliates on AIG's Board:  It provided that the "Trustees shall Vote to elect . . . as members of the board of directors of [AIG] only persons who are not, and have not been within one year of their nomination, officers, directors, or senior employees of the FRBNY or the Treasury Department."  Kiernan Decl. Ex. 2 at 7.  The Trust Agreement, in a section entitled "*Exercise of Trust Stock Voting Rights,*" recited that "it is the FRBNY's view that (x) maximizing [AIG]'s ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department and (y) the Company being managed in a manner that will not disrupt financial market conditions, are both consistent with maximizing the value of the Trust Stock."  Am. Compl. ¶ 104; *see also* Kiernan Decl. Ex. 2 at 7.[9]  Notwithstanding that, the Trust Agreement provided:  "In no event . . . shall information by the FRBNY as lender relieve the Trustees from exercising their independent judgment with respect to any action to be taken under this Section 2.04."  *Id.* at 8.

On March 4, 2009, AIG issued the Series C shares to the Trust.  Am. Compl. ¶ 67(b). These shares as issued carried a 79.9% voting interest, and were convertible into a 79.9% share of AIG common stock.  *Id.* ¶ 57.

---

[9] The materials transmitted in the Kiernan Declaration and the Supplemental Kiernan Declaration are:  (1) the $85 billion Credit Agreement, dated September 22, 2008; (2) the agreement creating the Trust; (3) AIG's Form 8-K/A dated November 10, 2008; (4) excerpts of the purchase agreement for the Series C Shares; (5) excerpts from AIG's proxy statement dated April 4, 2008; (6) excerpts from AIG's proxy statement dated June 5, 2009; (7) excerpts from AIG's proxy statement dated April 12, 2010; and (8) the term sheet for the $85 billion credit facility, dated September 16, 2008.  These documents are properly considered on a motion to dismiss because they are either referenced in the Amended Complaint, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007), or are "legally required public disclosure documents filed with the SEC," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Starr has not challenged FRBNY's reliance on these documents.

### F.     Conversion of the Series C Shares to Common Stock

As of the issuance of the Series C shares, AIG's certificate of incorporation (the "Charter") authorized the issuance of up to 5 billion shares of AIG common stock.  *Id.* ¶ 110. However, 3 billion of those shares had already been issued or reserved.  *Id.*  Thus, even if AIG had issued all remaining authorized shares of common stock to the Trust, the Trust would have had only a 40% stake in AIG's common stock, not the 79.9% stake that AIG's Board had agreed the Trust would receive in accepting the $85 billion credit facility.  *Id.*

Under § 242 of the Delaware General Corporation law, which governs AIG's Charter, any increase in the number of authorized shares of a particular class of stock requires approval by a vote of the holders of that class of shares.  *Id.* ¶ 109.  In other words, AIG's Charter could not be amended to authorize additional shares of common stock unless a majority of common shareholders so voted.  *Id.*  On November 4, 2008, a lawsuit was filed in Delaware Chancery Court to ensure that the Series C Preferred Stock would not be "convertible into common stock absent a class vote" by the common stock shareholders.  *Id.* ¶ 111.  On February 5, 2009, after AIG agreed to hold a vote before increasing the number of authorized common shares, the Delaware court entered a stipulated order of dismissal because that agreement had mooted the lawsuit.  *Id.* ¶ 112.  In subsequent filings and disclosures, AIG represented that the common shareholders would be given the opportunity to vote on an increase in the authorized number of shares of AIG common stock.  *Id.* ¶ 113; *see also id.* ¶¶ 114–16.

On or about June 5, 2009, AIG circulated its 2009 proxy statement in advance of its annual shareholder meeting, scheduled for June 30, 2009.  *Id.* ¶ 120.  One proposal contained in the proxy ("Proposal 3") was to increase the number of authorized shares of common stock.  *Id.* The proxy statement noted that approval of Proposal 3 would require a majority vote of Common

Stock and the Series C shares, taken together, plus a separate majority vote of the common

shareholders, voting as a separate class.  *Id.* ¶ 121.  That proposal failed, because AIG's common

shareholders did not approve it.  *Id.* ¶ 122.

The proxy also included "Proposal 4."  *Id.* ¶ 123.  Proposal 4 was to effect a 20:1 reverse

stock split of AIG's issued shares of common stock.  If approved, Proposal 4 would reduce the

approximately 3 billion issued shares of common stock to 150 million shares, while the total

number of authorized shares of such stock would remain at 5 billion.  *Id.*  Starr alleges that

Proposal 4 therefore served as a means to "evade the requirement of an affirmative vote by

AIG's [c]ommon [s]tock shareholders" because it would free up enough issued common shares

to enable the Series C shares to be converted into the 79.9% block of common stock promised to

the Trust.  *Id.*  Because Proposal 4 required only a single vote by all AIG shares voting

together—including the Series C shares held by the Trust that carried a 79.9% voting interest—

common shareholders were unable to block Proposal 4.  *Id.*  Based on the yes vote of the Trust's

Series C shares, Proposal 4 was adopted.  *Id.* ¶ 125.

### G.    AIG's Exit Plan

More than 15 months later—on September 30, 2010—AIG announced an "exit plan"

designed to satisfy all of its obligations arising out of the numerous rescue packages it had

accepted in 2008.  *Id.* ¶ 128.  As part of this plan, AIG undertook to: (1) repay and terminate the

Credit Agreement with FRBNY; (2) exchange the Series C shares for common stock; and (3)

permit the United States Treasury to gradually sell off its stake in AIG which, between the

common stock obtained from conversion of the Series C shares and other stock issued pursuant

to the Troubled Asset Relief Program, amounted to 92.1% of AIG.  *Id.* ¶ 130.

[12]

Pursuant to this plan, on January 14, 2011, the Series C shares were exchanged for 562,868,096 shares of AIG common stock.  AIG fully repaid FRBNY for the outstanding balance of the $85 billion credit facility.  *Id.* ¶¶ 128, 133.

## II.  Procedural History

### A.     The Complaint and Amended Complaint

On November 21, 2011, Starr filed the Complaint in this case.  Dkt. 1.  The same day, Starr filed a complaint in the United States Court of Federal Claims ("the CFC Complaint").  *See Starr Int'l Co. v. United States*, 106 Fed. Cl. 50 (2012).  Starr's CFC Complaint recited essentially the same conduct at issue in this case.  However, it named the United States, not FRBNY, as the primary defendant, and brought solely constitutional claims, including claims based on the takings clause of the Fifth Amendment.

On January 23, 2012, the Court endorsed a stipulation in this case providing for: (1) Starr to file an amended complaint; (2) FRBNY to file a motion to dismiss within 60 days; (3) Starr to file an opposition 60 days thereafter; and (4) FRBNY to submit a reply 30 days after the filing of an opposition. Dkt. 10.  On February 1, 2012, Starr filed an Amended Complaint.  Dkt. 17.

The Amended Complaint—the operative pleading in the case—formally brings six claims.  In substance, however, there are three claims, each brought both directly on Starr's own behalf and derivatively by Starr on AIG's behalf.

First, Starr alleges, FRBNY breached the fiduciary duty it allegedly owed to AIG and its shareholders, by virtue of "its control of AIG and its power to act on behalf of AIG."  Am. Compl. ¶ 146.  Starr alleges that, while controlling AIG, FRBNY took actions involving self-dealing "that were deliberately contrary to the interests of the company."  *Id.* ¶ 147; *see also id.* ¶¶ 154–156.  These actions, Starr alleges, included forcing upon AIG the September 2008 Credit Agreement, the November 2008 Maiden Lane III transaction (and the "backdoor bailouts" and its

other terms assertedly unfavorable to AIG's interests), and the later stock transactions (in June 2009 and January 2011) implementing the terms of the Credit Agreement.

Second, Starr alleges, FRBNY aided and abetted AIG's officers and directors in breaching their fiduciary duties to AIG and its other shareholders. Starr's aiding and abetting claim is based on the same events as its fiduciary duty claim. *Id.* ¶¶ 150-52, 158-160.

Third, Starr alleges, FRBNY violated the Equal Protection, Due Process, and Takings Clauses of the United States Constitution by expropriating AIG's assets, in a discriminatory manner, and without due process or just compensation. *Id.* ¶¶ 162-165; 167-169.

**B. Subsequent Proceedings**

On April 2, 2012, FRBNY moved to dismiss the Amended Complaint. Dkt. 21–23. On June 1, 2012, Starr filed an opposition to FRBNY's motion. Dkt. 26. On July 2, 2012, FRBNY filed its reply. Dkt. 27–28.

On July 2, 2012, the Court of Federal Claims issued an opinion on the United States's motion to dismiss the Complaint in Starr's parallel action in that court. The Court of Claims denied the United States's motion in substantial part; however, it granted the motion as to Starr's Equal Protection claim and a portion of Starr's Due Process claim. *See Starr Int'l Co. v. United States*, 106 Fed. Cl. 50 (2012) ("*Starr CFC Decision*"). On July 17, 2012, this Court granted the parties leave to submit brief letters, by July 20, 2012, addressing the Court of Federal Claims' decision. The parties submitted those letters.

On July 26, 2012, the Court heard more than three hours of oral argument on this motion. The Court reserved decision on FRBNY's motion.

### C.  Status of AIG's Consideration of Starr's Derivative Claims

Among the bases for FRBNY's motion to dismiss was that—to the extent Starr's claims were properly seen as derivative—Starr had not made a demand upon AIG's board and the requirement of such a demand was not excused on account of futility.  As of July 26, 2012, the date of argument, as a result of a stipulation approved by the Court, the deadline for nominal defendant AIG to answer, move, or otherwise respond to the Amended Complaint, *see* Fed. R. Civ. P. 12(a)(1), had not yet passed.[10]  AIG's directors therefore had not been called upon to decide whether to adopt Starr's claims (to the extent derivative) against FRBNY in this Court.

At argument, counsel for AIG reported that, as a result of the Court of Federal Claims' denial of the United States's motion to dismiss, AIG's directors, in August 2012, would be discussing whether to join Starr's lawsuit in that court.  This Court directed AIG's counsel to inform the Court promptly by letter of that decision, once made.  At argument, this Court also strongly encouraged AIG's Board to determine, at the same time, whether to adopt this lawsuit.

On August 20, 2012, AIG submitted a response to the Court, reporting on its Board's discussions.  Dkt. 33.  AIG stated that Starr had agreed to make a demand on AIG's Board with respect to Starr's Maiden Lane III claims, which Starr has conceded are derivative in nature.  *Id.* at 2.  Following that demand, AIG stated, its Board planned to receive written presentations regarding Starr's derivative claims from Starr, the government, and FRBNY, and, at a Board

---

[10] The stipulation, endorsed on March 9, 2012, extended AIG's time to answer until 20 days after FRBNY filed its answer.  Dkt. 19.  It thus effectively permitted AIG to remain on the sidelines while FRBNY's motion to dismiss was litigated.  Notwithstanding the stipulation, on May 30, 2012, AIG filed a document styled as a "response" to FRBNY's motion to dismiss.  Dkt. 25. That response asked the Court to refrain from ruling on the basis of demand futility, an issue, it stated, that was best raised by AIG in the first instance.  *Id.*  In the parallel action in the Court of Federal Claims, AIG was also granted permission to wait until resolution of the United States's motion to dismiss before taking a position on the substantive merits of Starr's claims, including demand futility.  *See* 106 Fed. Cl. 50, No. 11-779C (Fed. Cl. July 2, 2012), Dkt. 32, 35.

[15]

meeting scheduled for January 9, 2013, oral presentations by these parties.  *Id.* at 3–4.  AIG's

letter represented that its Board anticipated deciding whether to join the lawsuit—*i.e.*, whether to

adopt Starr's allegations here as its own—by the end of January 2013.  *Id.* at 4.[11]

## III.    Starr's Fiduciary Duty Claims

### A.    Overview

At the outset, it is important to isolate the actions of FRBNY that are and are not at issue

here.  Starr's Amended Complaint trains much of its fire on FRBNY's actions in September

2008.  Specifically, it sharply criticizes FRBNY for (1) the actions leading up to the September

17, 2008 term sheet and September 22, 2008 Credit Agreement with AIG, including its alleged

refusal to allow AIG access to the Federal Reserve's discount window, (2) the terms of the

Credit Agreement, which Starr claims were needlessly harsh, and (3) FRBNY's actions towards

AIG in the immediate aftermath of that Agreement, which Starr depicts as high-handed.  *See,*

*e.g.*, Am. Compl. ¶¶ 41–66.  However, none of those actions is within the scope of this lawsuit.

That is because the statute of limitations for breach of fiduciary duty in Delaware is three years,

*see* Del. Code tit. 10, § 8106; *Graulich v. Dell, Inc.*, C.A. No. 5846-CC, 2011 Del. Ch. LEXIS

76, at *26 (Del. Ch. May 16, 2011), and Starr did not file the original Complaint in this case until

November 21, 2011.  At argument, Starr conceded that any claim for breach of fiduciary duty

challenging actions taken before November 21, 2008 is time-barred.  *See* Hg. Tr. 62 ("The Court:

The statute [of limitations] is three years from November 2011.  Mr. Boies:  Exactly.").

---

[11] In the event that AIG's Board determined not to pursue Starr's derivative claims, AIG
reported, Starr reserved its right to seek to amend the Amended Complaint to allege that Starr's
demand was wrongfully refused by AIG's Board, or not required as a matter of law.  *Id.* at 4.

In light of that concession, Starr seeks to hold FRBNY accountable for three discrete later actions by FRBNY, which Starr casts as breaches of its purported fiduciary duty to AIG and its shareholders.

The first is the November 2008 Maiden Lane III transaction. Starr's principal allegation is that AIG was forced by FRBNY to pay excessive amounts to its counterparties to satisfy its obligations under the CDS contracts. As noted, Starr claims that that transaction served as a "backdoor bailout" by FRBNY of these counterparties. Starr also claims that the terms of ML III unfairly allowed FRBNY to realize a profit on the transaction at AIG's expense, by reserving for FRBNY a two-thirds share of the residual proceeds recovered from AIG's CDS contracts and mortgage-backed securities *after* FRBNY's loans and AIG's equity contribution to ML III, and other sunk costs, had been repaid.

The second is the June 2009 20:1 reverse stock split of AIG's common shares. Starr claims that FRBNY brought about that stock split to circumvent the vote of AIG's common shareholders rejecting a proposal to increase the number of authorized shares of AIG's common stock. That vote, Starr states, had effectively blocked AIG from issuing the Trust the 79.9% of AIG's common stock contemplated by the Credit Agreement. But, Starr states, the reverse stock split served as an end-run around the common shareholders' vote by freeing up common shares that could be issued to the Trust. Starr further notes that the company's common shareholders were powerless to prevent the reverse stock split, because it was approved by a vote of *all* AIG shareholders, including the Trust, whose preferred shares enabled it to dictate the vote's outcome.

The third action that Starr protests is the January 2011 exchange of the Treasury's Series C shares for AIG common stock.

In moving to dismiss, FRBNY makes a series of alternative arguments.

First, FRBNY argues, Starr's claims are all derivative, and must be dismissed because Starr did not make a pre-suit demand on AIG and the requirement of such a demand was not excused.  Second, FRBNY argues, Starr has failed adequately to plead control by FRBNY of AIG, and therefore the existence of a fiduciary relationship between FRBNY and AIG.  Third, even if FRBNY was plausibly pled to have stood in a fiduciary relationship to AIG, Delaware fiduciary duty law does not apply to FRBNY.  This is so either because such law is preempted as applied to FRBNY, as a federal instrumentality; or because the legal standards to which FRBNY is subject are supplied by federal common law, which should not be read in this context to incorporate or borrow state fiduciary law.  Fourth, even if Delaware fiduciary duty law applies to FRBNY's actions with respect to AIG, none of FRBNY's actions breached such duty.  Starr disputes each point.

For the reasons that follow, the Court dismisses Starr's fiduciary duty claims for two independent reasons.

First, measured against the settled standards for corporate control under Delaware law, Starr has not adequately pled that FRBNY controlled AIG at the time of any of the three relevant events (*i.e.*, November 2008, June 2009, and January 2011).  Starr therefore has not adequately pled that FRBNY was, at those times, a fiduciary to AIG and its shareholders.

Second, even assuming *arguendo* that FRBNY was such a fiduciary, Delaware fiduciary duty law does not apply to FRBNY's actions challenged here.  That is so whether the issue is analyzed as one of federal preemption or as one of appropriate borrowing of state law by federal common law.  That is because, at the time it assertedly was a fiduciary of AIG's, FRBNY was also a federal instrumentality charged with vitally important statutory responsibilities.  These

[18]

included preserving the stability of the nation's banking system and economy. FRBNY's challenged actions with regard to AIG during the financial crisis were integrally bound up in the rescue loan packages it furnished AIG in fall 2008, made with the goal of stabilizing the American economy. And, where imposing state-law duties upon a federal instrumentality would squarely conflict with its federal responsibilities, as would subjecting FRBNY to Delaware fiduciary duty law in connection with the terms of its serial rescues of AIG, such state law is preempted and is not properly borrowed by federal common law.

### B. Applicable Legal Standards

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*,

550 U.S. at 555).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In applying these principles to a particular case, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

### C.  Starr Does Not Adequately Allege That FRBNY Was a Fiduciary of AIG's

It is axiomatic that, for an entity to be liable for breach of a fiduciary duty owed to a corporation, it must have had control over that corporation.  As the Delaware Chancery Court has repeatedly emphasized, "the very essence of a breach of corporate law fiduciary duty claim is the misuse of corporate control," *Sample v. Morgan*, 935 A.2d 1046, 1059 (Del. Ch. 2007) (Strine, V.C.), and "[f]iduciary duties . . . arise from control," *Citron v. Steego Corp.*, C.A. No. 10171, 1988 Del. Ch. LEXIS 119, at *16 (Del. Ch. Sept. 9, 1988) (citing *Ivanhoe Partners v. Newmont Mining Co.*, 535 A.2d 1334 (Del. 1987)).

Under Delaware law, an entity controls a corporation, and therefore owes a fiduciary duty to it and its shareholders, in two circumstances:  First, where it is a majority shareholder in the corporation; and, second, where it is a minority shareholder but exercises *actual control* over corporate conduct.  *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989); *Ivanhoe Partners*, 535 A.2d at 1344; *see also Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994); *In Re Sea-Land Corp. Shareholders Litig.* (*In Re Sea-Land Corp.*), C.A. No. 8453, 1987 Del. Ch. LEXIS 439, at *12 (Del. Ch. May 22, 1987); *Gilbert v. El*

*Paso Co.*, 490 A.2d 1050, 1055 (Del. 1984). For a minority shareholder to control corporate conduct, a plaintiff must show "domination by a minority shareholder through actual exercise of direction over corporate conduct." *Gilbert*, 490 A.2d at 1055 (citation omitted); *see also Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005); *Kahn*, 638 A.D.2d at 1114; *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984); *In Re Sea-Land Corp.*, 1987 Del. Ch. LEXIS 439, at *10; *Kaplan v. Centex*, 284 A.2d 119 (Del. Ch. 1971); *Puma v. Marriott*, 283 A.2d 693 (Del. Ch. 1971). "The *potential* ability to exercise control" does not suffice, as it "is not equivalent to the actual *exercise* of that ability." *In Re Sea Land Corp.*, 1987 Del. Ch. LEXIS 439, at *10 (emphasis in original); *see also Gilbert*, 490 A.2d at 1055-1056.

Because Starr alleges breaches by FRBNY of fiduciary duties to AIG, a threshold issue is, therefore, whether Starr has met its burden to plead, plausibly, that FRBNY controlled AIG, either as a majority shareholder or by the exercise of actual control, and therefore was AIG's fiduciary. To be sure, Starr's Amended Complaint paints a portrait of government treachery worthy of an Oliver Stone movie. Starr claims that, as the global financial system teetered on the brink of collapse, FRBNY seized control of AIG. Then, Starr claims, FRBNY, in an act of Napoleonic plunder, stole AIG's assets, re-distributing some to shore up other flagging financial institutions while keeping much of the residue for itself. It is, however, one thing to make a sweeping and dramatic claim of government misconduct. It is quite another to plead plausibly—under the established standards of Delaware law, and based on concrete factual allegations, as *Twombly* and *Iqbal* require—that FRBNY exercised control over AIG.

Specifically, in light of Starr's claims of three distinct breaches of duty, the Court must evaluate whether Starr has adequately pled control of AIG by FRBNY as of each of the three distinct moments when the conduct constituting those alleges breaches occurred—*i.e.*, in

November 2008, June 2009, and January 2011.  Because, however, Starr's narrative begins by claiming that FRBNY's domination of AIG began earlier, including on September 17, 2008, when AIG's Board accepted the $85 billion credit facility, and on September 22, 2008, when it executed the Credit Agreement, the Court first analyzes the adequacy of Starr's suggestion that FRBNY controlled AIG at those points.

> **1.    Did FRBNY Control AIG When AIG's Board Accepted the $85 Billion Credit Facility (September 17, 2008) and Entered into the Credit Agreement (September 22, 2008)?**

Under the September 17, 2008 agreement between AIG and FRBNY, memorialized in the September 22, 2008 Credit Agreement, FRBNY extended an $85 billion credit facility to AIG in return for: interest at an "exceptionally high interest rate"; security; and an agreement to later issue the Series C shares, carrying a 79.9% voting stake, to a Trust with the United States Treasury as the sole beneficiary.  Am. Compl. ¶¶ 51(a), 52, 57.  Starr claims that FRBNY "coerced" AIG into accepting these terms, which "amounted to stealing the Company."  *Id.* ¶ 51(a).

Starr's claim that FRBNY controlled AIG at the moment of this agreement is based on the following allegations:  (1) "The members of the Board knew that if they refused FRBNY's demands, the blame for a historic global collapse, and the attendant public opprobrium and risk of legal liability, likely would fall on their own shoulders"; (2) FRBNY had "declin[ed] to grant AIG liquidity access on the same terms as other similarly situated entities with lower quality collateral"; (3) FRBNY "contributed to a credit downgrade" by "repeatedly and inaccurately representing that there would be no Government assistance to AIG"; (4) FRBNY organized a "private-sector effort" to rescue the bank which FRBNY "did not believe had a significant chance of success"; (5) FRBNY "ensur[ed] through its actions and representations that the Board

would have only hours to make the decision to avoid a global economic meltdown"; (6) FRBNY "inform[ed] AIG that it should try to undo its plans for bankruptcy without first informing AIG of its intentions"; and (7) FRBNY "falsely and irresponsibly represent[ed] that it was willing to risk destroying the global economy if the AIG Board did not accept its extortionate demands." *Id.* ¶ 52.  These steps, Starr alleges, left AIG's Board with "no choice" but to accept FRBNY's terms.  *Id.*  Starr alleges:  "The Credit Agreement was imposed upon, and not voluntarily agreed to by, the AIG board."  *Id.* ¶ 58.

The Court puts Starr's rhetorical declarations about AIG's lack of choice and volition to one side, because they are the quintessential "labels and conclusions" and "naked assertions" which the Supreme Court has instructed "will not do."  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  However, on a motion to dismiss, the factual allegations in Starr's narrative must be taken as true.  These include that FRBNY pressured AIG to enter into the Credit Agreement by "irresponsibly" claiming that a decision not to do so would risk "destroying the global economy" and causing "a global economic meltdown."  Am. Compl.  ¶ 52.

Measured against the standards for corporate control set by Delaware law, Starr's factual allegations do not support—or come close to supporting—a "reasonable inference," *Iqbal*, 556 U.S. at 678, that AIG, at the moment its Board approved the term sheet (September 17, 2008) or the Credit Agreement that memorialized those terms (September 22, 2008), was controlled by FRBNY.

To begin with, on those dates, FRBNY was not a shareholder, let alone a majority shareholder, of AIG.  Thus, for its claim of control to be plausible, Starr must show, through concrete factual allegations, that FRBNY in fact exercised "actual control" over AIG's decisions

to agree to the term sheet and Credit Agreement. *See Weinstein Enters., Inc.*, 870 A.2d at 507; *In Re Sea-Land Corp.*, 1987 Del. Ch. LEXIS 439, at *10.

In conducting that analysis, it is centrally important that those decisions were made by AIG's Board. And, both on September 17 and September 22, 2008, AIG's Board consisted solely of directors who had been elected, well before the financial crisis, through the ordinary mechanisms of corporate democracy.[12] Starr does not allege that these directors had been selected by, or were in any way beholden to, FRBNY, or, for that matter, to any other arm of the federal government. Nor does Starr make any concrete factual allegations that would suggest that these independent directors were personally threatened or otherwise coerced to approve the term sheet and Credit Agreement, or that they were motivated during these days by anything other than advancing AIG's well-being at a moment of crisis in which all options were grim. *See Aronson*, 473 A.2d at 815 ("[E]ven proof of majority ownership of a company does not strip directors of the presumptions of independence, and that their acts have been undertaken in good faith and in the best interests of the corporation.").

As for the warning that Starr alleges that FRBNY officials made to AIG's Board regarding the grave consequences that its course of action presented for the "global economy," Am. Compl. ¶ 52, that warning is not plausibly viewed as an act by which FRBNY exercised (or revealed its) "actual control" over AIG's corporate conduct. Rather, as pled, it was an act of

---

[12] The 13 directors as of September 2008 included Richard C. Holbrooke, the former United States Ambassador to the United Nations; Martin S. Feldstein, a Harvard Professor of Economics who served as President and CEO of the National Bureau of Economic Research; James F. Orr III, the Chairman of the Rockefeller Foundation; Michael H. Sutton, the former chief accountant of the SEC; Ellen V. Futter, the President of the American Museum of Natural History; the then-current or former CEOs of the Estee Lauder Companies, WQED Multimedia, and Hilton Hotels Corporation; and executives of IBM Corporation and Offit Capital Advisors LLC. *See* Kiernan Decl. Ex. 5, at 7–9 (Schedule 14A to AIG's April 4, 2008 proxy statement, listing and providing biographies of candidates for directors to be elected on May 14, 2008).

[24]

expression by the federal regulator statutorily charged with responsibility for maintaining the stability of the nation's economy.  And, under the urgent circumstances of the financial crisis in mid-September 2008, even in the spare form in which those circumstances are presented in the Amended Complaint, FRBNY's message was a fair one to convey to AIG's Board.  In any event, whatever the merits as a matter of public policy of FRBNY's statements and actions towards AIG in mid-September 2008, Starr's critiques of them do not convert them into instances of actual control, as measured under Delaware law.

The facts pled in the Complaint instead plausibly permit only one conclusion, and it is inconsistent with Starr's thesis of control.  *Cf. Iqbal*, 556 U.S. at 681 (rejecting claim of discrimination as implausible given existence of "more likely explanations" for facts alleged); *Twombly*, 550 U.S. at 567–68 (rejecting claim of antitrust conspiracy as implausible given "obvious alternative explanation" for facts alleged).  It is that, in September 2008, AIG was in extremis, and its independent board of directors, to save the company, voluntarily accepted the hard terms offered by the one and only rescuer that stood between it and imminent bankruptcy— FRBNY.  Specifically, based on Starr's own allegations, (1) AIG, as of mid-September 2008, was in dire straits, whether as a result of its own business decisions, the unraveling state of the financial system, the lack of available liquidity, or a perfect storm of these and other factors, and was actively considering bankruptcy; (2) AIG had not found any effective rescuer in its hour of need other than FRBNY, and had run out of time to keep looking; and (3) AIG's Board, unwilling to accept bankruptcy and the "public opprobrium" and "risk of legal liability," Am. Compl. ¶ 52, that would come with it, acceded—regretfully, and perhaps angrily, but, as a matter of law, voluntarily—to the hard terms on which FRBNY was willing to extend the $85 billion credit facility.

[25]

Far from describing actual control of AIG by an outside party, these allegations describe a moment of corporate desperation, in which AIG's Board grabbed the sole lifeline extended to the company.  Merely because the AIG Board felt it had "no choice"[13] but to accept bitter terms from its sole available rescuer does not mean that that rescuer actually controlled the company.  By Starr's logic, a loan shark whose usurious interest rate is agreed to by a small business so that it may stay afloat could equally be said to have had actual control over that business so as to compel its agreement to a loan.  To be sure, AIG's directors faced wrenching circumstances.  But Starr has not pled facts sufficient, under Delaware law, to shift responsibility from the Board to FRBNY for the Board's decision to agree to the term sheet and Credit Agreement.  On the facts alleged, as of September 17 and 22, 2008, AIG's directors retained actual control of the Company.  They—not FRBNY—were the ones with fiduciary duties towards AIG and its shareholders.

## 2.     Did FRBNY Control AIG as of ML III (November 25, 2008)?

Starr next challenges the Maiden Lane III transaction as a breach of FRBNY's purported fiduciary duty in two respects.  First, Starr alleges, AIG's CDS counterparties would have accepted less than full (par) value on the CDS contracts, but AIG was forced by FRBNY to pay more money to unwind those transactions than was necessary, in an attempt by FRBNY to fortify those counterparties.  *Id.* ¶¶ 84–90.  Second, Starr alleges, FRBNY effectively confiscated profits due to AIG under the CDS contracts:  Under ML III's terms, the money generated by the CDO securities held by the ML III vehicle was to be used, first, to pay back FRBNY's $24.3 billion

---

[13] In fact, contrary to Starr's rhetoric, Am. Compl. ¶ 52, AIG's predicament does not describe a situation in which AIG was devoid of choice:  According to Starr's own pleadings, on September 16, 2008, AIG's Board had, and was actively considering, the alternative choice of bankruptcy.  *Id.* ¶ 51.  FRBNY's term sheet presented an alternative course for the Board to consider, and the Board chose that course.  Even a choice between a rock and a hard place is still a choice.

dollar loan, and then AIG's $5 billion equity contribution, *id.* ¶ 80, with "residual" profit left over to be split, with two-thirds going to FRBNY.  *Id.* ¶ 81.

In claiming that FRBNY was subject to fiduciary duties in connection with the ML III transaction, Starr argues that FRBNY, as of November 2008, was a "controlling shareholder" and a "controlling lender" of AIG.  Starr asserts that "AIG's shareholders and those directors selected independently of FRBNY had lost the ability to control AIG, protect its interests, or remedy acts that damaged it."  *Id.* ¶ 53.  Starr's theories of control, in turn, derive from the term sheet and Credit Agreement which AIG's Board had entered into in September 2008, under which AIG had borrowed $85 billion from FRBNY and was required eventually to issue stock, carrying a 79.9% voting interest in AIG, to a Trust of which the United States Treasury was the beneficiary.  *Id.* ¶¶ 4, 53, 57.  To illustrate its claim of control, Starr alleges that, on September 18, 2008, the day after the term sheet was executed, AIG's Chief Executive Officer was terminated and replaced with a candidate who "would be under the control of FRBNY."  *Id.* ¶ 54; *id.* ¶ 58 ("The [g]overnment's coercion is evidenced by, among other facts, the [g]overnment's unilateral removal of [AIG's Chief Executive Officer] and its installation of [a replacement] to do FRBNY's bidding.").

The Court addresses first the claim that FRBNY was a controlling *shareholder* of AIG in November 2008.  That claim is easily put to one side.  As the Amended Complaint alleges, the Trust which was to hold stock for the benefit of the Treasury was not even created until January 2009, two months later.  *Id.* ¶ 57.  And these Series C shares were not issued to the Trust until March 2009, some four months after the ML III transaction.  *Id.* ¶ 67(b).  Therefore, even if FRBNY were legally coterminous with the Trust, or with its beneficiary the Treasury—a claim the Court rejects, *see infra* at 39–43—the Amended Complaint does not plausibly allege that

FRBNY was an AIG shareholder at all (let alone a majority or controlling shareholder) in

November 2008, when AIG approved ML III.

   The Court turns, next, to Starr's claim that FRBNY functioned as a controlling *lender*

over AIG at the time it entered into ML III.  Analysis of that claim properly begins with the fact

that it was AIG's Board that approved the ML III transaction.[14]  It is a foundational principle of

---

[14] The Amended Complaint is silent as to whether AIG's Board approved ML III.  At argument, FRBNY's counsel represented that "the [AIG] board had to decide whether to agree to [ML III]" and AIG "signed the ML III operative agreements because it was an equity holder in ML III.  It contributed $5 billion to ML III, and it agreed to contribute its collateral to resolving the CDS problem.  So, all of those things took board actions."  Hg. Tr. 38–40.  Starr's counsel did not dispute the point.  Asked whether AIG's Board approved the terms of ML III, Starr's counsel responded that while he did not know the answer, "I would expect that with $5 billion the board would have had to."  *Id.* at 77.  He added:  "If they [AIG] will send me the board approval, I will send a letter accepting that."  *Id.* at 78.  The Court thereupon asked all parties to work together to answer this question, perhaps by means of a document or a stipulation.  *Id.* at 102.

On October 26, 2012, with no response having been filed, the Court directed AIG to respond to the question.  Dkt. 34.  By letter dated October 31, 2012, AIG's counsel responded, on behalf of AIG.  He represented that "AIG's Board approved the ML III transaction as reflected in the minutes of the November 9, 2008 board meeting."  The minutes were attached.  Dkt. 36.  The minutes in fact reflect the Board's vote approving the ML III transaction, as set forth in a nine-page single-spaced term sheet.

In a letter dated November 1, 2012, Dkt. 37, Starr observed that the minutes do not themselves reflect the specific supporting data that had been presented to the Board before its vote, and that they can be read to reflect that, as of November 9, 2008, some terms were not final.  These include the percentage (100% or some lesser percent) of par value that the ML III facility would pay to AIG's CDS counterparties.  The term sheet does, however, reflect that FRBNY, as the "Senior Lender," would receive two-thirds of both contingent interest and any residual profits "waterfall" from those CDS interests.

In a letter dated November 6, 2012, Dkt. 38, FRBNY noted that the minutes explicitly state that they do not reflect the full presentations to or the full deliberations by the Board during the "lengthy discussion" at that meeting; FRBNY also notes that the draft ML III term sheet provides that (subject to certain adjustments) each counterparty will be paid "the notional amount for the CDS transaction," and that the term "notional amount" corresponds to "par value."  FRBNY also notes that, according to the minutes, the Board's approval was for an ML III transaction "on substantially the terms and conditions presented to the Board at this meeting" and with "such amendments" to the draft forms of agreement "as any Authorized Officer may deem necessary, desirable, or appropriate."

Delaware corporation law that control of corporate affairs is vested in a company's board of directors.  Del. Code Tit. 8, § 141(a); *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, C.A. No. 1668-N, 2006 Del. Ch. LEXIS 160, at *16 n.38 (Del. Ch. Aug. 25, 2006) ("[T]he 'business and affairs' of a Delaware corporation are under the direction of the board pursuant to 8 Del. C. § 141(a)."). And AIG's directors at the time of ML III were the same independently elected directors who had approved the term sheet and the Credit Agreement in September. Starr does not allege that the Board's membership had changed between then and November 2008, or that in any respect any Board member was beholden to FRBNY.

Under these circumstances, Starr faces an uphill battle in arguing that it has plausibly pled that FRBNY was a "controlling lender" of AIG. It is well-settled that, because a creditor-debtor relationship does not, in the ordinary course, entail a creditor's control of a debtor's board, "as a general rule, there is no fiduciary relationship between a debtor and a creditor . . . and, therefore, there can be no breach of fiduciary duty." *Keith v. Sioris*, C.A. No. 05C-02-272, 2007 Del. Super. LEXIS 36 (Del. Super. Jan. 10, 2007). As the Second Circuit has put the point, "absent special circumstances, a lender does not incur fiduciary obligations toward its debtor." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, *N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995) (citations omitted); *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, *N.A.*, 731 F.2d 112, 122 (2d Cir. 1984) ("[under New York law,] the usual relationship of bank and customer is that of debtor and creditor. And in this case, there is no evidence to indicate that Chase or Ferer-London intended that their relationship be something more than just the debtor-credit

---

The Court appreciates counsel's close analyses of the Board minutes. For present purposes, the question relevant to the Court's legal analysis is simply whether—as both FRBNY and AIG have represented, and as Starr anticipated at argument—it was AIG's Board, as opposed to some other decisionmaker at AIG, that approved the ML III transaction. The minutes make unambiguously clear that the Board did so approve; and the Amended Complaint does not allege to the contrary.

[29]

relationship"); *Bank Leumi Trust Co. v. Block 3102 Corp.*, 180 A.D.2d 588, 589 (1st Dep't 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors.").

Starr's claim that FRBNY controlled AIG's Board—AIG's decisionmaker as to ML III— by using its leverage as a lender therefore must be measured against the line of cases in which Delaware courts have inquired whether an entity other than a majority stockholder "d[id], in fact, exercise actual control over the board of directors during the course of a particular transaction." *In re W. Nat'l Corp. S'holders Litig.*, C.A. No. 15927, 2000 Del. Ch. LEXIS 82, at *70 (Del. Ch. May 22, 2000); *see also Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160, at *15 ("Delaware case law has focused on control of the board."). These cases underscore that the test of whether a non-majority shareholder has assumed *de facto* control over the board "'is not an easy one to satisfy and stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.'" *Zimmerman v. Crothall*, C.A. No. 6001-VCP, 2012 Del. Ch. LEXIS 64, at *36–37 (Del. Ch. Mar. 5, 2012) (quoting *In re PNB Hldg. Co. S'holders Litig.*, C.A. No. 28-N, 2006 Del. Ch. LEXIS 158, at *31–32 (Del. Ch. Aug. 18, 2006)). In particular, synthesizing these cases yields the conclusion that Delaware courts have found *de facto* control of a corporate board by a business partner or counterparty only where either (1) the business partner or counterparty also had a substantial shareholding in the company, and other factors supported an inference of control, such as a close relationship between that entity and a second shareholder (thus pushing their combined stake above 50%); or (2) there were non-independent members of the board who played an influential role in an allegedly self-dealing transaction.

For example, in *Williamson v. Cox Communications*, C.A. No. 1663-N, 2006 Del. Ch. LEXIS 111 (Del. Ch. June 5, 2006), the plaintiffs, bondholders of the At Home Corporation, claimed that the defendants, cable companies that were minority shareholders in At Home, had controlled At Home when it entered into a transaction favoring the cable companies. The court found that plaintiffs had met their pleading burden as to control[15] based on the fact that: (1) the defendant cable companies were, if viewed collectively, At Home's largest shareholders, (2) the subset of At Home's directors who had approved the transaction was comprised entirely of defendants' designees, many of whom were officers of the defendant companies; and (3) the defendant cable companies were At Home's only significant customers and source of revenue, and had used that bargaining power to extract contractual veto power over board decisions. *See id.* at *16–22.

In *In re Western National Corp.*, shareholders in Western National challenged a merger between the company and its largest shareholder, American General. 2000 Del. Ch. LEXIS 82 at *3. The shareholders asserted that American General had exercised control over Western National and that the transaction constituted improper self-dealing. On summary judgment, the Chancery Court found the shareholders' claim of control lacking despite the fact that: (1) American General held a 46% stake in Western National, *id.* at *21; (2) American General had exercised significant direction over a number of joint ventures between itself and Western National, *id.* at *22–24; and (3) before the merger, American General had opposed, and persuaded Western National's board to reject, a proposed business combination between Western National and another company and then had proceeded to acquire that company itself, *id.* at *24–

---

[15] The Chancery Court in *Williamson* applied a pleading standard under which dismissal was warranted only if "plaintiff would not be entitled to relief under any set of facts that can be inferred from the pleadings." *Id.* at *13. That standard is less stringent than that of *Twombly* and *Iqbal*.

29.  The Chancery Court held that these facts did no more than show the *potential* for control, not actual control of Western National's business and affairs.  *Id.* at *21, 28.  Particularly relevant here, the Chancery Court noted that "none of Western National's eight directors, at the time of the merger, were employed by or directly under American General's control," and six had sat on the board "*before* American General acquired its stake in the Company."  *Id.* at *35– 36 (emphasis in original).  Further, there was "no evidence to suggest that American General directly or indirectly participated, or was in any way involved, in the functioning of the Western National board of directors before the merger," *id.* at *68, or that it had dominated or controlled the special committee of the board responsible for the merger.  *Id.* at *71–79.

In *Superior Vision Services*, the issue of actual control arose in an unusual context:  The corporation, Superior Vision, had sued its largest shareholder, ReliaStar, for blocking a dividend payment pursuant to a contractual right to do so.  2006 Del. Ch. LEXIS 160, at *1–2.  Superior Vision claimed that ReliaStar was its fiduciary by virtue of ReliaStar's 44% stake in Superior Vision, combined with ReliaStar's rights, obtained under an earlier-negotiated contract, to block a dividend payment.  *Id.* at *1–7.  The court granted ReliaStar's motion to dismiss.  Reviewing Delaware case law, the court noted that "the focus of the [control] inquiry has been on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process"— *i.e.*, the board.  *Id.* at *16–17.  Applying that principle, the court concluded that "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose."  *Id.* at *19–20.

Consistent with these holdings, the decisions of the Delaware courts that have found actual control indicate that to have such control, a minority shareholder must possess a significant ownership stake in the corporation *and* there must be other factors indicative of control.  *See, e.g.*, *Kahn*, 638 A.2d at 1114–1115 (finding control of Lynch Communications by Alcatel U.S.A. Corp., where Alcatel held 43% equity stake, Alcatel managers were members of Lynch's board, and evidence of board's operations graphically revealed that remaining directors deferred to Alcatel-affiliated directors for reasons other than an exercise of business judgment, including because Alcatel-affiliated director told other board members: "You must listen to us. We are 43 percent owner.  You have to do what we tell you."); *Weinstein Enters.*, 870 A.2d at 507–08 (finding *de facto* control of J.W. Mays, Inc., by Weinstein, where Weinstein owned a 45% stake in Mays, and also controlled a Weinstein subsidiary that held an additional 6–7% stake in Mays); *In re Loral Space & Commc'ns  Inc.*, C.A. Nos. 2808-VCS, 3022-VCS, 2008 Del. Ch. LEXIS 136, at *72 (Del. Ch. Sept. 19, 2008) (stating that, "[i]n determining whether a blockholder who has less than absolute voting control over the company is a controlling stockholder . . . the question is whether the blockholder, as a practical matter, possesses *a combination of stock voting power* and managerial authority that enables him to control the corporation, if he so wishes"; the court found such control where three of Loral's eight board members were directly controlled by the bondholder, MHR, and the facts showed that two other directors were beholden to MHR" (emphasis added) (internal citation omitted)); *cf. Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 130–31 (Del. Ch. July 12, 2007) (on motion for preliminary injunction, finding no likelihood of success in establishing control where alleged controlling party owned 14% of company and had contractual rights to approve certain management decisions).

[33]

Measured against these precedents, the Amended Complaint falls well short of alleging the exercise of actual control by FRBNY at the time of ML III.  The Amended Complaint does not allege that FRBNY had a significant holding in ML III:  in fact, as alleged, FRBNY had none.  And the separate entity that stood, eventually, to receive Series C shares in AIG with a 79.9% voting right was a Trust which (1) did not yet exist; (2) was for the benefit of the Treasury, not FRBNY; and (3) was to be, and in fact was, under the control of its own independent directors.  *See infra* at 39–43.[16]

Also absent from the Amended Complaint, as noted, is any allegation that any of the AIG directors who approved ML III—estimable persons elected to the Board before the financial crisis—were affiliated with or beholden to FRBNY, interested in the ML III transaction, or in any way less than 100% independent.  In this salient respect, this case is on par with *Western National, Superior Vision,* and *Gradient OC Master.*  In each case, the Delaware court found a minority shareholder had *not* exercised control over a board where there was no allegation that a majority of directors was beholden to that shareholder.  This case is thus materially different from *Williamson*, *Kahn*, *Weinstein*, and *Loral Space & Communications Inc.*  In each, actual control of the board was found, based on concrete allegations—or evidence—that a majority of directors was under the minority shareholder's sway.

As pled, Starr's claim that FRBNY was a "controlling lender" of AIG's as of November 2008 reduces to the fact that FRBNY, by then, had extended a massive amount of credit ($85 billion) in September and had agreed to loan AIG an additional $37.8 billion in October.  But Starr does not anywhere concretely allege that FRBNY exploited this relationship in connection with ML III—for example, threatening any adverse action (*e.g.*, a demand for immediate

---

[16] Further, in November 2008, with AIG still at risk of collapse, it could not be taken for granted that AIG would survive until the point when the Trust would receive such shares.

repayment of its loan) had AIG's Board refused to accept the terms of ML III. To support its "controlling lender" claim, Starr instead merely makes a series of conclusory assertions about FRBNY's control. *See, e.g.*, Am. Compl. ¶ 68 ("Acting (as always) at the direction and under the supervision of FRBNY . . . ."); *id.* ¶ 69 ("In the fall of 2008, however, FRBNY decided to create a special purpose vehicle . . . designated Maiden Lane III to resolve AIG's obligations to CDS counterparties."); *id.* ¶ 72 ("Through its control over AIG, FRBNY required AIG to use this vehicle to fund the purchase of CDOs from the counterparties."); *id.* ¶ 83 ("First, FRBNY forced AIG to fund approximately . . . ."); *id.* ¶ 93 ("In using its control over AIG and ML III to do so, FRBNY violated its duties to AIG and its shareholders."). But these "naked assertions" do not suffice. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. And the one relevant fact that is clearly pled—that FRBNY was a massive creditor of AIG—shows only that FRBNY had a "*potential* ability to exercise control," not "the actual *exercise* of that ability." *In re Sea Land Corp.*, 1987 Del. Ch. LEXIS 439 at *10 (emphasis in original).

Also insufficient to establish actual control is Starr's claim that FRBNY had an on-site team at AIG to monitor AIG and "exercise FRBNY's consent rights under the Credit Agreement." Am. Compl. ¶ 59. That is because the exercise of contractual consent rights does not establish the exercise of control over a corporate board: Even "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a controlling shareholder for that particular purpose." *Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160 at *19–20; *see also*

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 390–91 (Bankr. S.D.N.Y. 2007).[17]

Finally insufficient to show actual control is Starr's claim that FRBNY "unilateral[ly]" replaced AIG's CEO, in September 2008.  Am. Compl. ¶ 58.  This broad claim of unilateral action is conclusory:  Starr does not, notably, allege that AIG's Board (or even any member of it) opposed replacing CEO Robert B. Willumstad with Edward M. Liddy.  And, as another case involving a change of control during the turbulent events of 2008 illustrates, *de facto* control over a corporate board is not established by the fact that a savior of the company, or an entity with a contractual right to future control of it, exerted leverage over it.  *See In re Bear Stearns Litig.*, 870 N.Y.S.2d 709, 731, 740 (Sup. Ct. N.Y. County 2008) (applying Delaware law, and finding that JPMorgan did not control Bear Stearns even though JPMorgan had allegedly "controlled [Bear] by threatening to cease operational funding," under circumstances in which Bear "could simply not continue to carry on its major operations on Monday morning, unless it had put some major financing, or a major transaction which would carry with it major financing, into place" and "[n]o options appeared to be available other than the merger transaction with JPMorgan"); *see also In re Sea-Land Corp.*, 1988 Del. Ch. LEXIS 65 at *9 ("Plaintiffs allege only that LLC and its affiliates had significant 'leverage,' (*i.e.*, a superior bargaining position) because they owned 39.5% of Sea-Land's stock.  But 'leverage' is not actual domination and control."); *Gilbert*, 490 A.2d at 1055–56 (where defendant used a "right to future control as

---

[17] Even if Starr had adequately pled that FRBNY controlled AIG as of November 2008, its exercise of its contractual rights would not be subject to review under fiduciary standards.  *See In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 409 (Del. Ch. 2010) ("When a controller exercises contractual or statutory rights as a third-party lender, its actions are not subject to fiduciary review.") (citing *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 414–15 (Del. Ch. 1999)).

leverage to fashion a merger agreement more to its benefit," it was not a controlling entity, but "an outsider, free to bargain but not to dictate terms").

For these reasons, Starr has not plausibly pled that, at the time it approved the ML III transaction, AIG's Board of Directors was controlled by FRBNY.  To the extent that Starr's claim for breach of fiduciary duty is based on that transaction, Starr does not state a claim.

### 3.    Did FRBNY Control AIG During the Reverse Stock Split (June 2009)?

The next relevant date in assessing Starr's claim of control by FRBNY is June 2009, when the first of the two stock transactions that Starr challenges occurred—the 20:1 reverse stock split.

To recap the context of this transaction, in March 2009, when the Trust's Series C shares were issued, AIG's Charter did not authorize the creation of enough shares of common stock to permit the shares to be exchanged for 79.9% of AIG common stock, as contemplated in the Credit Agreement.  Under Delaware law, an increase in the number of authorized shares of a particular class of stock required approval by a vote of the holders of that class of shares.  Approval of a majority of common shareholders was thus needed to amend AIG's Charter to authorize additional common shares.  Am. Compl. ¶ 108.  On February 5, 2009, after a shareholder lawsuit, AIG agreed to hold a vote before increasing the number of authorized common shares.  Id. ¶ 112.

On or about June 5, 2009, AIG circulated its 2009 proxy statement in advance of its annual shareholder meeting.  Id. ¶ 120.  Proposal 3 in the proxy was to increase the number of authorized shares of common stock.  Id. ¶¶ 120–21.  The proxy statement noted that approval of Proposal 3 required a majority vote of common stock and the Series C shares, taken together, plus a majority vote of the common shareholders, voting as a separate class.  Id. ¶ 121.  That

[37]

proposal failed, because AIG's common shareholders voted it down.  *Id.* ¶ 122.  The proxy also

included Proposal 4, which provided for the 20:1 reverse split of AIG's common stock.  *Id.* ¶

123.  By reducing the number of issued shares of common stock from 3 billion to 150 million,

while leaving the total number of authorized shares of AIG common stock unchanged, Proposal

4 made it possible for the Trust to receive the 79.9% block of common stock promised in the

Credit Agreement.  Unlike Proposal 3, Proposal 4 could be, and was, voted upon by all voting

shares, including the Series C shares held by the Trust, and thus common shareholders were

unable to block it.  *Id.* ¶ 125.

        In alleging a breach of fiduciary duty, Starr contends that Proposal 4 was the product of a

surreptitious plan by FRBNY to circumvent the affirmative vote which AIG had promised its

common shareholders in its disclosures, *id.* ¶ 126, and that this plan breached FRBNY's duties

as majority shareholder.  *Id.* ¶ 127.[18]

---

[18] Because the Court dismisses the Amended Complaint on the grounds that FRBNY was not
subject to Delaware fiduciary duty law—both because FRBNY is not adequately alleged to have
controlled AIG and because application of state fiduciary duty law to FRBNY's actions towards
AIG is preempted—there is no occasion to resolve generally whether Starr has adequately pled a
breach of a fiduciary duty.  However, Starr's premise as to this particular alleged breach is
logically infirm, such that this theory of breach does not state a claim.  That is because, as
alleged in the Amended Complaint, AIG's common shareholders *were* offered a vote to increase
the number of common shares and *did* vote on that proposal without the participation of the
Series C Shares.  Starr does not allege facts on which could be found an additional promise by
AIG to its shareholders not to take other action (such as Proposal 4) to enable the company, by
other means, to comply with its commitment in the Credit Agreement to supply the Trust with
79.9% of common shares.

Starr does argue that the purchase agreement for the Series C shares, executed between AIG and
the Trust, itself required the Trust to submit the proposal to increase the number of authorized
common shares to AIG's common shareholders until it passed, and impliedly committed that the
Trust would not pursue alternative strategies to permit the Trust to exchange the Series C shares
for common stock.  Even if the terms of the stock purchase agreement could be construed in this
fashion, however, this theory would not assist Starr.  That is because the share purchase
agreement is between the Trust and AIG, not FRBNY and AIG.  And for the reasons explained

As noted, FRBNY is not alleged to have ever itself been a shareholder of AIG.  However, by June 2009, the Series C shares, with a 79.9% voting interest, had been issued to the Trust; thus the Trust is properly characterized as AIG's controlling shareholder as of that time. Consequently, whether in June 2009 FRBNY can be held responsible as a "controlling shareholder" of AIG turns on whether FRBNY has plausibly been alleged to have controlled the Trust.[19]

The Amended Complaint articulates two theories as to why the trustees administering the Trust were, purportedly, beholden to FRBNY.  First, Starr claims that the trustees were selected by FRBNY, and two of the three trustees had previous professional affiliations with FRBNY before being appointed as trustees.  Second, Starr selectively quotes from the agreement establishing the Trust, seizing on provisions that encourage the trustees to vote the Series C shares so as to maximize AIG's ability to repay its debts to FRBNY and the Treasury.

As a matter of law, Starr's allegations fall short of establishing FRBNY's control.  As to the first argument, directed at the trustees' independence, Starr alleges that two of the three trustees appointed in January 2009 had prior ties to FRBNY.  One, Jill Considine, had previously been a member of FRBNY's Board of Directors and Chairperson of its Audit and Operational Risk Committee.  Am. Compl. ¶ 103.  A second, Chester Feldberg, had been a longstanding employee of FRBNY but had not been part of FRBNY since 2000.  *Id.*  Starr does not allege that either Considine or Feldberg, during his or her tenure as a trustee, was employed by FRBNY or

---

*infra*, Starr does not plausibly allege that FRBNY controlled the Trust.  *See infra* at 39–43. Thus, any obligations in the share purchase agreement do not attach to FRBNY.

[19] AIG's directors as of June 2009 were the same pre-financial-crisis directors who agreed to the September 2008 Credit Agreement and who approved ML III in November 2008.  The Amended Complaint does not allege any change in board membership between November 2008 and June 2009.  For this reason, Starr does not appear to allege direct control by FRBNY of AIG's Board, but rather, control of AIG by virtue of FRBNY's alleged control of the Trust.

had any financial incentive to act in FRBNY's interest.  Nor does Starr allege that either trustee had improper communication with, or improperly took direction from, FRBNY.

These limited allegations fail, as a matter of law, to draw the trustees' independence from FRBNY into question.  In the analogous situation of corporate board members, "under Delaware law[,] a director's past employment with the company on whose board he sits does not alone establish that director's lack of independence."  *In re W. Nat'l*, 2000 Del. Ch. LEXIS 82 at *58 (citing *Odyssey Partners v. Fleming Cos.*, 735 A.2d at 408); *see also id.* at *35 (distinguishing facts from case in which the directors were active employees of the majority shareholder).

To the extent Starr's challenge to the trustees' independence derives from its allegation that FRBNY selected the trustees in the first place, that, too, is insufficient.  Again in the analogous context of corporate directors, Delaware law is clear that "[i]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of the corporate election.  That is the usual way a person becomes a corporate director."  *Aronson*, 473 A.2d at 816; *see also In re S. Peru Copper Corp. S'holder Derivative Litig.*, 30 A.3d 60, 69 n.14 (Del. Ch. 2011).  These two circumstances thus do not give rise to a plausible claim that FRBNY exercised *de facto* control over the Trust.

In its second argument, Starr cherrypicks portions of the Trust's founding Trust Agreement in an attempt to bolster the inference that the trustees were beholden to FRBNY.  However, viewed in the context of the entire Trust Agreement—which the Amended Complaint references and quotes, *see* Am. Compl. ¶ 104, and which FRBNY has supplied to the Court, *see* Kiernan Decl. Ex. 2 ("Trust Agreement")—the portions on which Starr seizes fail to plausibly support Starr's thesis of control.

[40]

Starr principally relies on a Trust Agreement provision which states that, "in exercising their discretion," the trustees "are advised that it is the FRBNY's view that (x) maximizing the Company's ability to honor its commitments to, and repay all amounts owed to, the FRBNY or the Treasury Department and (y) the Company being managed in a manner that will not disrupt financial conditions, are both consistent with maximizing the value of the Trust stock." Am. Compl. ¶ 104 (citing Trust Agreement at 7). Although if read in isolation this passage would bolster Starr's argument, the passage loses such force when read in combination with the immediately following sentence—which Starr's Amended Complaint neglects to mention:

> *With those nonbinding views in mind*, with respect to any and all matters . . . to be Voted on by the Trustees as holders of the Trust Stock, the Trustees shall have full discretionary power to Vote the Trust Stock, provided, however, that the Trustees shall exercise all such Voting and other similar rights with respect to the Trust Stock in accordance with the Applicable Standard of Care (as defined in Section 3.03(a) hereof).

Trust Agreement at 7 (emphasis added). This provision explicitly designates the statement of FRBNY's views as "nonbinding." In light of this provision, the language on which Starr relies cannot plausibly be read to command the Trustees either (1) specifically always to prioritize repayment of FRBNY or (2) generally to put FRBNY's interests or directives first. By its plain language, the sentence cited by Starr is precatory.

Starr also relies upon the "Applicable Standard of Care" provision in the Trust Agreement. That subsection provides that the trustees will be indemnified so long as they "(i) acted in good faith in a manner the Trustee reasonably believed to be in accordance with the provisions of this Trust Agreement and in or not opposed to the best interests of the Treasury and (ii) had no reasonable cause to believe his or her conduct was unlawful." Am. Compl. ¶ 106 (citing Trust Agreement at 12). But that provision, too, does not bear the weight which Starr assigns it. The Treasury—the entity for whose benefit the Series C shares were held, and whose

interests the trustees were duty-bound to advance—is distinct from FRBNY.  A provision that indemnifies the trustees so long as they act in the interests of the Treasury does not show that the trustees were beholden to FRBNY.

Finally, Starr cites § 2.04(c) of the Trust Agreement.  It states that the trustees agree to "take any and all reasonable actions available to them and necessary to cause" the AIG Charter to be amended to facilitate the redemption of Series C shares for common stock, and to "vote or cause to be voted all of the Trust Stock in favor of" any such amendment to the Charter.  *Id.* ¶ 105 (citing Trust Agreement at 6).  But that provision does not compromise the trustees' independence, let alone indicate their control by FRBNY.  It simply mandates that the trustees vote the Series C shares so as to carry out the terms of the Credit Agreement, which AIG's independent board had entered into in September 2008.  Moreover, the conversion of the Series C shares to common stock (and thus any vote to compel that result) inured to the benefit of the *Treasury*, not FRBNY.

Finally undermining Starr's claim are numerous other provisions in the Trust Agreement which are inconsistent with the thesis that the Trust was controlled by FRBNY.[20]  To choose just three:

> • The Trust Agreement begins with recitations that put the quotes highlighted by Starr in context.  One states that, "to avoid any possible conflict with its supervisory and monetary policy functions, the FRBNY does not intend to exercise any discretion or control over the voting and consent rights associated with the Trust Stock."  Trust Agreement at 2.  Another states that "FRBNY wishes the Trustees to have absolute discretion and control over the Trust Stock, subject to the terms of this Trust Agreement."  *Id.*

---

[20] In weighing plausibility, the Court may review the full content of documents which, like the Trust Agreement here, are referenced in the Amended Complaint, *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996), and the Court need not accept Starr's characterizations of those documents, *see Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).

- The Trust Agreement states that, "[i]n exercising their authority [to vote the Series C shares] the Trustees may request information from FRBNY that the FRBNY may have as a result of its role as lender to the Company under the Credit Agreement.  In no event, however, shall information provided by the FRBNY as lender relieve the Trustees from exercising their independent judgment with respect to [voting the Series C shares]."  *Id.* at 8.  This provision undermines the notion that the trustees were bound to accept and follow any advice or information received from FRBNY.  Rather, it specifically instructed the trustees to exercise their own independent judgment.

- The Trust Agreement also affirmatively contains provisions to assure that the AIG Board remains independent from FRBNY.  To this end, it prohibits the trustees from nominating for AIG's Board of Directors anybody who has been "within one year of their nomination, officers, directors, or senior employees of the FRBNY or the Treasury Department."  *Id.* at 7.

In sum, the terms of the Trust Agreement, read in its entirety, do not plausibly support Starr's thesis that FRBNY "controlled" the Trust as of the June 2009 20:1 reverse stock split, and was thus a *de facto* controlling stockholder.  As such, Starr has failed to allege that FRBNY was a fiduciary to AIG or to its minority shareholders as of the time of that transaction.

### 4.   Did FRBNY Control AIG When the Series C Shares Were Exchanged for AIG Common Stock (January 2011)?

The final transaction that Starr challenges is the January 2011 exchange of the Trust's Series C shares for AIG common stock.  Starr asserts that this transaction completed the process (which the June 2009 20:1 reverse stock split began) by which the stakes of AIG's minority shareholders, including Starr, were improperly diluted.  *See* Am. Compl. ¶¶ 128–35.  Starr again asserts that FRBNY controlled AIG during the relevant period, and therefore is accountable for this alleged breach of fiduciary duty.

Recapping the pertinent facts as alleged, in September 2010—more than 15 months after the June 2009 reverse stock split—AIG announced an "exit plan" to comply with its obligations arising out of the various rescue packages it had entered into in 2008.  As part of this plan, AIG undertook to, *inter alia*, exchange the Trust's Series C shares for common stock, as contemplated

in the Credit Agreement.  Pursuant to this plan, on January 14, 2011, the Series C shares were exchanged for 562,868,096 shares of AIG common stock, and AIG fully repaid FRBNY for the outstanding balance of the $85 billion credit facility.  *See* Am. Compl. ¶¶ 129–35.

Starr's Amended Complaint is silent on a number of questions potentially relevant to its claim that FRBNY abused its fiduciary duty in connection with the exchange of these shares:  (1) Did AIG's Board approve the exit plan, and therefore the share exchange?; (2) In January 2011, what was the composition of AIG's Board, *i.e.*, was the Board dominated by directors nominated by the Trust?; and (3) Was the exit plan put to a shareholder vote?

Even assuming, however, that each of these questions is answered in the manner that is most advantageous to Starr's claim—*i.e.*, that a Trust-dominated board approved the exit plan and that decision was ratified by the Trust's 79.9% voting interest without a separate vote for non-Trust shareholders—Starr's claim of FRBNY control still fails.  That is for the same reason it did above:  Starr does not plausibly allege that FRBNY controlled the Trust.  On Starr's factual allegations, only the Trust, as the actual holder of the Series C shares, could have had a fiduciary duty to AIG's minority shareholders, including Starr.  Starr's claim that FRBNY had, and breached, fiduciary duties to those shareholders hinges on FRBNY having controlled the Trust.  But, for the reasons noted, Starr has failed to allege facts sufficient to carry its heavy burden of calling the trustees' independence from FRBNY into question.[21]

---

[21] As noted, this Opinion and Order does not, in general, address whether Starr has adequately alleged a *breach* of fiduciary duty, because Starr has failed to plead that FRBNY was subject to any such duty.  *But see supra* at 38 n.18 (finding deficient Starr's theory of breach based on the June 2009 reverse stock split).  However, the particular breach that Starr asserts as to the January 2011 share exchange is not legally viable.  That is because, on the facts as pled by Starr, the exchange of the Series C Shares so as to give the Trust a 79.9% share of AIG's common stock was merely a mechanism to carry out an extant legally binding contractual obligation of AIG's.  AIG's independent Board had taken on that obligation in September 2008, when it approved the Credit Agreement as a means of saving AIG and averting bankruptcy.  Had AIG's Board refused

[44]

The Court, accordingly, holds that Starr's claim that FRBNY was a "controlling shareholder" or a "controlling lender" of AIG is not plausible, in light of the facts pled and documents referenced in the Amended Complaint.  Because Starr's fiduciary duty claims are all premised on such control, those claims must be dismissed.

### D.   Delaware Fiduciary Duty Law Does Not Apply to FRBNY's Challenged Actions

FRBNY makes two related but distinct arguments why Delaware fiduciary duty law cannot be applied to it here: one, based on federal common law; the other, on preemption under the Supremacy Clause.  Both start from the premise that FRBNY is a federal instrumentality.[22] Because status as such an instrumentality is the basis for FRBNY's arguments, the Court first addresses that point.  The Court subsequently reviews the standards under federal common law and preemption doctrine as to when state law may be applied to a federal instrumentality.  The Court, finally, applies those standards to Starr's fiduciary duty claims here.

### 1.   FRBNY's Status as a Federal Instrumentality—and its Powers

Congress has expressly designated some entities as federal instrumentalities, *see, e.g.*, 12 U.S.C. § 2121 (banks for farm cooperatives), but it has not done so with respect to Federal Reserve Banks.  As to entities which Congress has not so designated, there is "no simple test for determining whether an entity is a federal instrumentality immune from state regulation."  *James v. Fed. Reserve Bank of N.Y.*, 471 F. Supp. 2d 226, 238–239 (E.D.N.Y. 2007); *cf. Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 282 (3d Cir. 2006) ("Instrumentality jurisprudence has

---

to act to implement the terms of the Credit Agreement, its Board would have invited legal challenge from the Trust, or its beneficiary the United States Treasury, for breaching that binding agreement.

[22] The Court reads Starr to concede this point implicitly, by withdrawing its claim of a Fifth Amendment taking, on the ground that, because FRBNY is a federal instrumentality, such a claim must be brought, under the Tucker Act, against the United States in the Court of Federal Claims.  *See* Starr Br. 6 n.2.

never been characterized by particular clarity.").  Instead, the Supreme Court has used a number of conceptually similar formulations to determine whether an entity is an instrumentality.

In *Federal Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 231 (1935), the Court found a federal land bank to be a federal instrumentality, because it "engaged in the performance of an important government function."  In *Department of Employment v. United States*, 385 U.S. 355, 358–60 (1966), the Court found the American Red Cross to be a federal instrumentality, because of its "status virtually as an arm of the Government."  In *First National City Bank v. Banca Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983), the Court stated that "a typical government instrumentality . . . is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law."  Finally, in *James*, a district court found a Federal Reserve Bank to be a federal instrumentality, framing the issue as:  "Does the entity which is alleged to be a federal instrumentality stand in such a close relationship to the federal government that it must be treated as the government is treated?"  471 F. Supp. 2d at 240.

As a brief review of the powers and characteristics of FRBNY demonstrates, FRBNY satisfies all of these standards, including the most stringent—the "virtually an arm of the government" standard used in *Department of Employment*.  The Federal Reserve System was established in 1913 by the Federal Reserve Act (FRA), 12 U.S.C. §§ 221 *et seq*.  The FRA "marked the end of a long struggle and was thought to afford the solution of many difficulties," notably a system of national banks which "provided no central regulating force, and furnished no adequate means for controlling interest rates, or preventing or lessening financial stringencies and panics."  *Raichle v. Fed. Reserve Bank*, 34 F.2d 910, 912 (2d Cir. 1929) (A. Hand, J.).

[46]

The Federal Reserve System is comprised of 12 regional Federal Reserve Banks spread across the nation, including FRBNY, and a central Board of Governors.  *See* 12 U.S.C. §§ 221 *et seq.*; *see also Fed. Reserve Bank v. Comm'r of Corps. & Taxation*, 499 F.2d 60, 62–63 (1st Cir. 1974).  The Board of Governors, comprised of seven presidential appointees confirmed by the Senate, is "the agency responsible for federal regulation of the national banking system."  *Secs. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 142 (1984); 12 U.S.C. § 241.  It oversees the Federal Reserve Banks and has additional enumerated powers to control their operations.  12 U.S.C. § 248.

The Federal Reserve Banks, in turn, are the "monetary and fiscal agents of the United States," *First Agric. Nat'l Bank v. State Tax Comm'n*, 392 U.S. 339, 356 (1968) (Marshall, J., dissenting), and carry out the "general fiscal duties of the United States."  *Fed. Reserve Bank v. Metrocentre Improv. Dist. #1*, 657 F.2d 183, 185 (8th Cir. 1981).  They are "the foundation for the federal reserve system" and are "intimate parts of the Government's fiscal structure." *Fasano*, 457 F.3d at 277–78.  They act "as depositories for money held in the United States Treasury and as fiscal and monetary agents of the United States . . . . They [also] . . . issue currency, facilitate check clearance and collection, and have supervisory duties as to member banks," and provide "services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities."  *Comm'r of Corps. & Taxation*, 499 F.2d at 62–63; *see also Fasano*, 457 F.3d at 274.[23]

The Federal Reserve System is also entrusted with responsibility for maintaining the stability of the financial system.  It has specific powers to be deployed when the economy is in

---

[23] To help insulate them from political pressure, the Federal Reserve Banks are formed as corporations.  *Fasano*, 457 F.3d at 277 (citing 12 U.S.C. § 341).  "The United States, while not a capital stockholder in the Federal Reserve Banks, is the residential interest-holder in the unlikely event of a Federal Reserve Bank's liquidation."  *Id.* at 278 (citing 12 U.S.C. § 290).

difficulty.  Section 13(3) of the FRA, 12 U.S.C. § 343, grants the power relevant here:

emergency lending.  Section 13(3) empowers the Federal Reserve System and the Federal

Reserve Banks, in "unusual and exigent circumstances," to offer discounted lending terms to a

distressed "individual, partnership, or corporation,"[24] where approved by the Board of

Governors.  *See Huntington Towers Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 868 (2d Cir.

1977) (FRBNY's emergency lending of $1.7 billion to troubled bank "comport[ed] with

congressional purpose in approving the [FRA]," and was an "exercise[] of judgment by the

public officials concerned [] well within their competence and authority").

By statute, such emergency lending assistance is conditioned on the discounted loans

being "indorsed or otherwise secured to the satisfaction of the Federal reserve bank," and on the

Federal Reserve's "obtain[ing] evidence that [the distressed party] is unable to secure adequate

credit accommodations from other banking institutions."  12 U.S.C. § 343(A).  The Board of

Governors may invoke the emergency lending power only "if, in the judgment of the Federal

Reserve Bank . . . failure to obtain such credit would adversely affect the economy."  12 C.F.R.

§ 201.4(d).  Section 13(3) further provides that "[a]ll such discounts for any [distressed entity]

shall be subject to such limitations, restrictions, and regulations as the Federal Reserve Board . . .

may prescribe."  12 U.S.C. § 343(A).

In light of its powers, characteristics, and central role in the national banking system, a

Federal Reserve Bank is a federal instrumentality.  *See, e.g.*, *James*, 471 F. Supp. 2d at 240

(FRBNY); *Metrocentre Improvement Dist. # 1*, 657 F.2d at 185–87 (FRB of St. Louis); *Comm'r*

---

[24] As of 2008, Section 13(3) permitted the Federal Reserve to assist a distressed "individual, partnership, or corporation."  In 2010, that provision was amended to permit aid for "any participant in any program or facility with broad-based eligibility."  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title XI, § 1101(a), 124 Stat. 2113 (2010).  That amendment is not relevant to this case.

*of Corps. & Taxation*, 499 F.2d at 62 (FRB of Boston); *Berini v. Fed. Reserve Bank of St. Louis*, 420 F. Supp. 2d 1021, 1024 (E.D. Missouri 2005) (FRB of St. Louis); *cf. Fasano*, 457 F.3d at 281, 283 (stating, in dicta, that "strong arguments have been made in favor of such status," that it is an "amply supportable conclusion that the New York Fed is a federal instrumentality," and that "Federal Reserve Banks are surely "virtually . . . an arm of the Government" (citations omitted)).

### 2.   Applicable Principles of Federal Common Law

FRBNY first argues that any claim against it here must be grounded in federal common law, but that federal common law will not adopt Delaware fiduciary duty law as substantive law to apply to FRBNY's actions in connection with the rescue of AIG.

In various lawsuits involving either federal entities or conduct that otherwise uniquely affects the United States's rights and obligations, the Supreme Court has held that federal common law must supply the rule of decision. *See, e.g., Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988) ("[A] few areas, involving uniquely federal interests, are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts' so-called federal common law."); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27 (1979) (when challenged actions "aris[e] from and bea[r] heavily upon a federal . . . program, the Constitution and Acts of Congress require otherwise than that state law govern of its own force"); *Corporacion Venezonala de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980), *cert. denied*, 449 U.S. 1080 (1981) (stating, in action under 12 U.S.C. § 632, that "where jurisdiction is based on a statute meant to give a federal forum to nationally

chartered banks," courts should "apply a federal common law choice of law rule").[25]  The

Supreme Court explained long ago:

> When the United States disburses its funds or pays its debts, it is exercising a
> constitutional function or power. . . .  The authority [to do so] had its origin in the
> Constitution and the statutes of the United States and was in no way dependent on
> the laws [of any State].  The duties imposed upon the United States and the rights
> acquired by it . . . find their roots in the same federal sources.  In absence of an
> applicable Act of Congress it is for the federal courts to fashion the governing rule
> of law according to their own standards.

*Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67 (1943).

To be sure, federal courts applying federal common law frequently adopt, or borrow,

state common law "as the federal rule of decision," *Kimbell Foods*, 440 U.S. at 728, to fill gaps

for which a developed body of common law does not exist.  *Id.* at 728–30; *see also Kamen*, 500

U.S. at 98; *Boyle*, 487 U.S. at 507; *United States v. Little Lake Mesere Land Co.*, 412 U.S. 580,

594 (1973); *cf. Atherton v. FDIC*, 519 U.S. 213, 218 (1997) ("Congress 'acts . . . against the

background of the total *corpus juris* of the states,' and, as a result, "cases in which judicial

creation of a special federal rule would be justified . . . are . . . 'few and restricted.'") (quoting

*O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) (additional citation omitted)).  "The

presumption that state law should be incorporated into federal common law is particularly strong

in areas in which private parties have entered legal relationships with the expectation that their

rights and obligations would be governed by state-law standards."  *Kamen*, 500 U.S. at 98.

"Corporate law is one such area":  Because corporations are creatures of state law, state common

---

[25] Under 12 U.S.C. § 632, "all suits of a civil nature at common law or in equity to which any
Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United
States."  Section 632 is the basis for federal jurisdiction in this case.  Am. Compl. ¶ 20; *cf.
Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97 (1991) (in derivative action brought under the
Investment Company Act but presenting common law claims, "any common law rule necessary
to effectuate a private cause of action under that statute is necessarily federal in character").

law "bearing on the allocation of governing powers within [a] corporation" is commonly

incorporated into cases arising under federal law.  *Id*. at 98–99.

That presumption, however, does not carry the day where "application of [the particular]

state law [in question] would frustrate specific objectives of [a] federal program[]."  *Id.* (quoting

*Kimbell Foods*, 440 U.S. at 728).  Rather, "in deciding whether to draw from state law or to

create a rule of federal common law in cases involving federal programs . . . we consider: (1) the

need for a nationally uniform body of law; (2) *whether application of state law would frustrate*

*specific objectives of the federal programs*; and (3) the extent to which application of a federal

rule would disrupt commercial relationships predicated on state law."  *Marsh v. Rosenbloom*,

499 F.3d 165, 182 (2d Cir. 2007) (emphasis added) (citation omitted).  "[T]he essence of this test

is 'whether the relevant federal interest warrants displacement of state law.'"  *New York v. Nat'l*

*Serv. Indus.*, 460 F.3d 201, 207 (2d Cir. 2006) (quoting *Empire HealthChoice Assurance, Inc. v.*

*McVeigh*, 547 U.S. 677, 692 (2006)).

Finally, where state law cannot be borrowed, courts will sometimes craft a federal rule of

decision where such a rule can usefully accommodate federal interests and the non-problematic

aspects of state law.  *See Boyle*, 487 U.S. at 511.  But that option is unavailable where Congress

has spoken "directly to [the] question at issue" and its legislation therefore "excludes the

declaration of federal common law," *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537

(2011) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)), because "it is

primarily the office of Congress, not the federal courts, to prescribe national policy in areas of

special federal interest." *Am. Elec. Power Co.*, 131 S. Ct. at 2537 (citing *TVA v. Hill*, 437 U.S.

153, 194 (1978)).

### 3.    Applicable Principles of Federal Preemption

[51]

As an alternative way of articulating its argument that Delaware fiduciary duty law does not apply to its conduct challenged here, FRBNY urges that such law is preempted.

It is "a seminal principle of our law 'that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them.'"  *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 426 (1819)).  Accordingly, it is also "[a] fundamental principle of the Constitution [] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Such preemption may be express, where Congress so states in a statute, or implied, where it promulgates such thoroughgoing federal law as to occupy an entire regulatory field.  *See id.*, 530 U.S. at 372–73.  But "[e]ven without an express provision for preemption," or pervasive federal regulation, "state law is naturally preempted to the extent of any conflict with a federal statute," or where, "'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 66–67 (1941)) (citation omitted) (brackets in original).

The type of preemption relevant here is a form of "conflict" or "obstacle" preemption: FRBNY argues that using state law to regulate its activities as a federal instrumentality would conflict with, or present an obstacle to, its effective functioning.

That the conduct at issue was that of a federal instrumentality significantly "colors the typical preemption analysis." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).  Ordinarily, where state law regulating private conduct is at issue, the Court "begin[s] 'with the assumption that the historic police powers of the States are not to be

[52]

superseded' by federal law 'unless that is the clear and manifest purpose of Congress.'" *Niagara Mohawk Power Corp. v. Hudson River-Black River Reg. Dist.*, 673 F.3d 84, 95 (2d Cir. 2012) (quoting *Cippollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). But no presumption against preemption applies to attempts to hold federal instrumentalities to the dictates of state law, because concerns about interference with federal functions are more acute in that context. Indeed, case law—dating to *McCulloch v. Maryland*—has long held that state regulation is preempted where it "would 'retard, impede, burden, or in any manner control' the operations of federal instrumentalities." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 187 (1988) (White, J., dissenting) (quoting *McCulloch*, 17 U.S. at 436); *see also Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875); *Mount Olivet Cemetery Ass'n*, 164 F.3d at 486 (attempts to apply state law to the conduct of a federal instrumentality "require[e] the court to presume, in the absence of clear and unambiguous congressional authorization to the contrary, that Congress intended to preempt state or local regulation of the federal instrumentality." (citing *Don't Tear It Down, Inc. v. Penn. Ave. Dev. Corp.*, 642 F.2d 527, 534–35 (D.C. Cir. 1980))).

Accordingly, "[w]here an entity claims federal instrumentality immunity from state regulation, a court must answer two fundamental questions. First, the court must determine whether that entity qualifies as a federal instrumentality for the purpose at issue." *James*, 471 F. Supp. 2d at 238. If so, "the court must determine whether that entity's status as a federal instrumentality immunizes it against the particular local or state exaction it seeks to avoid"—in other words, whether applying the state law or regulation at issue would retard, impede, burden, or control the operation of the instrumentality. *Id.*

The Supreme Court has, in fact, gone so far as to state: "[W]here 'Congress does not affirmatively declare its instrumentalities or property subject to regulation,' 'the federal function

must be left free' of regulation."  *Hancock*, 426 U.S. at 179 (quoting *Mayo v. United States*, 319

U.S. 441, 447–48 (1943)).  More recently, the Court has stated, in the context of an attempt to

apply state regulations to a national bank:  "Federally chartered banks are subject to state laws of

general application to the extent that such laws do not conflict with the letter or general purposes

of the [National Bank Act]. . . . But when state prescriptions significantly impair the exercise of

authority, enumerated or incidental, under the NBA, the state's regulations must give way," and

"'states can exercise no control over [national banks], nor in any wise effect their operation,

except in so far as Congress may see proper to permit.'" *Watters v. Wachovia Bank, N.A.*, 550

U.S. 1, 11–12 (2007) (quoting *Farmers' & Mechanics' Nat'l Bank*, 91 U.S. at 34).

### 4.   Analysis

The issue here as to the availability of Delaware fiduciary duty law may be fairly

presented either as one of federal common law (does it adopt that law as the rule of decision

here?) or as one of federal preemption (is Delaware fiduciary duty law preempted here?).  Either

way, however, the operative legal test is the same or substantially so:  Would applying Delaware

fiduciary duty law to the various FRBNY actions towards AIG that Starr challenges frustrate,

conflict with, burden, or impede FRBNY in the discharge of its significant statutory

responsibilities?  If so, such state law may not be applied.  *See Boyle*, 487 U.S. at 507 n.3

(finding no "practical difference" between casting issue as one of displacement of state law by

federal common law or as one of federal preemption); *cf. O'Melveny & Myers*, 512 U.S. at 85

("The issue . . . is whether the California rule of decision is to be applied . . . or displaced, and if

[54]

it *is* applied it is of only theoretical interest whether the basis for that application is California's

own sovereign power or federal adoption of California's disposition." (emphasis in original)).[26]

As to that point, FRBNY and Starr make diametrically different arguments.  FRBNY

argues that each of its challenged actions was a valid exercise of its emergency lending power

under § 13(3) of the FRA and/or its statutory authority to take steps "incidental" to that power.

*See* 12 U.S.C. § 341 (Seventh).  It follows, FRBNY argues, that state law may not impose

liability for these actions.  *See generally* FRBNY Br. 21–32; FRBNY Rep. Br. 12–25.

Starr, for its part, agrees that state fiduciary duty law may not be applied to FRBNY when

it exercises its statutory powers, including emergency lending.  Starr Br. 31–32.  But Starr

disputes that FRBNY's challenged actions fell within its lending authority.  *Id.* at 37 ("[T]his is a

corporate governance case and does not involve lending functions at all, much less an

interference with those functions."); *see also id.* at 26, 28.  Rather, Starr casts its lawsuit as

challenging actions by FRBNY that were *outside* its statutory authority.  These included:  (1)

redistributing AIG's assets, via ML III, to "bail out" other financial institutions; (2) taking an

equity position in AIG under the Credit Agreement, and retaining, as part of the ML III

transaction, an interest in AIG's residual CDS profits; (3) subverting, through the June 2009

"deceptive and improper reverse stock split" and the January 2011 exchange of the Trust's shares

for common stock, the shareholder vote that had rejected a proposal to authorize the issuance of

additional common shares; and, overall, (4) "exercising unfettered control over a corporation."

*Id.* at 32–39.  To preempt state law as to these unauthorized acts, Starr argues, would give

FRBNY "total immunity for all acts regardless of circumstance or purpose."  *Id.* at 28.

---

[26] For the sake of clarity, in the analysis that follows, the Court principally uses the language of
preemption and displacement of state law, as opposed to that of federal common law's not
adopting or borrowing state law.  This analysis is, however, equally applicable to the federal
common law inquiry and is intended as such.

The Court's conclusion is that Delaware fiduciary duty law is preempted and cannot apply here.  First, FRBNY is correct that these actions were within FRBNY's statutory power, which includes the power to take actions incidental to its emergency lending power.  Under the Supremacy Clause and as a matter of federal common law, civil liability based on state fiduciary duty law therefore may not be imposed on FRBNY based on these actions.  Second, and more important, even if some of FRBNY's actions towards AIG had exceeded its statutory writ, Starr's premise that state law may sanction FRBNY for them does not follow.  The parameters of federal preemption of state law are not coterminous with the scope of a federal instrumentality's authorized federal conduct.  Rather, the Supremacy Clause (and federal common law) inquiries are functional in nature.  They examine whether holding an instrumentality to state law would tend to burden, impede, conflict with, or frustrate its lawful operation.  And subjecting FRBNY's actions undertaken in connection with its rescue lending function to liability under state fiduciary duty law would assuredly do so, even if some of those actions exceeded FRBNY's authority. Third, notwithstanding Starr's rhetoric, a ruling that state law is preempted does not give FRBNY "total immunity" for lawless conduct.  The Court develops these points in turn.

### (a)  The statutory basis for FRBNY's challenged actions

The basis for Starr's argument that FRBNY acted outside its authority is that the actions it protests were not themselves acts of lending.  But the emergency lending provision is not the only grant of authority relevant here.  To exercise its enumerated powers under the FRA, the Federal Reserve System and its agents are also granted "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by [the] Act."  12 U.S.C. § 341 (Seventh).

[56]

A power is "incidental" to an enumerated power if it is "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers." *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972) (interpreting incidental powers under the National Bank Act (NBA), 12 U.S.C. § 24 (Seventh), which is worded similarly in all material respects to § 341 of the FRA); *see Securities Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1049 (2d Cir. 1989) (adopting "convenient or useful" test of *Arnold Tours*); *see also Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 960 (9th Cir. 2005); *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002); *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 640 (D.C. Cir. 2000); *Guar. Mortg. Co. v. Z.I.D. Assoc., Inc.*, 506 F. Supp. 101, 105 (S.D.N.Y. 1980).

Each FRBNY action that Starr challenges was either (1) premised on FRBNY's § 13(3) power to lend in unusual and exigent circumstances, (2) incidental to that power, and/or (3) part of the process of implementing the September 22, 2008 Credit Agreement, which had been explicitly authorized under that power.  Specifically:

**1.  *FRBNY's execution of the September 22, 2008 Credit Agreement*:** Starr's Amended Complaint does not recite the statutory basis on which FRBNY entered into the Credit Agreement.  But the Credit Agreement, which FRBNY has supplied to the Court, states unambiguously that the basis was the § 13(3) emergency lending power, which the Federal Reserve Board invoked.  *See* Credit Agreement at 7 ("Recitals") ("Unusual and exigent circumstances exist as determined by the Board, and the Board has authorized the Lender [FRBNY] to extend credit to the Borrower [AIG], under the third paragraph of Section 13 of the Federal Reserve Act (12 U.S.C. § 343)").

**2. *The November 2008 Maiden Lane III transaction*:**  The Amended Complaint is again silent as to whether the Federal Reserve Board invoked its § 13(3) rescue lending power in connection with the ML III transaction.  Unlike in the case of the Credit Agreement, the Amended Complaint does not reference any documents embodying that transaction.  Thus, given the materials cognizable on a motion to dismiss, there is no direct proof that the Federal Reserve Board invoked its § 13(3) power in connection with ML III.[27]  However, even on the spare facts pled by Starr, the inference is compelling that ML III was authorized under FRBNY's § 13(3) authority and its authority to take actions incidental to that power, and Starr does not plead to the contrary.[28]

To begin with, to the extent Starr may be taken to imply that the Federal Reserve Board may not itself have approved the terms of ML III, the Amended Complaint does not supply a basis for supposing that FRBNY acted without such permission.  It does not allege a lack of authorization by the Federal Reserve.  And the context of ML III, as alleged, makes that thesis implausible.  The Amended Complaint recites that the Federal Reserve Board had consistently signed off on FRBNY's actions with respect to the rescue and stabilization of AIG:  It authorized the $85 billion loan from FRBNY to AIG in September 2008, *see* Credit Agreement at 7; it "announced . . . an additional $37.8 billion" cash loan from FRBNY to AIG on October 8, 2008, *see* Am. Compl. ¶ 66; and it "implemented financial transactions related to AIG" in November

---

[27] At argument, counsel for FRBNY stated that, but for the limits on the materials cognizable on a motion to dismiss, "there would be more I could say" on this subject.  Hg. Tr. 34.

[28] The Amended Complaint, in fact, nowhere alleges that *any* of FRBNY's actions challenged here were outside its statutory authority.  Starr first articulated that theory in its brief in opposition to FRBNY's motion to dismiss.  The Amended Complaint does state, without elaboration, that on September 16, 2008, FRBNY "demand[ed] consideration it was not legally authorized (by statute or otherwise) to demand."  Am. Compl. ¶ 52.  But it makes no claims of *ultra vires* conduct with respect to any later actions or events.

2008, including modifying the Credit Agreement and arranging for Treasury's purchase of $40 billion in newly issued AIG "Series Preferred Stock" under the Troubled Asset Relief Program. *Id.* ¶ 67.  The ML III transaction contained another massive loan ($24.3 billion) from FRBNY— to enable AIG's CDS counterparties to be bought out.  *Id.* ¶ 75.  Given the Federal Reserve Board's active role in FRBNY's earlier multi-billion dollar loans to stabilize AIG, and given the size of the loan to AIG that was a key part of ML III, Starr's conjecture that FRBNY entered into ML III without the Federal Reserve Board's authorization cannot be seriously entertained.  *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364, 368–69 (2d Cir. 2011) ("While, as a general matter, Gallop or any other plaintiff certainly may allege that the most senior members of the United States government conspired to [break the law], the courts have no obligation to entertain pure speculation and conjecture."); *Norton v. FBI*, No. ED CV 08-01829, 2009 U.S. Dist. LEXIS 124378, at *15–20 (C.D. Cal. Nov. 24, 2009) (collecting cases in which conclusory allegations of government conspiracies have been dismissed pursuant to Rule 12(b)(6)).

To the extent Starr's argument is instead that the Federal Reserve Board approved ML III but that that transaction was untethered to the § 13(3) rescue lending power, that claim, too, fails. As Starr itself alleges, a component of the ML III transaction was FRBNY's  $24.3 billion loan to a special purpose vehicle (ML III) created to buy out AIG's counterparty exposure.  Money ($20.2 billion) remaining from FRBNY's earlier $85 billion loan to AIG pursuant to § 13(3) also infused ML III—it formed part of the $35 billion cash collateral that AIG had posted and which it now conveyed to ML III.  Am. Compl. ¶ 77.  And ML III, as alleged, was designed to stabilize the economy—the purpose for which rescue lending is authorized—by putting an end to the cash collateral calls that had jeopardized AIG's survival since the summer.  *See generally id.* ¶¶ 38– 39, 48, 69–75.

Starr's assault on ML III therefore depends on disaggregating the transaction and analyzing each of its components separately.  Starr snips off the $24.3 billion emergency-loan feature of that transaction, which is readily justified under § 13(3), and then attacks two other components of that transaction on the grounds that they, viewed in isolation, were unauthorized. First is the provision requiring AIG to pay par value to unwind its CDS exposure, *see* Am. Compl. ¶¶ 76–79; second is the "payment waterfall" provision giving FRBNY two-thirds of the residual profits (if any) from AIG's retained CDS interests.  *Id.*  ¶¶ 80–83.  However, these provisions—as the Amended Complaint reveals—were part and parcel of a single integrated transaction of which FRBNY's latest $24.3 billion rescue loan to AIG was a key part.  For purposes of determining whether FRBNY acted within its statutory authority, the transaction cannot be analyzed pointillistically.  It must be viewed as a whole.

So viewed, the two provisions of ML III that Starr assails are comfortably viewed as incidental to FRBNY's use in ML III of the § 13(3) emergency loan power.  First, paying CDS counterparties at par value rather than trying to negotiate a better deal with one or more of them was on its face a rational means of bringing FRBNY's statutory mission to a successful end. FRBNY could reasonably view paying par value as a quick and relatively sure way—perhaps the quickest and surest—of terminating AIG's damaging exposure to collateral calls from its CDS counterparties.  And the circumstances pled were such that FRBNY could reasonably view attaining closure as urgently necessary.[29]  FRBNY could reasonably conclude, in the moment,

---

[29] The fast-paced narrative of events in September through November 2008 presented in the Amended Complaint alone supports the conclusion that in November 2008, FRBNY did not have the gift of time and long deliberation in responding to AIG's latest tribulations.  That the Federal Reserve Board did in fact view time as of the essence with respect to AIG is reflected in its approval of the Credit Agreement in September.  The Federal Reserve Board's invocation of its § 13(3) authority at that point denoted that it had found "unusual and exigent circumstances" as

that had negotiations been undertaken with the various counterparties to obtain better terms, those negotiations would have taken time.  Protracted negotiations were a particular risk to the extent that counterparties might have sought "most favored nation" status or otherwise declined to sign off on discounted terms before comparing them with the terms extended to other counterparties.

As to the "payment waterfall" that gave FRBNY a two-thirds stake in any residual profits from AIG's CDS interests, on the face of the Amended Complaint, that provision, too, was justified as an exercise of power incidental to the $24.3 billion rescue loan at the heart of ML III. FRBNY's stake in any residual CDS profits served to compensate it (and through it, the American public) for the risk they were running that the billions of dollars that FRBNY was loaning and had loaned to AIG might never be seen again.  As of ML III, FRBNY, on the basis of its lending power, had already extended $85 billion and then $37.8 billion to AIG, and it was now anteing up another $24.3 billion.  On the facts pled, FRBNY could reasonably view the payment waterfall provision as "convenient or useful in connection with the performance" of its emergency lending power on an unprecedented scale.  *Arnold Tours, Inc.*, 472 F.2d at 432; *see Indep. Ins. Agents of Am.*, 211 F.3d at 640 ("[T]he [incidental] 'powers of [] banks must be construed so as to permit the use of new ways of conducting the very old business of banking.'" (quoting *M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977))).

Further statutory justification for the "payment waterfall" comes from the requirement that the Federal Reserve adequately secure emergency loans, 12 U.S.C. § 343(A), which may be made only upon confirmation that a distressed entity is unable to procure private credit in the

---

to AIG and made a "judgment . . . [that] failure [of AIG] to obtain such credit would adversely affect the economy."  12 C.F.R. § 201.4(d).

market.  *Id.*[30]  Emergency credit must be offered only at a rate above the highest at which the

Federal Reserve extends credit to depository institutions.  12 C.F.R. § 201.4(d).  In November

2008, the Federal Reserve could reasonably have concluded that the ML III profit-sharing term

that Starr denounces as an "appropriate[ion]" of AIG's assets, Am. Compl. ¶ 82, was a fair

means to give FRBNY adequate security for its latest jumbo loan.  In effect, the "payment

waterfall" provision reflected the obvious downside risk of this latest extension of credit to

AIG—that FRBNY might never get its money back—and provided FRBNY, and the public, with

upside potential for its risk.  *See Corbin*, 475 F. Supp. at 1069 ("It is the public interest that the

Federal Reserve Bank must serve.").[31]

      In sum, putting to one side Starr's critiques of the ML III transaction as a matter of public

policy, the Amended Complaint, on its face, reveals a valid basis for that transaction under

FRBNY's § 13(3) and incidental powers.

      **3.  *The June 2009 20:1 reverse stock split***:  The June 2009 20:1 reverse stock split, as

pled by Starr, was intended as a means to carry out a central provision in the Credit Agreement

between AIG and FRBNY:  It enabled the Trust to receive the 79.9% of AIG's common stock to

---

[30] For example, in September 2008, in connection with the $85 billion credit facility extended to AIG in connection with the Credit Agreement, AIG broadly pledged "perfected liens on all personal property of the Borrower and each Guarantor, including, but not limited to, receivables, inventory, equipment, licenses, patents, brand names, trademarks, contracts, [and] securities." Kiernan Decl. Ex. 8.

[31] Additionally, the Court owes deference to the Federal Reserve's determination that its incidental powers include the ability to take a participatory interest in the AIG rescue.  *See Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256–57 (1995) (giving *Chevron* deference to determination by Office of the Comptroller of the Currency that national banks have discretionary power to sell annuities).

which it was contractually entitled.  *See* Am Compl. ¶¶ 120–125.[32]  Because the Credit

Agreement was itself explicitly undertaken pursuant to the § 13(3) emergency lending power,

FRBNY's actions to bring about the reverse stock split were, therefore, necessarily justified as

incidental—"convenient and useful"—to the performance of that power.

In a separate challenge to the legality of the stock split, Starr argues that FRBNY lacked

legal authority to hold stock in AIG.  Starr Br. 38 (citing *Cal. Nat'l Bank v. Kennedy*, 167 U.S.

362, 369 (1897)).  On this premise, Starr argues, FRBNY's actions to bring about the June 2009

reverse stock split (and the January 2011 share exchange) were outside its statutory power.  *Id.*

For a number of reasons, that argument is unavailing.

First, Starr misreads *Kennedy*.  There, the Supreme Court interpreted the NBA, the model

for the Federal Reserve Act.  *Kennedy* held that national banks could not engage in the

*speculative purchase* of stock.  But it absolutely did not hold that such banks were prohibited

from *holding* stock at all.  Quite the contrary:

> No express power to acquire the stock of another corporation is conferred upon a
> national bank, but *it has been held that, as incidental to the power to loan money
> on personal security, a bank may, in the usual course of doing such business,
> accept stock of another corporation as collateral*, and, by the enforcement of its
> rights as pledgee, it may become the owner of the collateral and be subject to
> liability as other stockholders . . . .  So, also, *a national bank may be conceded to
> possess the incidental power of accepting in good faith stock of another*

---

[32] To be sure, FRBNY represents that, although the effect of the 2009 stock split was to facilitate
the later conversion of the Series C shares into common stock, that was not its purpose.  Rather,
it states, the purposes of the split were to buoy the price of a share of AIG stock, so as to prevent
these shares from being delisted, and to soothe institutional investors' concerns about holding
shares of stock priced below $1.  FRBNY Br. 43.  Consistent with FRBNY's representation,
AIG's proxy statement issued before the June 2009 shareholder meeting states that "[t]he
primary purpose of the reverse stock split is to increase the per share trading price of AIG
Common Stock.  AIG believes a reverse stock split will increase the price of AIG Common
Stock, and thus allow a broader range of institutional investors to invest in AIG Common Stock.
. . and help ensure the continued listing of AIG Common Stock on the NYSE."  Kiernan Decl.
Ex. 6, at 10.

> *corporation as security for a previous indebtedness*.  It is clear, however, that a
> national bank does not possess the power to deal in stocks.

*Kennedy*, 167 U.S. at 366–67 (emphasis added); *see also First Nat'l Bank of Charlotte v. Nat'l

*Exch. Bank of Baltimore*, 92 U.S. 122, 128 (1875) ("[A] prohibition [on the Bank of the United

States, the template for the national bank system] against trading and dealing was nothing more

than a prohibition against engaging in the ordinary business of buying and selling for a profit,

and did not include purchases resulting from ordinary banking transactions.").

        Moreover, under the NBA, a bank's incidental powers "necessary to carry on the

business of banking," 12 U.S.C. § 24 (Seventh), have been defined expressly to include the

receipt of equity in the borrower as part of the consideration for a loan.  *See* 12 C.F.R. § 7.1006

("A national bank may take as consideration for a loan a share in the profit, income, or earnings

from a business enterprise of a borrower."); *see also* O.C.C. Inter. Ltr., 1992 OCC Ltr. LEXIS

95, at *5 (July 15, 1992) ("In general, the OCC has approved the use by national banks of

various forms of participatory financing . . . .  Essentially, this ruling recognizes the authority of

a national bank to take a share in the profit, income or earnings of a business enterprise as a full

or partial substitute for interest.  This aspect of a lending arrangement is sometimes referred to as

an 'equity kicker'. . . .").  There is no reason why the incidental power to take an "equity kicker"

under the NBA does not apply equally to the FRA.  And the June 2009 and January 2011 stock-

related actions that Starr protests both, as alleged, implemented the "equity kicker" in the Credit

Agreement.

        Third, even if Starr were correct that FRBNY cannot legally hold stock, it did not do so

here.  The Series C shares were held by the Trust, a separate entity, for the benefit of the United

States Treasury.  Am. Compl. ¶ 57.  Fourth, and finally, Starr's grievance as to this point is with

the Credit Agreement, which is what created the Trust's right to AIG stock. But any challenge to the Credit Agreement is time-barred, for the reasons addressed above.

**4.** ***The January 2011 share exchange***: Finally, Starr challenges the January 2011 exchange of the Series C shares. As pled, the share exchange was the final step taken to fulfill AIG's contractual obligation to furnish the Trust with common shares equating to 79.9% of AIG's common stock. *Id.* ¶¶ 128–133. FRBNY's actions to bring about the share exchange, like its actions to bring about the June 2009 reverse stock split, are fairly viewed as incidental— "convenient or useful"—to FRBNY's § 13(3) emergency lending power.

Thus, on the basis of the facts pled in the Amended Complaint, the actions which Starr challenges were each thus within FRBNY's statutory authority. Imposing liability for these lawful actions under state law would necessarily "frustrate the purposes of the federal scheme," and is thus in "'irreconcilable conflict' with federal law, and hence preempted by federal law." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008); *see also id.* at 351–52 ("[I]n order for conflict preemption to apply, the activity that is forbidden by state law need not be required by federal law; it is sufficient that the activity that state law prohibits is federally authorized."); *cf. Fid. Fed. Savs. & Loan Ass'n v. de La Cuesta*, 458 U.S. 141, 153–154 (1982).

### (b) The scope of preemption

Even if Starr were correct that some of FRBNY's actions towards AIG exceeded its statutory authority, that would not establish that state common law can properly be used to regulate or impose liability for such actions. Starr has not identified any case that limits the scope of preemption to the scope of a federal instrumentality's lawful operation, or that makes state law inherently available to police excesses of authority by federal actors.

The federal common law and preemption inquiries instead pose a different, functional question: Would applying the state law "frustrate specific objectives of the federal program," *Atherton*, 519 U.S. at 218 (quoting *Kimbell Foods*, 440 U.S. at 728), or tend to "'retard, impede, burden, or . . . control'" the federal instrumentality's functions? *Goodyear Atomic*, 486 U.S. at 187 (quoting *McCulloch*, 17 U.S. at 436). Those inquiries do not turn on whether the federal instrumentality has acted within the scope of its statutory power. Rather, they recognize more broadly that exposing federal instrumentalities to liability under state law may deter them from vigorously pursuing their important authorized activities. *See* additional discussion *infra* at 74–79.

The Court, accordingly, turns to examining whether holding FRBNY's conduct here to the standards of Delaware fiduciary duty law would tend to frustrate FRBNY's programmatic goals or "retard, impede, burden, or . . . control" its functions. *McCulloch*, 17 U.S. at 436. The answer to that question is, emphatically, yes. This damages action, in fact, supplies a textbook illustration of the need to preempt a conflicting state law in order to enable federal actors to perform their vital duties undeterred and undistracted.

Under federal law, FRBNY's duty with respect to its actions towards AIG was to serve the public interest. The Federal Reserve Board's purpose in exercising its emergency lending authority is to forestall economic hardship for the economy; it is to ensure that "the economy" is not "adversely affect[ed]." 12 C.F.R. § 201.4(d). Its purpose is not to advance the interests of the particular distressed financial institution (or its shareholders). For this reason, authority to lend to distressed entities in "unusual and exigent" circumstances exists only when the Board of Governors has determined that failure to extend credit would "adversely affect the economy." *Id.* That FRBNY's authority is aimed at addressing systemic, not parochial, concerns, also

follows from the implementing regulation which requires that "[e]mergency credit [] be extended [only] at a rate above the highest rate in effect for advances to depository institutions." *Id.* This point is also reinforced by the case law: "[L]oans made by the Federal Reserve are made for a public purpose, they are not intended to serve private interests." *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F. Supp. 1060, 1068 (S.D.N.Y. 1979), *aff'd*, 629 F.2d 233 (2d Cir. 1980).

As Judge Pollack put the point in *Corbin*, summarizing the mission of the Federal Reserve Board and its member banks:

> Reserve banks are operated for public service. . . . The Federal Reserve Act was enacted to give the country an elastic currency, to provide facilities for discounting commercial paper and to improve supervision of banking. *Its purposes do not include overriding of the public's interest by preferred or special or concerned treatment of holders of . . . stock of insolvent banks.* It has no obligation at the expense of the general taxpayer to subsidize money lenders to banks which become insolvent or their stock investors, or to supply term loans at below-market or noncommercial rates of interest. . . . Nor is it obliged to discount commercial paper at rates more favorable after insolvency than before insolvency of a member bank. *It is the public interest that the Federal Reserve Bank must serve*.

*Id.* at 1068–69 (emphasis added). And FRBNY's charge in deploying its powers to rescue AIG was quintessentially public: to "preserve the stability of the banking system, to minimize the losses to the public, and to reduce the possibility of grave national and international financial repercussions." *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 210, 217–19 (E.D.N.Y. 1979).

By contrast, the duties of a corporate fiduciary in Delaware are narrowly—even myopically—focused on the corporation and its shareholders. It is a "fundamental principle of Delaware law" that those persons in control of a corporation—as Starr alleges FRBNY was— "are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede & Co. v. Technicolor*, 634 A.2d 345, 360 (Del.

1993); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *overruled in part on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009); *In re Alloy, Inc.*, C.A. No. 5626-VCP, 2011 Del. Ch. LEXIS 159, at *22 (Del. Ch. Oct. 13, 2011).

In essence, then, if Starr were correct that FRBNY was subject to Delaware fiduciary duty law, then beginning in mid-September 2008, it wore two very different hats.  FRBNY was, under Delaware law, a fiduciary with an "unyielding duty" to act in the best interests of the shareholders of a corporation, AIG.  But, simultaneously, FRBNY retained its day job:  It remained, under the FRA, a custodian of the stability of the banking system of the United States. Accordingly, if Starr's allegations of control are assumed to be correct—including that, after the Credit Agreement, an on-site FRBNY team "controlled or influenced virtually every material business decision made by AIG," Am. Compl. ¶ 64, including negotiating with counterparties on AIG's behalf, *id*. ¶¶ 61, 65—then FRBNY's officials assigned to AIG necessarily had to bear in mind and heed, at the relevant times, these two very different missions.

These missions are fundamentally incompatible.  To be sure, as to many quotidian decisions at AIG, a custodian of the stability of the national banking system would presumably be agnostic.  And there are assuredly matters as to which advancing the best interests of AIG and its shareholders are in harmony with FRBNY's statutory charge of assuring the stability of the national economy.  But as to the actions by FRBNY towards AIG that Starr faults here, that is not so.  Starr's explicit theory, in fact, is that, each time, FRBNY, in violation of state law, elevated the national interest above those of AIG and its shareholders.  *See, e.g.*, Am. Compl. ¶ 79.

The choices made by FRBNY that Starr assails here each vividly illustrate the conflict between FRBNY's statutory mission and the duty of an AIG fiduciary to advance unyieldingly the interests of AIG and its shareholders.

Consider, first, the Maiden Lane III transaction.  Starr would impose liability on FRBNY for paying AIG's counterparties par value.  Starr alleges that, had FRBNY negotiated with the counterparties, AIG's obligations under the CDS contracts "could have been compromised for substantially less."  Am. Compl. ¶¶ 76, 79.  But while driving a hard bargain with the counterparties might have saved AIG and its shareholders money, FRBNY could reasonably conclude that its statutory mission of stabilizing the economy made speed and closure a top priority.  It could reasonably conclude that it was time for the cycle of collateral calls and mammoth rescue loans to end; that the stability of the U.S. economy required decisively terminating AIG's exposure to counterparties; and that paying par value—as opposed to opening up a bazaar of uncertain and maybe protracted negotiations with counterparties—was the best means to attain such closure.

Under these circumstances, subjecting FRBNY to civil liability under Delaware fiduciary duty law for failing to pursue below-par-value workouts with AIG's CDS counterparties would tend to "retard, impede, burden, or . . . control" FRBNY's discharge of its statutory duties, *McCulloch*, 17 U.S. at 436, and to "frustrate [FRBNY's] specific [statutory] objectives." *Atherton*, 519 U.S. at 218.  That is so even if the responsible FRBNY officials believed that forcing AIG to pay par value was within FRBNY's statutory authority, because such officials could not ignore the possibility that a court would later hold otherwise—and expose FRBNY to vast monetary damages.

[69]

To appreciate the drag that the prospect of such liability might put on FRBNY's pursuit of its statutory mission, one need only imagine the predicament confronting the hypothetical FRBNY officials ostensibly "controlling" AIG in late November 2008 were their actions in connection with AIG's rescue potentially subject to state fiduciary law: "To act or not to act? Is it better to act decisively, and pay par value, and thereby end the grave threat to the economy posed by AIG's continuing CDS exposure? Or is it better, at the risk of not helping the economy, to negotiate over price with these counterparties, and thereby avoid being found liable by a jury, years from now, for breach of Delaware fiduciary duty law?" It is to avoid distracting and detaining such federal officials—including the FRBNY personnel who in fall 2008 were the paradigmatic men and women "in the arena"[33]—from carrying out their vital official duties that the preemption doctrine covers federal instrumentalities. *See In re Franklin Nat'l Bank*, 478 F. Supp. at 222–23 ("The critical national and international ramifications of crises in the banking industry require that the initiative and imagination of the regulators not be stifled by the threat of tort actions against the United States. Congress' grant of broad discretionary powers to banking regulators acknowledges this necessity for creativity and innovation.").[34]

---

[33] Theodore Roosevelt, The Man in the Arena: Citizenship in a Republic, Address at the Sorbonne, Paris (April 23, 1910), *available at* http://www.theodoreroosevelt.org/research/speech%20arena.htm.

[34] Starr, revealingly, acknowledges that applying Delaware fiduciary law to the terms of AIG's CDS workout could create conflicting incentives for FRBNY officials. *See* Am. Compl. ¶ 79 ("[W]hile in light of the global credit crisis it might be understandable why FRBNY would want to assist the counterparties in dealing with their liquidity needs, no party who genuinely was focused on protecting the interests of AIG or its shareholders would have implemented this arrangement."). Whether or not FRBNY decisionmakers were motivated to prop up AIG's counterparties, Starr chooses not to acknowledge the obvious additional reason FRBNY would have had in November 2008 for wanting AIG to settle at par value: It was a surer route to ending AIG's CDS exposure and the risk that future cash collateral calls on AIG posed for the economy.

[70]

The same logic applies to the "payment waterfall" provision of the ML III transaction which Starr faults. Starr labels as "self-dealing" the provision giving FRBNY two-thirds of the profits (if any) from AIG's retained CDOs. Am. Compl. ¶ 82. But exposing FRBNY to liability for breach of fiduciary duty for installing that term—if later found to be outside FRBNY's statutory reach—would risk deterring FRBNY officials from advancing the *public* interest by insisting on a muscular security provision such as this. Were such liability possible, the hypothetical FRBNY employees arranging the ML III transaction might have had this conflicted thought process: "Isn't the public interest served—given the historic rescue loan to AIG we have already made and to which we are now adding, which may never be repaid, and which is so large as to cramp the federal government's ability to spend on other public needs—by putting a security provision in the ML III transaction that will enable the public to benefit in the event the ML III loan is fully repaid? Or, is it better to stand down, and give the public no potential upside for its sacrifice and risk, lest a jury in Delaware—or somewhere else—someday sock us with an astronomical verdict?" Exposing FRBNY to fiduciary duty liability for including this term in the November 2008 rescue lending package would, unavoidably, tend to burden FRBNY in discharging its duties.

Similarly preempted are Starr's challenges to the June 2009 20:1 reverse stock split and the January 2011 exchange of the Trust's Series C shares for AIG common stock. As pled, those two actions were means to implement the provision in the Credit Agreement that entitled the Trust to a 79.9% share of AIG's common stock. Starr, as noted, is time-barred from challenging that Credit Agreement provision, and so it must be treated as binding. Yet Starr would impose liability on FRBNY based on steps taken to enable AIG to comply with it. This Starr may not do, for it is well settled that state law must yield where it would disturb the balance of rights and

obligations under contracts, like the Credit Agreement, which involve the United States or its instrumentalities, implicate uniquely federal interests, and affect the public fisc. *See Boyle*, 487 U.S. at 504–06.

In holding that Delaware fiduciary duty law is preempted as applied to FRBNY's activities in the course of rescuing AIG, this case is not the first to hold state tort laws preempted in the face of the Federal Reserve's lending power. Notably, it does not appear that in any case such a challenge has been permitted to proceed. Indeed, some 80 years before the financial crisis, the Second Circuit stated that allowing tort challenges to FRBNY's exercise of its powers to extend or restrict credit "would make the courts, rather than the Federal Reserve Board, the supervisors of the Federal Reserve System, and would involve a cure worse than the malady." *Raichle*, 34 F.2d at 912; *see also Huntington Towers Ltd.*, 559 F.2d at 868–69 (affirming dismissal of tort claim, and claim of preferential transfer, against FRBNY arising out of emergency loan); *Billings Util. Co. v. Advisory Comm. Bd. of Governors*, 135 F.2d 108, 112 (8th Cir. 1943) (discretionary decision by Federal Reserve Bank not to make a particular loan is not reviewable in civil damages action); *cf. Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 45–46 (upholding dismissal of claims against FRBNY, based on state-law agency principles, on grounds that plaintiff's agency theory was inconsistent with federal law).

Judge Weinstein aptly put the point in dismissing a case in which a plaintiff faulted FRBNY for its acts and omissions in the course of trying to prevent a failing bank from damaging the economy:

> Officials of administrative agencies possess resources and expertise unavailable to courts. Their policy decisions rest upon delicate technical and political judgment of the risks and benefits of possible courses of action. It is highly unlikely that damage actions brought in the courts will consistently produce a more desirable balancing of the competing policy considerations.

*In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 210, 222 (E.D.N.Y. 1979) (noting

unavoidable tension between the public interest and the interests of a regulated bank and its

shareholders and creditors "as viewed by the responsible government officials").

      In opposing preemption, Starr relies on several cases in which state law was permitted to

apply to Federal Reserve Banks.  Each is inapposite.  In *Anderson National Bank v. Luckett*, 321

U.S. 233, 248 (1944), the Supreme Court noted that national banks "are subject to state laws,

unless those laws infringe the national banking laws or impose an undue burden on the

performance of the banks' functions."  But the Court applied that test to facts far afield from

those here:  It held that a state law treating as abandoned funds in long-inactive bank accounts

did not conflict with national banking laws.  *Id.* at 247, 252.

      Similarly, in *Federal Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 236–37 (1935), the

Court found that a federal land bank (not a federal reserve bank), was subject to attachment

under state law because Congress had granted limited immunity to such banks, including

immunity from taxation, while authorizing a broad array of lawsuits against them by providing

that the banks could be held liable "as fully as natural persons."  295 U.S. at 234–36.  The Court

reasoned that the "cumulative effect" of Congress's legislative statements "is persuasive that

federal land banks, like joint stock land banks, were intended to be subject to the incidents of

suit, including attachment and execution."  *Id.* at 236–37.  Starr does not identify any comparable

legislative statements here.  *See Fasano*, 457 F.3d at 288–299 (holding that state employment

remedies, to the extent they exceed those provided in federal statutes, *are* preempted).

      Starr, finally, relies on *James*, 471 F. Supp. 2d 226, which held that FRBNY, although a

federal instrumentality, was subject to suit under the New York State Human Rights Law

(NYSHRL).  The district court reasoned that because that law tracks and is consistent with Title

[73]

VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act—two federal laws to which FRBNY is subject—obliging FRBNY to comply with the NYSHRL did not impose an incremental functional burden on FRBNY.  471 F. Supp. 2d at 242–43.  Here, in contrast, there is no federal analog to Delaware fiduciary duty law to which FRBNY is already subject.  *Cf. In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. at 214–15 (declining to imply, from FRA and companion statutes, a duty of care on the part of bank regulatory agencies to banks and their shareholders).[35]

In rejecting Starr's suggestion that state causes of action should survive in situations where federal actors exceed their lawful powers, the Court, finally, notes that there is a substantial body of law (statutory and decisional) refuting that thesis.  In at least four distinct areas of doctrine, tort liability for governmental actors is narrowly limited or precluded altogether, in order to give such actors the latitude and discretion to do their jobs effectively, including when circumstances are pressing and there is limited time to act.  This body of law— which the Court considers for its persuasive force, not because it is controlling here—reinforces that Delaware fiduciary duty law has no rightful place in this case.

**1.  *The Discretionary Function Exception*:**  The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, subjects the United States to liability "in the same manner and to the same extent as a private individual under like circumstances."  But the FTCA contains a "discretionary function" exception.  It precludes governmental liability for:

---

[35] In a different argument, Starr relies on the statutory waiver of sovereign immunity for Federal Reserve Banks, codified at 12 U.S.C. § 341 (Fourth), which provides that such banks may "sue and be sued."  Starr notes that these laws are "to be liberally construed."  Starr Br. 27–28 (citing *FDIC v. Meyer*, 510 U.S. 471, 480 (1994), and *Loeffler v. Frank*, 486 U.S. 549, 556 (1988)).  But the "sue and be sued" waiver is not determinative, because FRBNY is not claiming *immunity* from suit.  Instead, it argues that a particular state law is preempted.  Neither *Meyer* nor *Loeffler* holds that 12 U.S.C. § 341 alters the applicable preemption analysis.

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680.  *See In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. at 219–20;

*Huntington Towers, Ltd.*, 559 F.2d at 870; *cf. Boyle*, 487 U.S. at 512–13.[36]

"The discretionary function exception is 'a form of retained sovereign immunity.  As a result, the [FTCA's] waiver of federal sovereign immunity does not encompass actions based upon the performance of, or failure to perform, discretionary functions.'"  *Reichhart v. United States*, 408 F. App'x 441, 443 (2d Cir. 2011) (summ. order) (quoting *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008)).  Retention of that immunity is designed "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citation omitted).  A prerequisite to such immunity is that "the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis."  *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000).  That description well fits the FRBNY's judgments as to how to fashion the terms of its serial rescues of AIG during fall 2008.  Those terms inherently reflect complex policy choices ill-suited to *post hoc* review under state tort law.  *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (preempting state tort claims which could "skew[]" the "delicate balance" of statutory objectives of the Food and Drug Administration).

---

[36] The FTCA does not apply here because Starr, at least in this Court, has not sued the United States as a defendant or asked that it be substituted for a defendant.

**2.  *The Westfall Act***:  The Westfall Act, 28 U.S.C. § 2679, provides officials acting within the scope of their duties with absolute immunity from civil lawsuits:

> The remedy against the United States provided by [the FTCA] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.  Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

28 U.S.C. § 2679.

"The doctrine of official immunity is designed to promote the effective administration of government affairs by ensuring that government officials are 'free to exercise their duties unembarrassed by the fear of damage suits.'"  *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 174 (2d Cir. 2006) (quoting *Barr v. Matteo*, 360 U.S. 564, 571 (1959) (plurality opinion)).  "[O]fficial immunity is not meant 'to protect an erring official, but to insulate the decision making process from the harassment of prospective litigation.'"  *Id.*, 444 F.3d at 174 (quoting *Westfall v. Erwin*, 484 U.S. 292, 295 (1988)).  "The doctrine rests on the premise that the threat of damage suits might 'appreciably inhibit the fearless, vigorous, and effective administration of policies of government.'"  *Id.*, 444 F.3d at 174 (quoting *Barr*, 360 U.S. at 571).[37]  As discussed, that premise also fairly applies to FRBNY's emergency rescue of AIG.  *See Barr*, 360 U.S. at 571–72 ("Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard

---

[37] The immunity provided by the Westfall Act may be invoked when the Attorney General or a designee certifies that the defendant is being sued for acts committed within the scope of his or her official duties.  *See* 28 U.S.C. § 2679(d).  Upon certification, the United States is substituted as a defendant, and the action proceeds under the auspices of the Federal Tort Claims Act.  *See Osborn v. Haley*, 549 U.S. 225, 229–30 (2007).

put to it to satisfy a jury of his good faith. . . . [B]etter to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their best to the constant dread of retaliation."); *cf. Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 73 (2d Cir. 1988); *Murray*, 444 F.3d at 174–175.

   **3.  *Tort law as Applied to Traditional Emergency Rescues by the United States***:  Courts have long recognized that "[t]ort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions" made in emergency "rescue" situations. *Blessing v. United States*, 447 F. Supp. 1160, 1170 (E.D. Pa. 1978).  The en banc Third Circuit memorably explained why in *P. Dougherty Co. v. United States*, 207 F.2d 626 (3d Cir. 1953), in which the owner of a barge sued the United States for damage caused to the barge during a rescue at sea by the Coast Guard.

   In *P. Dougherty Co.*, the barge, the Harford, had been cast adrift in heavy seas; the Coast Guard cutter Mohawk steamed to the scene, at the request of the ship towing the barge.  *Id.* at 628.  The Mohawk secured a line to the Harford, and began towing it to a harbor.  *Id.*  But, as the Mohawk approached the harbor's breakwater, the current pushed it and the Harford off course, causing the Harford to run aground on the breakwater.  *Id.* at 629.  The Mohawk cut the tow line and left the Harford to pound against the breakwater for approximately 45 minutes before additional help could come; the grounding severely damaged the Harford.  *Id.*  Dougherty, the Harford's owner, brought a negligence suit against the United States.  After the district court found in his favor, the Third Circuit reversed, on the broad ground that "public policy dictates that the United States should not be liable for fault of the Coast Guard in the field of rescue operations."  *Id.* at 634.

   The court reasoned:

There are two arrows in the quiver of this public policy.  The first may be directed to the inevitable consequence on the morale and effectiveness of the Coast Guard if the conduct of its officers and personnel in the field of rescue operations under the indescribable strains, hazards and crises which attend them, is to be scrutinized, weighed in delicate balance and adjudicated by Monday-morning judicial quarterbacks functioning in an atmosphere of serenity and deliberation far from the madding crowd of tensions, immediacy and compulsions which confront the doers and not the reviewers.

*Id.*  And, the court noted, if servicemen were held liable in tort:

[T]he instinct of self-preservation would inevitably function even under the pressures of life or death crises which so often arise in rescue operations when members of the Coast Guard are called upon to make decisions.  *If men are to be brought to an abrupt halt in the midst of crisis—to think first that if they err in their performance they may expose their Government to financial loss and themselves to disciplinary measures or loss of existing status, and then to pause and deliberate and weigh the chances of success or failure in alternate rescue procedures, the delay may often prove fatal to the distressed who urgently require their immediate aid.*

*Id.* (emphasis added).  Accordingly, the Third Circuit held, as a matter of federal common law, the actions of the Mohawk's crew during a harrowing rescue at sea were not reviewable in tort.  The Third Circuit's reasoning resonates decades later in the non-traditional (but equally urgent) rescue setting here, where FRBNY acted to prevent the national economy from going aground.  *P. Dougherty* underscores the need for legal rules that give government rescuers the latitude to act free of the fear of second-guessing by "Monday-morning judicial quarterbacks."  *Id.*

**4.  *Qualified Immunity for Emergency Responders***:  Finally, for much the same reasons, case law in the area of qualified immunity reflects an unwillingness to expose to tort law the decisions of government officials responding to emergencies.  Illustrative is *Estate of Rosenbaum by Plotkin v. City of New York*, 975 F. Supp. 206 (E.D.N.Y. 1997), in which plaintiffs brought federal damages claims against New York City, asserting that their due process rights had been violated by police misfeasance during a period of urban unrest, and racial and ethnic tension, in a neighborhood of Brooklyn.  The City's police department initially responded

with a deliberate strategy of not arresting protesters or people engaged in petty crimes, but, as violence worsened, took a more forceful approach, saturating the neighborhood with officers on horseback and motorcycle, keeping watch by helicopter, and making scores of arrests for unlawful assembly and disorderly conduct.  *Id.*  The violence abated.  Later, members of the Hasidic community, including the estate of the murder victim, sued the City for its initial passive response.

In granting the defendants summary judgment on the grounds of qualified immunity, Judge Block stated:

> An important policy behind qualified immunity is to prevent litigation which "will unduly inhibit officials in the discharge of their duties."  . . .  Second-guessing the decision of law enforcement officers regarding the choice of police personnel in a crisis would undermine that policy.  Lawsuits alleging that police should have acted one way or another in response to a [crisis] situation "pose[] a no-win situation for the police and do[] nothing to encourage law enforcement or a respect for constitutional rights."

*Id.* at 222 (quoting *Salas v. Carpenter*, 980 F.2d 299, 311 (5th Cir. 1992) (citation omitted)).  As Judge Block elaborated:  "An individual who confronts an emergency necessarily acts 'in agitation and with imperfect knowledge,'" and "the reason for his or her actions '[is] not the reason of the morrow.  It [is] reason fitted and proportioned to the time and the event.'"  *Id.* at 222 (quoting *Wagner v. Int'l Ry. Co.*, 232 N.Y. 176, 182 (1921) (Cardozo, J.)).  He added:

> As a civilized society, we rely upon government officials to act decisively in times of crisis, and we hope that the decisions they make effectively address the crisis.  We should not, however, impose upon them the penalty of civil liability every time a critical decision, made under emergent, stressful conditions, does not have the desired effect or results in unanticipated consequences.

*Id.*[38]

---

[38] To the extent the issue presented is analyzed as one of federal common law, this is not a case in which a federal common law rule can realistically be fashioned to accommodate the competing federal and state concerns.  That is because, as explained, a fiduciary duty to

[79]

### (c)  Starr's claim of "total immunity"

Starr, finally, argues that it is necessary to leave intact its fiduciary duty claims, because no remedy would otherwise exist to check actions by a Federal Reserve Bank that abuse or exceed its statutory authority, and FRBNY would be afforded "total immunity for all acts." Starr. Br. 28.  That is a substantial overstatement.  First, not all state laws are preempted as applied to Federal Reserve Banks.  The cases on which Starr relies (*e.g.*, *Anderson*, *Priddy*, and *James*) illustrate that point.

Second, even where state law is preempted, there may be federal remedies available for a Federal Reserve Bank's excesses.  Starr, in fact, has brought a companion lawsuit to this one, in the Court of Federal Claims, based on the same conduct alleged here.  That Court has *denied*, in large part, the United States's motion under Fed. R. Civ. P. 12(b)(6) to dismiss Starr's claim of an unconstitutional taking of property without just compensation.  *See Starr CFC Decision* at 55. Further, at argument here, FRBNY conceded that, on some hypothetical (albeit extreme) facts, the United States could be liable for damages caused by an unconstitutional taking committed by FRBNY.  Arg. Tr. 23, 25–26.[39]

---

unyieldingly advance AIG's interests is inherently incompatible with FRBNY's statutory duty in emergency rescue situations to protect the overall financial system and the public.  The Court is not at liberty to adopt a rule of federal common law compelling FRBNY to subordinate its statutory duties to the interest of the shareholders of a particular corporation.  *See Corbin*, 475 F. Supp. at 1068 ("[L]oans made by the Federal Reserve are made for a public purpose; they are not intended to serve private interests.").

[39] At argument, the Court asked FRBNY's counsel what remedy there would be for shareholders of AIG if, hypothetically, FRBNY, having attained control of AIG in the course of an emergency rescue, then forced AIG to purchase a photocopying machine from a bank in Utah for $1 billion, solely to stabilize the Utah bank in the interest of the banking system.  Arg. Tr. 25.  This hypothetical—an extreme extension of Starr's allegation that, in ML III, FRBNY forced AIG to overpay its counterparties in order to fortify them—was intended to test whether a shareholder would have some damages remedy in the event a Federal Reserve Bank grossly abused its duties after taking control of a bank.  FRBNY's counsel responded that a cause of action might lie then

In sum, both because Starr has not plausibly alleged FRBNY's control over AIG, and because there is no claim for breach of fiduciary duty available to Starr on the facts alleged, Starr fails to state a claim against FRBNY for breach of fiduciary duty. Counts I and III, alleging such a breach, are therefore dismissed.

## IV.      Analysis of Starr's Aiding and Abetting Claims

Counts II and IV of the Amended Complaint claim that FRBNY required, induced, or aided and abetted breaches of fiduciary duty by AIG's directors. Am. Compl. ¶¶ 149–52, 157–60. Under Delaware law, "[c]orporate directors have an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *In re Alloy, Inc.*, C.A. No. 5626-VCP, 2011 Del. Ch. LEXIS 159, at *22 (Del. Ch. Oct. 13, 2011). And:

> A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party knowingly participates in the breach. To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.

*Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citation omitted).

The breaches of duty that Starr asserts were committed by AIG's directors and aided by FRBNY are the same ones Starr asserted in its fiduciary duty claims aimed directly at FRBNY: They are based on (1) the ML III transaction; (2) the 20:1 reverse stock split; and (3) the Series C share exchange. The aiding and abetting claims must be dismissed, because, for the same

---

against the United States, under the Tucker Act, 28 U.S.C. § 1491. *Id.* at 26, 28. The Court's hypothetical, of course, contorts the ML III transaction as alleged by Starr in at least two major ways. First, in ML III, par value, not a sum vastly exceeding any plausible fair consideration, was allegedly paid to AIG's counterparties. Second, on the face of ML III, the transaction carried an arguable benefit to AIG, not merely the national economy and the counterparties: the certain and quick elimination of the risk of future cash collateral calls upon AIG. *Id.* at 25.

reasons addressed above, state law causes of action for aiding and abetting breaches of fiduciary duty are equally preempted as applied to FRBNY's actions towards AIG.

The goal of rescue lending is to "preserve the stability of the banking system, to minimize the losses to the public, and to reduce the possibility of grave national and international financial repercussions." *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. at 217–19. The threat that a Federal Reserve Bank would be held derivatively liable for corporate directors' alleged breaches of duty in accepting such aid could deter the bank from furnishing this aid, for the same reasons discussed in connection with Starr's claims of a direct breach of duty by FRBNY. The potential for vicarious or secondary liability for such a breach would stand as an obstacle to, and impede and burden, the implementation of federal policy by a federal instrumentality. *See McCulloch*, 17 U.S. at 436.

Accordingly, Counts II and IV, Starr's aiding and abetting claims against FRBNY, must be dismissed.[40]

## V.     Status of Starr's Constitutional Claims

As noted, the Amended Complaint asserted constitutional claims against FRBNY, based on the asserted violations of the Equal Protection, Due Process, and Takings Clauses. In moving to dismiss, FRBNY argued that the Court lacks subject matter jurisdiction over the takings claim, because such a claim against a federal instrumentality must be brought in the Court of Federal Claims. FRBNY also argues that this claim, and Starr's other two constitutional claims, are substantively deficient. *See* Dkt. 23 (devoting six pages to these points). In opposing the motion to dismiss, Starr did not defend its constitutional claims, except to withdraw its takings claim. *See* Dkt. 26.

---

[40] The preemption of these aiding and abetting claims as against FRBNY does not, of course, prevent Starr from bringing claims against AIG's directors themselves.

Starr's takings claims are therefore dismissed without prejudice as withdrawn.  Starr's remaining constitutional claims, brought under the Due Process and Equal Protection Clauses, are deemed abandoned and therefore dismissed with prejudice.  *See Uy v. Mount Sinai Hosp.*, No. 10 Civ. 5674, 2012 U.S. Dist. LEXIS 143308, at *20–21 (S.D.N.Y. Sept. 30, 2012) (Preska, C.J.); *Nguyen v. People's United Bank*, No. 10 Civ. 455, 2011 U.S. Dist. LEXIS 60476, at *12–13 (D. Conn. June 6, 2011) (Droney, J.); *Bonilla v. Smithfield Assocs. LLC*, No. 09 Civ. 1549, 2009 U.S. Dist. LEXIS 116233, at *11 (S.D.N.Y. Dec. 4, 2009) (Chin, J.); *Moccio v. Cornell Univ.*, No. 09 Civ. 3601, 2009 U.S. Dist. LEXIS 62052, at *12 (S.D.N.Y. July 20, 2009) (Lynch, J.); *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723–24 (S.D.N.Y. 2005); *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004).

Independently, on the merits, these two abandoned constitutional claims against FRBNY fail to state a claim.  As FRBNY observes, there is no private cause of action for damages arising from an alleged deprivation of these rights against either federal agencies, *see FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994), or private corporations acting under color of federal law, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69–72 (2001).  Accordingly, Starr cannot recover damages from FRBNY by claiming that FRBNY violated Starr's (or AIG's) rights under either the Due Process or Equal Protection clauses.  For that additional reason, these claims must be dismissed.

## VI.      FRBNY's Argument for Dismissal Based on Estoppel and Acquiescence

In its reply brief in support of dismissal, FRBNY made, for the first time, the argument that Starr is estopped from challenging any of the transactions in question (the Credit Agreement, Maiden Lane III, the June 2009 reverse stock split, and the January 2011 share exchange) under the doctrines of estoppel and acquiescence.  *See* FRBNY Rep. Br. 33–34.  Under these related doctrines:

> [O]ne who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction. The success of this defense hinges on the challenging party's knowledge. If the plaintiffs knew of the questionable behavior and did not previously challenge it, while simultaneously accepting a benefit from the now challenged behavior, then a Court will find that the plaintiffs acquiesced to the wrongdoing and will bar a claim against the alleged wrongdoer.

*Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1240 (Del. Ch. 2000); *see also Norberg v. Sec. Storage Co.*, C.A. No. 12885, 2000 Del. Ch. LEXIS 142, at *16–17 (Del. Ch. Sept. 19, 2000); *NTC Group, Inc. v. West Point-Pepperell, Inc.*, C.A. No. 10665, 1990 Del. Ch. LEXIS 151, at *14 (Del. Ch. Oct. 17, 1990) ("Acquiescence will clearly bar an action when a plaintiff has shown his approval of the challenged act by sharing in its benefits.").

Out of solicitude for Starr, whose brief on the motion to dismiss was submitted before FRBNY first articulated this argument, the Court declines to consider estoppel or acquiescence as an independent basis on which to dismiss Starr's fiduciary duty claims. *See, e.g.*, *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 359 (S.D.N.Y. 2007).

Nevertheless, the Court is constrained to note that, on an initial review, FRBNY's argument for dismissal on these grounds would appear, at a minimum, credible. As FRBNY presents the facts underlying its claim of acquiescence and estoppel: (1) in 2008, AIG accepted multiple rounds of negotiated emergency lending from FRBNY, including the $24.3 billion put at risk in the Maiden Lane III transaction; (2) Starr, a large shareholder of AIG, has long been aware of the terms of that transaction that it now alleges to be unlawful and confiscatory;[41] (3)

---

[41] The terms of the Credit Agreement and Maiden Lane III had been a matter of public record for at least 2 years before Starr filed this lawsuit. *See, e.g.*, Liam Pleven, *In Reversal of Fortune, AIG Recoups Collateral*, Wall Street J., Oct. 29, 2009, at C1 ("While AIG can't get any of the collateral back on the swaps that were canceled, it still could see some small upside on the deal. The investments held by Maiden Lane III increased in value in the second quarter. If they ultimately end up throwing off enough cash to pay off the loans that funded Maiden Lane III, the New York Fed will get two-thirds of any profits, and AIG will get one-third."); Serena Ng,

[84]

for years, AIG and Starr chose to refrain from challenging these transactions while "AIG and its

shareholders received enormous benefits from FRBNY's lending," because they did not want to

"run[] the risk that FRBNY might become unwilling to rescue AIG from bankruptcy"; and (4)

only in November 2011, with "the rescue ha[ving] succeeded" and the financial system and AIG

having stabilized, and with it now apparent that the CDOs that ML III purchased had appreciated

in value so as to yield a profit to the residual beneficiaries of the ML III transaction, has Starr

brought suit challenging the fairness and legality of that transaction.  *See* FRBNY Rep. Br. 34.

Had Starr's claims otherwise survived a motion to dismiss, the Court would have called for a

brief from Starr in response to this argument.

**VII.    FRBNY's Argument for Dismissal Based on Demand Futility**

FRBNY also moved to dismiss on the alternative ground that, to the extent Starr's claims

are derivative and not direct, Starr had not adequately pled that its failure to make a demand on

AIG's current board of directors was excused as futile.[42]

---

Carrick Mollenkamp and Michael Siconolfi, *AIG Faces $10 Billion in Losses on Bad Bets*, Wall
Street J., Dec. 10, 2008 at C1 ("As part of the revamped bailout package, the Fed and AIG
formed a new company, Maiden Lane III, to purchase CDOs with a principal value of $65 billion
on which AIG had written credit-default-swap protection . . . .  The plan has resulted in banks in
North America and Europe emerging as winners:  They have kept the collateral they previously
received from AIG and received the rest of the securities' value in the form of cash from Maiden
Lane III."); Monica Langley, Liam Pleven & Dennis K. Berman, *The Financial Crisis: AIG
Holders Seek Alternative to U.S. Plan*, Wall Street J., Sept. 22, 2008, at A3 ("Major shareholders
concerned about American International Group Inc.'s $85 billion loan agreement with the federal
government plan to meet Monday to discuss alternatives to the bailout plan, according to a
person familiar with the matter. . . . Shareholders who are dissatisfied with the deal are exploring
ways to quickly pay off the loan, which gave the federal government the right to take 80% of the
insurer.").

[42] At argument, the parties agreed that Starr's fiduciary duty claims based on the Maiden Lane III
transaction are derivative.  Arg. Tr. 13–14, 103.  Starr's claims based on the June 2009 and
January 2011 stock transactions, however, are plausibly viewed as direct, to the extent that
the legal basis for those claims is that AIG's common (but not preferred) shareholders were uniquely
injured by the circumvention of a purported promise to common shareholders that their vote on

FRBNY is correct that the Amended Complaint does not adequately plead demand futility.  It merely recites that conclusion, stating that Starr "inquired of AIG representatives whether AIG would institute proceedings against the Defendant . . . [and] [t]hose inquiries demonstrated that any demand on the AIG Board of Directors would be futile."  Am. Compl. ¶ 141.  Missing is any allegation tending to show that any outside director of AIG as of the filing of the Amended Complaint, let alone a majority, had an individual interest that would make him or her not disinterested with respect to a decision whether to sue FRBNY.  *See Rales v. Blasband*, 634 A.D. 2d 927, 933–934 & n.8 (Del. 1993); *see also In re Dow Chem. Co. Deriv. Litig.*, C.A. No. 4349-CC, 2010 Del. Ch. LEXIS 2, at *25 n.31 (Del. Ch. Jan. 11, 2010).

The Amended Complaint does allege that a majority of the current directors were elected by the Trust.  Am. Compl. ¶ 143.  However, for the reasons discussed earlier, Starr has failed to plead that the Trust is controlled by FRBNY.  *See supra* at 39–43.[43]  And, even if FRBNY's control of the Trust had been adequately pled, control sufficient to elect a company's directors does not, alone, suffice to raise a fair doubt about those directors' independence.  "[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election.  That is the usual way a person becomes a corporate director."  *Aronson*, 473 A.2d at 816; *see also In re Paxson Commc'n Corp. S'holders Litig.*, No. 17568, 2001 WL 812028, at *9 (Del. Ch. July 12, 2001) (shareholder's power to select all company directors and officers was insufficient to make demand futile).

---

whether to authorize additional common shares would resolve whether such shares would be made available to the Trust (as promised in the Credit Agreement).  However, for the reasons explained earlier, Starr has failed to adequately plead the existence of such a promise.  *See supra* at 38 n.18.

[43] Starr does not allege that there is any overlap between the trustees of the Trust and the present directors of AIG, and FRBNY represents that there is none.  Arg. Tr. 17.

Ordinarily, Starr's unexcused failure to make a demand would alone justify dismissing the Amended Complaint, with no need to address other grounds asserted for dismissal (*e.g.*, the substantive deficiency of the plaintiff's claims). That is because the demand requirement is a substantive obligation to be evaluated under the law of the plaintiff's state of incorporation, *see, e.g.*, *Kamen*, 500 U.S. at 92; *Halebian v. Berv*, 590 F.3d 195 (2d Cir. 2009), and Delaware law counsels that the right to bring a derivative action "does not come into existence until the plaintiff shareholder has made a demand on the corporation to institute such an action or until the shareholder has demonstrated that demand would be futile." *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

However, developments following argument in this case have persuaded the Court that dismissing this case on the basis of demand futility alone would likely not moot, but only defer, the question whether Starr's substantive allegations state a claim. At argument, the Court strongly encouraged AIG's Board at the August 2012 meeting at which it was to determine whether to join Starr's lawsuit in the Court of Federal Claims, to determine whether it would join this lawsuit as well. Instead, on August 20, 2012, AIG responded that Starr had now agreed to make a demand on AIG's Board, and that the Board expected to decide by the end of January 2013 whether to join Starr's lawsuit. Under these circumstances, dismissal on the basis of demand futility might prove an impermanent result, because either Starr might seek leave to re-amend to reflect the fact of its eleventh-hour demand, and/or AIG might adopt Starr's allegations as its own. FRBNY, for its part, has acknowledged that the Court has the latitude to dismiss on substantive grounds without reaching the question of demand futility. Arg. Tr. 9–13. Inasmuch as the Court has found Starr's substantive allegations deficient for the reasons addressed above,

[87]

the interests of judicial economy, and of giving the parties and AIG a durable outcome from this Court, counseled in favor of reaching the merits.[44]

---

[44] In the event that Starr continues to pursue this lawsuit (*i.e.*, that it appeals the dismissal of the Amended Complaint), the interests of judicial economy and expedition of this litigation would appear to be served by AIG's Board carrying through with its promise to decide, in January 2013, whether to adopt Starr's lawsuit as its own.  That is because, in the event of a reinstatement of Starr's claims on appeal, this Court would expect next to take up, in addition to FRBNY's unresolved argument based on estoppel and acquiescence, (1) whether AIG intends to pursue those claims as its own; and, if not (2) whether Starr's demand that it do so was wrongfully refused by AIG's Board.  Given the time which it appears it will take for AIG's Board to hear and decide whether to adopt Starr's claims, a decision by AIG's Board to avoid that question on the promised schedule could add many months to this litigation.

## CONCLUSION

For the foregoing reasons, FRBNY's motion to dismiss the Amended Complaint is granted in its entirety. All of Starr's claims are dismissed with prejudice, with the exception of Starr's takings claim, which was withdrawn, and which is therefore dismissed without prejudice. The Clerk of Court is directed to terminate the motion at docket number 21, and to close this case.[45]

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 19, 2012
       New York, New York

---

[45] The Court wishes to compliment counsel for all parties to the case. The quality of briefing and argument was extraordinary. It was of invaluable assistance to the Court in analyzing the complex and important issues presented.